ACCEPTED
06-15-00024-CV
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
11/4/2015 4:20:17 PM
DEBBIE AUTREY
CLERK

No. 06-15-00024-CV

===========================================================FILED IN=====

6th COURT OF APPEALS
TEXARKANA, TEXAS
11/4/2015 4:20:17 PM
DEBBIE AUTREY
Clerk

# IN THE SIXTH COURT OF APPEALS
# TEXARKANA, TEXAS

===========================================================

MONTY CLAY, ET AL.                                    APPELLANTS

V.

AIG AEROSPACE INSURANCE SERVICES, INC., ET AL.        APPELLEES

===========================================================

## BRIEF OF APPELLANTS

===========================================================

KEITH DOLLAHITE
M. KEITH DOLLAHITE, P.C.
5457 Donnybrook Avenue
Tyler, Texas 75703

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

| *Party* | *Attorneys* |
|---------|-------------|
| Appellants/Plaintiffs, Monty Clay, Individually, as Next Friend of Jacob Clay and Jonathan Clay, and as Executor of the Estate of Amy Clay; and Lynda Wilson | Mike Simpson<br>Alan Powers<br>Matt Meyer<br>Simpson Boyd Powers & Williamson<br>P.O. Box 685<br>Bridgeport, Texas 76426<br><br>Bryan Hughes<br>Law Office of D. Bryan Hughes<br>701 N. Pacific Ave.\| P.O. Box 450<br>Mineola, Texas 75773<br><br>Keith Dollahite<br>M. Keith Dollahite, P.C.<br>5457 Donnybrook Avenue<br>Tyler, Texas 75703 |
| Appellants/Plaintiffs, Brendan Phillips and Grace Phillips | Robert Waltman<br>Waltman & Grisham<br>2807 South Texas Avenue, Suite 201<br>Bryan, Texas 77802<br><br>Bryan Hughes<br>Law Office of D. Bryan Hughes<br>701 N. Pacific Ave.\| P.O. Box 450<br>Mineola, Texas 75773<br><br>Keith Dollahite<br>M. Keith Dollahite, P.C.<br>5457 Donnybrook Avenue<br>Tyler, Texas 75703 |

| Party | Attorneys |
|---|---|
| Appellants/Plaintiffs, Dale Phillips, Sr., Individually and as the Executor of the Estate of Dale Leighroy Phillips, Jr.; and Karen B. Phillips | William Angelley<br>Braden, Varner & Angelley, P.C.<br>703 McKinney Avenue, Suite 400<br>Dallas, Texas 75202<br><br>Bryan Hughes<br>Law Office of D. Bryan Hughes<br>701 N. Pacific Ave.\| P.O. Box 450<br>Mineola, Texas 75773<br><br>Keith Dollahite<br>M. Keith Dollahite, P.C.<br>5457 Donnybrook Avenue<br>Tyler, Texas 75703 |
| Appellees/Defendants, AIG Aerospace Insurance Services, Inc.; Chartis Aerospace Insurance Services, Inc.; Chartis Aerospace Adjustment Services, Inc. | Ross Cunningham<br>Don Swaim<br>Alex J. Whitman<br>Steven D. Sanfelippo<br>Cunningham Swaim, LLP<br>7557 Rambler Road, Suite 440<br>Dallas, Texas 75231 |

# TABLE OF CONTENTS

Identity of Parties and Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Index of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

Issues Presented.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1.    Amy Clay, a devoted wife and mother, worked for Scooter Phillips.. . . . . . 1

2.    Scooter Phillips was a successful physical therapist and experienced pilot.. 1

3.    Scooter Phillips replaced the engine in his airplane.. . . . . . . . . . . . . . . . . . 2

4.    Amy Clay and Scooter Phillips began a flight in his plane from Abilene to Oklahoma City. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

5.    Six years earlier, the same engine was in an airplane destroyed by a hurricane . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

6.    AIG insured the airplane and declared it a total loss. . . . . . . . . . . . . . . . . . 9

7.    AIG advertised the aircraft and its engine for sale to the public on AIG's aviation website.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

8.    AIG sold the aircraft and engine to Robert Ruhe.. . . . . . . . . . . . . . . . . . . 13

9.    The Ruhe family kept the engine in a box until August 2011, when Eric Ruhe sold the engine to Air-Tec.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

10.   Air-Tec received the engine and clean logbook from Eric Ruhe.. . . . . . . . 15

11.   Air-Tec sold the engine to Scooter Phillips. . . . . . . . . . . . . . . . . . . . . . . 18

12.  The families of Amy Clay and Scooter Phillips sued AIG.. . . . . . . . . . . . 18

13.  The jury answered two questions in favor of AIG and did not answer the ten remaining, conditionally submitted questions. . . . . . . . . . . . . . . . . . . . . . . . 19

14.  The trial court entered a take-nothing judgment. . . . . . . . . . . . . . . . . . . . . 20

Summary of the Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

I.  The Court should grant a new trial because the jury's refusal to find that AIG was in the "business of selling aircraft engines and vacuum pumps" is clearly wrong.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    A.  The standard of review for factual insufficiency is well-settled. . . . 23

    B.  The legal standards for a defendant engaging in the business of selling a product are also well-settled. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    C.  The jury erred in refusing to find AIG was in the business of selling aircraft engines and vacuum pumps. . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    D.  The error was harmful because the record contains evidence of AIG's products liability and the damages resulting from the deaths of Amy Clay and Scooter Phillips. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    E.  This error alone requires a reversal and remand of the entire case for the claims of the family of Amy Clay.. . . . . . . . . . . . . . . . . . . . . . . . . . 42

    F.  This error alone also requires a reversal and remand of the entire case for the claims of the family of Scooter Phillips. . . . . . . . . . . . . . . . . 44

    G.  Conclusion: the Court should reverse and remand the entire case for a new trial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

II.     Alternatively, the Court should grant a new trial because the jury's negligence findings are clearly wrong.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

    A.    The jury's refusal to find that AIG was negligent is clearly wrong.. 46

    B.    The jury's finding that Scooter Phillips was negligent is also clearly wrong. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

III.    Alternatively, the Court should grant a new trial because of the trial judge's harmful comments on the evidence about AIG's expert.. . . . . . . . . . . . . . 51

    A.    The judge bolstered the credibility of AIG's main expert. . . . . . . . . 51

    B.    The judge's error was harmful. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

IV.     Alternatively, the Court should grant a new trial because the trial court erred in not instructing the jury about the "as is" clause.. . . . . . . . . . . . . . . . . . . 55

    A.    An "as is" clause in the seller's contract with its buyer does not immunize the seller from products liability to a downstream consumer or user. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

    B.    The trial court erred in not instructing the jury about the "as is" clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Prayer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Appendix

1.    Final Judgment and Charge of the Court
2.    Photographs of Amy Clay and her Family
3.    Photographs of Scooter Phillips and his Family
4.    Transcript of Flight Radio Transmissions
5.    Diagrams of Flight Path and Events
6.    FAA Airplane Flying Handbook Excerpt
7.    FAA Spatial Disorientation Publication
8.    Photographs of Airplane Wreckage
9.    Photographs of Airplane Damaged in Hurricane
10.   AIG's Advertisement and Bid Form
11.   Example of Insurance Company Logbook Entry
12.   AIG's Sales Report and Summary

# INDEX OF AUTHORITIES

## Cases

*Armstrong Rubber Co. v. Urquidez*, 570 S.W.2d 374 (Tex. 1978). . . . . . . . . . . . 25

*Blanton v. E. & L. Transp. Co.*, 207 S.W.2d 368 (Tex. 1948) .. . . . . . . . . . . . 42, 43

*Champion v. Robinson*, 392 S.W.3d 118 (Tex. App. – Texarkana 2012, writ ref'd n.r.e.) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50-51

*City of Irving v. Seppy*, 301 S.W.3d 435 (Tex. App. – Dallas 2009, no pet.). . . . 58

*Connecticut Gen. Life Ins. Co. v. Moore*, 75 S.W.2d 329 (Tex. Civ. App. – Beaumont 1934, writ dis'd) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*French v. Gill*, 252 S.W.3d 748 (Tex. App. – Texarkana 2008, pet. denied). . . . 28

*Fresh Coat, Inc. v. K-2, Inc.*, 318 S.W.3d 893 (Tex. 2010) .. . . . . . . . . . . . . . . . 24

*Gen. Motors Corp. v. Hudiburg Chevrolet, Inc.*, 199 S.W.3d 249 (Tex. 2006).. . 30

*Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400 (Tex. 1981). . . . . . . . . . . . . 32

*Hovenden v. Tenbush*, 529 S.W.2d 302 (Tex. Civ. App. – San Antonio 1975, no writ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*MAN Engines & Components, Inc. v. Shows*, 434 S.W.3d 132 (Tex. 2014). . . . . 24

*McClung v. Ayers*, 352 S.W.3d 723 (Tex. App. – Texarkana 2011, no pet.).. . .  23, 30, 46

*McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787 (Tex. 1967) .. . . . . . . . . . . 44, 55

*McLain v. Hodge*, 474 S.W.2d 772 (Tex. Civ. App. – Waco 1971, writ ref'd n.r.e.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Mid Continent Aircraft Corp. v. Curry County Spraying Service, Inc.*, 553 S.W.2d 935 (Tex. Civ. App. – Amarillo 1977), *rev'd on other grounds*, 572 S.W.2d 308 (Tex. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 56-57

*Otis Elevator Co. v. Bedre*, 776 S.W.2d 152 (Tex. 1989). . . . . . . . . . . . . . . . . . 45

*Parsons v. Ford Motor Co.*, 85 S.W.3d 323 (Tex. App. – Austin 2002, pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Sanchez v. Texas Employers Ins. Ass'n*, 618 S.W.2d 837 (Tex. Civ. App. – Amarillo 1981, writ ref'd n.r.e.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42-43, 45

*SSP Partners v. Gladstrong Investments (USA) Corp.*, 275 S.W.3d 444 (Tex. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Strauss v. LaMark*, 366 S.W.2d 555 (Tex. 1963). . . . . . . . . . . . . . . . . . . . . . 43, 45

*Thompson v. Janes*, 227 S.W.2d 330 (Tex. Civ. App. –Austin 1950, no writ). 53-54

Statutes

TEX. BUS. & COM. CODE § 2.316. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

TEX. CIV. PRAC. & REM. CODE § 33.001. .. . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

TEX. CIV. PRAC. & REM. CODE § 82.001, *et seq*. . . . . . . . . . . . . . . . . . . . . 19, *et seq*.

Rules

TEX. R. APP. P. 9.4(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

TEX. R. APP. P. 44.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 60

Tex. R. Evid. 201(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Other

4 MCDONALD & CARLSON, TEXAS CIVIL PRACTICE § 22:58 (2d. ed. 2015). . . . 43, 53, 54

*FAA Airplane Flying Handbook* at pg. 3-5 (Appendix 6). . . . . . . . . . . . . . . . . . . . . 5

*FAA Medical Facts for Pilots* at pg. 2 (Appendix 7). . . . . . . . . . . . . . . . . . . . . . . 5-6

RESTATEMENT (SECOND) OF TORTS § 402A (1965). . . . . . . . . . . . . . . . . . 25, *et seq.*

RESTATEMENT (THIRD) OF TORTS: PRODUCT LIABILITY (1998). . . . . . . . . . . . 24, 31

TEXAS PATTERN JURY CHARGES CH. 70 (2012). . . . . . . . . . . . . . . . . . . . . . . . 23, 32

## STATEMENT OF THE CASE

| | |
|---|---|
| *Nature of the Case* | Wrongful death and survival action resulting from an airplane crash that killed the pilot and his passenger. |
| *Course of the Proceedings* | Five-day jury trial ending with a verdict (2 CR 1162; Appendix 1 at pg. 4). |
| *Trial Court* | Honorable G. Timothy Boswell<br>402nd District Court, Wood County, Texas |
| *Trial Court's Disposition* | Take-nothing judgment (2 CR 1159; Appendix 1 at pg. 1). |

## ISSUES PRESENTED

1. The Court should grant a new trial because the jury's refusal to find that AIG was in the "business of selling aircraft engines and vacuum pumps" is clearly wrong.

2. Alternatively, the Court should grant a new trial because the jury's negligence findings are clearly wrong.

3. Alternatively, the Court should grant a new trial because of the trial judge's harmful comments on the evidence about AIG's expert.

4. Alternatively, the Court should grant a new trial because the trial court erred in not instructing the jury about the "as is" clause.

x

**STATEMENT OF FACTS**

1.      <u>Amy Clay, a devoted wife and mother, worked for Scooter Phillips.</u>

Amy Clay, age 31, was a devoted wife and mother of two sons, ages 8 and 7 (4 RR 233-235, 239-240, 247-265). Amy and her husband were high school sweethearts who later reconnected and married (4 RR 242-246). Amy was very close to her mother, who is a widow and lived nearby (4 RR 231, 238-239). Appendix 2 contains photos of Amy and her family (PX-7). Amy worked as the office administrator for Scooter Phillips's pediatric physical therapy clinic in Abilene. She loved working with children with disabilities (4 RR 235-236). She also worked as the executive assistant for Scooter Phillips (4 RR 211-212, 237, 261-262).

2.      <u>Scooter Phillips was a successful physical therapist and experienced pilot.</u>

Dale "Scooter" Phillips, age 48, was a dynamic, energetic businessman. He was actively involved in the lives of his son, age 19, and his daughter, age 15 (4 RR 197-199, 205-206, 221-226). He was also very close to his mother and father (4 RR 207-210, 219-222). Appendix 3 contains photographs of Scooter and his family (PX- 8).

Scooter grew up in a small town near Oklahoma City. During college at Abilene Christian University, he walked-on to the football team, became the starting wide receiver, and graduated with a degree in biology (4 RR 200-203). He then went to the University of Texas Health Sciences Center in Dallas, where he became a

1

physical therapist. After working for others in the field, he started his own successful physical therapy clinics in Abilene (4 RR 203-205).

Scooter also became an avid and experienced pilot (PX-19; 4 RR 206-207). He had more than 500 hours of total flight time (3 RR 138). Scooter's father owned an insurance company in Oklahoma City, which Scooter planned to take over when his father retired and went into the mission field (4 RR 209). Scooter was a director of the insurance company and often flew his private plane, a Piper PA-24-250, from Abilene to Oklahoma City to attend business meetings at his father's company (4 RR 201, 209-210, 212, 220). Amy Clay often flew with him to the meetings in Oklahoma City (4 RR 211-212, 237, 261-262).

3.      Scooter Phillips replaced the engine in his airplane.

In October 2011, Scooter Phillips saw an ad in a magazine for an engine he could use to replace the existing one in his plane. In response to the ad, he contacted the seller, Air-Tec, Inc., about the engine, and asked if the logbook for the engine was complete (PX-43; 4 RR 90). Under federal regulations, to be used in an airplane, an engine must have an accompanying logbook that details the history of the engine. The engine logbook is the document that moves with the engine through the stream of commerce (3 RR 103). The logbook is considered the "Bible of the engine" in the aviation industry (4 RR 95).

2

The seller told Scooter the complete logbook was with the engine and answered Scooter's questions about the engine (PX-43; 4 RR 90). The engine logbook did not indicate the engine had ever been damaged in any way or involved in any accident. Upon visual inspection, the engine "looked perfect" (4 RR 95-96).

Scooter purchased the engine and logbook for $10,178.00 (4 RR 94). He then had an FAA certified mechanic review the logbook, inspect and service the engine, and install the engine in his airplane. On December 15, 2011, the mechanic noted his work on the engine in its logbook. He installed new gaskets and hoses, flushed and replaced the oil and coolant, and installed new engine mounts. He ran the engine, checked the engine compression, and checked for oil leaks. He noted the number of hours that had elapsed between the last major overhaul of the engine recorded in the logbook and his installation of the engine in Scooter's plane. Everything about the engine checked out and the mechanic indicated in the logbook that the plane was "okay to return to service" (PX-24; 3 RR 188). There was nothing in the engine logbook to indicate that the mechanic needed to tear down or further inspect the engine before placing it into service (3 RR 189).

4. **Amy Clay and Scooter Phillips began a flight in his plane from Abilene to Oklahoma City.**

At 7:21 pm on the night of February 21, 2012, Amy and Scooter took off from the airport in Abilene to fly to Oklahoma City for a meeting at his father's company (2 RR 213-214, 221). Appendix 4 is a transcript of the radio transmissions between Scooter and the control tower (PX-1). Appendix 5 is a reconstruction of their flight path with information about the sequence of events (PX-1).

The control tower cleared Scooter at takeoff to fly "VFR" or under visual flight rules (2 RR 226). About 13 minutes after takeoff, Scooter called the control tower, said he needed to turn around, and said "we've lost our suction and our attitude indicator." At that point they were 8,100 feet above the ground (PX 1; 2 RR 223). It is undisputed that the vacuum pump on the engine – which powered the attitude indicator instrument – failed during their flight (2 RR 118-119; 5 RR 175). The vacuum pump was a component of the engine that the certified mechanic installed in Scooter's plane in December 2011 (2 RR 122-123).

It is well known in the aviation industry that the failure of a vacuum pump during flight and the resulting loss of the attitude indicator instrument can lead to spatial disorientation of the pilot and loss of control of the aircraft (5 RR 87-88). A pilot like Scooter who is flying "VFR" (under visual flight rules) maintains his

4

orientation by monitoring visual cues (looking out the windows to see the horizon) and also the attitude indicator instrument in the cockpit (which shows the position of the aircraft in relation to the horizon) (3 RR 225-226). The attitude indicator shows "the position of the nose relative to the horizon and will indicate whether [it] is necessary to change the pitch attitude to return to level flight." *FAA Airplane Flying Handbook* at pg. 3-5 (Appendix 6).[1]

When visual cues are telling the pilot one thing, and his attitude indicator is telling him something else or not functioning, the pilot can easily experience spatial disorientation (3 RR 154-156, 220-221, 227-228). "Spatial orientation in flight is difficult to achieve because numerous sensory stimuli (visual, vestibular, and proprioceptive) vary in magnitude, direction, and frequency. Any differences or discrepancies between visual, vestibular, and proprioceptive sensory inputs result in a sensory mismatch that can produce illusions and lead to spatial disorientation." *FAA Medical Facts for Pilots* at pg. 2 (Appendix 7).[2] Because a "sensory mismatch" between what a pilot is seeing and feeling can cause spatial disorientation, the FAA

---

[1] The Court is requested to take judicial notice of this publication pursuant to Tex. R. Evid. 201(d). The publication is also available at https://www.faa.gov/regulations_policies/handbooks_ manuals/aircraft/airplane_handbook/.

[2] The Court is requested to take judicial notice of this publication pursuant to Tex. R. Evid. 201(d). The publication is also available at http://www.faa.gov/pilots/safety/pilotsafetybrochures /media/spatiald.pdf

recommends that "[w]hen flying at night or in reduced visibility, use the flight instruments," and "[i]f you experience a vestibular illusion during flight, trust your instruments and disregard your sensory perceptions." *Id.* at pg. 8.

About 13 minutes into their night flight, Scooter Phillips told the control tower "we've lost our suction and our attitude indicator," so he could not use that critical instrument to keep his plane level. About 25 seconds later, Scooter told the controller he was going to try to turn around. At that moment, Amy and Scooter were still about 8,000 feet above the ground (PX-1; 2 RR 223-224). Around a minute later, the controller asked Scooter if he was flying VFR. Scooter responded "affirmative we are VFR but we are having trouble." Those were Scooter's last words to the controller. The controller then gave Scooter clearance to fly back to Abilene under visual flight rules. At that point, Amy and Scooter were about 3,700 feet above the ground (PX-1; 2 RR 226-227).

The controller told Scooter the closest airport was Albany, five miles to his southeast, and noted that "you're altitude appears to be going up and down pretty erratically ... you've lost a thousand feet in the last six seconds." This means Amy and Scooter were dropping to the ground at 6,000 feet per minute. A normal rate of descent is 500 feet per minute. Scooter's radio was then keyed open. The sound of a woman screaming can be heard in the background on the audio recording of the radio

6

transmission. About 24 seconds later, their plane crashed into the ground, killing Amy and Scooter (PX-1; 2 RR 227-230).

AIG's expert testified that a "graveyard spiral" occurs when a pilot does not have a visible horizon, cannot tell the attitude of the aircraft by looking outside, and gets disoriented. The disorientation causes the pilot to mistakenly turn the plane in the wrong direction, which causes the plane to spiral downward rapidly. He agreed that during the downward spiral, the cabin is a terrifying, thunderous cave of noise, with any loose objects bouncing around inside the cabin, until the plane smashes into the ground (5 RR 175-177). Amy and Scooter's violent, rapid descent tore the right wing off the plane; the wing landed about a half mile from the crash site. Their remains were found the next day at the crash site, 34 miles from the Abilene airport (2 RR 219, 221, 232-233). Appendix 8 contains photographs of the wreckage.

Amy and Scooter suffered horrific deaths because the logbook Scooter received when he bought the engine did not contain vital information about the engine that would have saved their lives, information that several years before, AIG intentionally omitted from the same logbook when AIG sold the engine and its logbook back into the stream of commerce.

**5.** Six years earlier, the same engine was in an airplane destroyed by a hurricane.

Six years before Scooter Phillips purchased the engine for his plane, the same engine was in another airplane in Florida (PX-501; 2 RR 122-123). The engine was in a Piper PA-32-260 airplane owned by Don Gregoire of Coral Springs, Florida (PX-1; 4 RR 171). Gregoire put more than 200 flight hours on the plane, which always flew well. He properly maintained the plane and its engine and had both inspected regularly (4 RR 173-174). He never had any mechanical problems with the engine or its vacuum pump (4 RR 180).

In October 2005, Don Gregoire had his plane stored outside, tethered to the ground with ropes, at Pompano Airpark near Fort Lauderdale, about a mile from the ocean (4 RR 174, 178). On October 24, 2005, Hurricane Wilma struck the Pompano Airpark and other parts of Florida. Wilma was a very strong Category 2 or a weak Category 3 hurricane when it struck land (2 RR 243). Don Gregoire testified the hurricane "destroyed" his plane. The wind broke the steel hooks for the ropes securing his plane to the ground and flipped his plane. He found his plane upside down with damages to "just about everything," which left it "well beyond repair" (4 RR 174-175). The propeller was damaged and Gregoire believed the engine "would need a complete overhaul" (4 RR 179).

8

Appendix 9 contains photographs showing the condition of the upside-down plane after the hurricane (DX-64; PX-61 to 64, 289 to 291). Photographs show that the propeller – while attached to the engine – struck the ground or another object with enough force to bend the propeller at a ninety-degree angle (PX-289; DX-64). The severely damaged airplane remained upside down at the airpark and exposed to the elements for about three weeks (4 RR 176, 178). From 4 to 5 inches of rain fell on the plane while it was upside-down (2 RR 245-247; 4 RR 178).

6. AIG insured the airplane and declared it a total loss.

AIG Aerospace Insurance Services, Inc.[3] insured Don Gregoire's airplane and he submitted a claim for the hurricane damages to AIG (DX-64; PX-38, 265, 273). In response to his claim, AIG's adjuster informed him that "[i]f the aircraft is a total loss we will need to retrieve the aircraft logbooks to conclude the claim" (DX-64; PX-265). As required by federal regulations, Gregoire had separate logbooks for the engine, airframe, and propeller. The engine logbook recorded the history of the engine, including its maintenance and inspections, and accompanied the engine from its original date of manufacture through each transfer of ownership (PX-22).

AIG's adjuster handled the claim from his office in Arizona, looked at photos of the damaged plane, and declared the plane a total loss (2 RR 68-69, 102; 4 RR

_____

[3] The entity was named "AIG Aviation, Inc." at the time in question (1 CR 178).

9

102). AIG's policy limit was $100,000.00, minus a $100.00 deductible (DX-64; PX-267). AIG paid the policy limit of $99,900.00 and required the following items from Gregoire: a signed bill of sale for the aircraft with the identity of the buyer left blank, the aircraft's registration document, the airworthiness certificate, the keys, the engine logbook, the airframe logbook, and the propeller logbook (2 RR 69-70; PX-283; DX-64, AIG000049). AIG required a blank bill of sale because it did not want to be named the owner of the aircraft with the FAA (2 RR 130-131). Gregoire delivered the logbooks and other items to AIG (2 RR 102-103; DX-64, AIG000025). AIG took possession of the destroyed aircraft and placed it in storage, where it remained under AIG's sole control (DX-64, AIG000024; 2 RR 76; 4 RR 104). Under the insurance policy, upon paying Gregoire, AIG owned the aircraft (4 RR 102).

7. <u>AIG advertised the aircraft and its engine for sale to the public on AIG's aviation website.</u>

AIG's adjuster made the decision as to whether AIG would sell the damaged airplane for scrap (thereby preventing any part of it from being used in aviation) or sell it on AIG's aviation website[4] (thereby recycling component parts back into the stream of aviation commerce). The adjuster testified that AIG's only criterion for that decision was whether AIG could make more money by placing the damaged aircraft

---

[4] http://www.aigaviation.com/aviationsalvage/SalvageList.aspx

10

and its components back into the stream of commerce through selling them on its website. Public safety was not a consideration to AIG (2 RR 70, 78-80). The adjuster testified that his orders were to re-sell every total loss aircraft and it components unless the aircraft was destroyed by fire so only ashes remained or the aircraft was missing at sea (2 RR 71). During the three years before it acquired the damaged aircraft from Don Gregoire, AIG had sold 1,140 aircraft or aircraft parts on its website and received in return more than $17.7 million from such sales (PX-311, 2 RR 8-9; Appendix 12).

The engine logbook recorded the date of the last major overhaul of the engine (PX-22). AIG knew the engine logbook on its face indicated the engine would have at least another 1,000 hours of useful life before it would need a major overhaul. AIG's internal valuation worksheet stated the engine was to be overhauled every 2000 hours ("TBO hours: 2000")[5] and that the logbook indicated the engine had been operated for about 1000 hours since its last major overhaul ("Eng Hrs SMOH: 1000")[6] (DX-64, AIG000031). Thus, AIG understood that taken at face-value, the logbook indicated the engine was valuable because it did not contain any reference to the hurricane damage (PX-22).

---

[5] "TBO" means "time between overhaul." http://www.acronymfinder.com.

[6] "SMOH" means "since major overhaul." http://www.acronymfinder.com.

11

Pursuant to AIG's standard procedure, the adjuster posted an advertisement and bid form on AIG's website, along with photographs of the aircraft (2 RR 71-73, 103; 4 RR 102, 107; DX-64, AIG000020-21; Appendix 10). AIG advertised on its website for sale to the public a specific engine (identifying its manufacturer, model, serial number, and hours of use), a specific airframe (identifying its manufacturer, model, serial number, and hours of use), a specific aircraft (identifying its manufacturer, model, and serial number), and the specific instruments on the aircraft (identifying their manufacturers and models) (DX-13, Appendix 10). AIG's advertisement and bid form stated "[h]urricane loss, aircraft flipped over;" described the damages as "[b]oth wings, all control surfaces, tail section, prop, fuselage, cowling;" and explained how to submit a bid. At the bottom, the document also said: "You are advised that the described aircraft is for sale 'AS IS/WHERE IS'..." (DX-13).

AIG's advertisement and bid form did not state there was any damage to the engine (DX-13). The adjuster knew that if AIG disclosed damage to the engine, AIG would get less money (2 RR 80). The adjuster knew that when there is a prop strike like this, "you're going to have some kind of engine damage" (2 RR 74). AIG knew about an FAA directive that said when there is a prop strike, a mechanic should determine if the strike damaged the engine (4 RR 107-108). AIG did not have a mechanic inspect the engine (2 RR 80; 4 RR 110-111,120-121).

12

8.    <u>AIG sold the aircraft and engine to Robert Ruhe.</u>

Robert Ruhe submitted a bid to AIG to purchase the aircraft, including its engine, for $28,400.00 (DX-13). AIG accepted his bid and sold the aircraft to Ruhe for $28,400.00 (2 RR 103-105; DX-64, AIG000010). On December 14, 2005, AIG released the aircraft to Ruhe and sent him the logbooks, airworthiness certificate, and blank bill of sale (2 RR 127-128; DX-64, AIG000011).

When other insurance companies sell aircraft and their components in this situation, they record in the logbooks that the aircraft was involved in an accident and was deemed a total loss, and provide the claim number, name, and address of the insurance company (2 RR 142-143; 3 RR 116, 178-182). Appendix 11 is an example of this type of logbook entry by an insurance company (PX-9).  In order for an engine to be used in aviation, FAA regulations require that the engine have a logbook. As a result, the engine logbook always accompanies the engine through the stream of commerce from one owner to the next (3 RR 108). By recording the fact that an aircraft was involved in an accident and was deemed a total loss in the engine logbook, an insurance company selling aircraft can easily ensure that a downstream owner of the engine like Scooter Phillips has vital, life-saving information about the history of the engine (3 RR 118).

13

AIG's corporate representative agreed that "[t]here's no history to the aircraft if you don't put it in the logbooks" (2 RR 159). He agreed that without an entry about the damage to the aircraft in the logbook, a reader would not know from the logbook whether the aircraft was damaged at all (2 RR 158-159). It was AIG's policy, however, not to disclose in the logbooks the fact that the aircraft was damaged in an accident when AIG sold the aircraft and its engine and delivered their logbooks to the buyer. AIG provides "clean" logbooks to the buyer, which do not disclose in any way any damages to the engine, airframe, or propeller (2 RR 82, 103, 134; 4 RR 108-109). It would have taken AIG about five minutes and cost nothing to make entries in the separate logbooks for the engine, airframe, and propeller, disclosing the hurricane damage (2 RR 134-135). AIG also delivered the airworthiness certificate for the airplane to Ruhe without marking on the certificate that the plane was not airworthy (2 RR 133).

AIG's adjuster testified that he understood that when AIG sold aircraft to a buyer, the buyer could re-sell the engine fraudulently without disclosing the potential damages to the engine, but he was not aware of any discussions at AIG about that issue. The adjuster agreed that if AIG recorded accident information in the engine logbook it delivered to its buyer, it could prevent fraudulent sales to downstream purchasers (2 RR 83-84).

14

9.    The Ruhe family kept the engine in a box until August 2011, when Eric Ruhe sold the engine to Air-Tec.

In December 2005, the aircraft was shipped from AIG's storage facility in Florida to Robert Ruhe in Ohio, who received the aircraft components disassembled in boxes. Ruhe stored the boxes in a closed hangar with concrete floors (4 RR 88; 5 RR 43, 46). Robert Ruhe thereafter became ill and died in September 2008 (5 RR 49, 61). About three years after he died, his son, Eric Ruhe, decided to sell the engine (5 RR 50). Eric Ruhe saw an advertisement for Air-Tec, called its owner, and sold the engine to Air-Tec for $6,000.00 (4 RR 83; 5 RR 51, 59-60). When the engine was in the possession of the Ruhe family, no one worked on it, no one used it, and it remained in its box (5 RR 51, 55). Eric Ruhe testified he looked at the engine and it looked like any other engine (5 RR 61). In August 2011, Eric Ruhe sent the clean engine logbook received from AIG with the engine to Air-Tec (5 RR 60; PX-3).

10.    Air-Tec received the engine and clean logbook from Eric Ruhe.

Richard Waters is the owner of Air-Tec. Waters buys and re-sells only Lycoming aviation engines like the one in question. Waters had been in the aviation engine business for about 40 years, during which time he had bought and re-sold more than 2,000 Lycoming engines (4 RR 80-82). Waters testified that Eric Ruhe called him wanting to sell the engine. Ruhe told him "the engine is perfect. It's complete with all

15

accessories except the alternator;" "it's in the hanger;" "a woman owns it and her husband passed away, and she wants to sell it;" and "there is no damage on the engine whatsoever" (4 RR 83, 86). Ruhe did not tell him the engine had been in an airplane that was flipped and damaged in a hurricane. Waters did not have an opportunity to review the engine logbook before he sent his check for $6,000.00 to Ruhe for the engine. Waters had the engine shipped from Ruhe in Ohio to Waters's mechanic in Orlando, Florida (4 RR 85, 87-88).

The engine and its logbook arrived in the same shipping crate (4 RR 88). Upon delivery, Waters immediately read the entire engine logbook, because when he buys an engine, he goes by its logbook, which "tells me exactly what the engine is" (4 RR 82, 88, 95). He thought it was "a wonderful logbook" and well-kept (4 RR 89). The last entry in the logbook was the 50-hour engine inspection and return to service, two months before the date when Hurricane Wilma occurred (2 RR 243; 4 RR 98). There was nothing in the engine logbook to indicate the engine had received a prop strike in a hurricane or was sold by AIG (4 RR 95). Waters "checked the engine and ... it looked perfect to me. And going by the logbook, I didn't have any reason to take it apart" (4 RR 96). The engine was not altered in any way when it was in Air-Tec's possession (4 RR 98).

16

At the time he testified, Waters knew that Amy Clay and Scooter Phillips were killed because the vacuum pump failed on the engine that Ruhe had sold to him, and that he had in turn sold to Scooter (4 RR 85). He testified that AIG should have recorded the hurricane damage in the logbook and that AIG should not have delivered the clean engine logbook to Ruhe. AIG should have sold the engine without a logbook for someone to use in an airboat. But if AIG had sold it without its logbook, the engine would not have been "worth anything" (4 RR 89).

The engine logbook did not indicate AIG had any involvement with the engine, so Waters had no reason to contact AIG about the engine. Even if Waters had looked on AIG's aviation website for information, he would have found none. Thirty days after posting an aircraft and its engine for sale on its aviation website, AIG deletes all information about the aircraft and its engine from its website (2 RR 105). Waters testified that if he had known the engine was in an airplane damaged in a hurricane, he may or may not have purchased the engine. If he had bought it, he would have paid only $1,500.00 and would have sold it to an airboater so it could never be used in an airplane (4 RR 89-90).

17

11.  Air-Tec sold the engine to Scooter Phillips.

After seeing an advertisement, Scooter Phillips called Air-Tec to ask about the engine. Richard Waters told Scooter the engine logbook indicated an "exceptionally" low number of hours since the last major overhaul of the engine. They then exchanged some emails about the engine, and Scooter paid him $10,178.00 for the engine and shipping (4 RR 90-91, 94).

As explained above, Scooter had an FAA certified mechanic review the logbook, inspect and service the engine, and install the engine in his airplane. Everything about the engine checked out and the mechanic indicated in the logbook that the plane was "okay to return to service" (PX-24; 3 RR 188). Nothing in the engine logbook indicated that the mechanic needed to tear down or further inspect the engine before Scooter could use it (3 RR 189). Scooter had operated the engine for only three hours before he and Amy left Abilene to fly to Oklahoma City, never to return to their homes and families (PX-3).

12.  The families of Amy Clay and Scooter Phillips sued AIG.

Amy Clay's husband, mother, and children, and Scooter Phillips's parents and children, sued AIG, alleging wrongful death and survival claims based on products liability and negligence (1 CR 162-177). Amy Clay's family did not believe Scooter Phillips was negligent and did not sue his estate. AIG denied the families' claims,

alleged that Scooter Phillips was negligent, and asserted that the Ruhes and Air-Tec were responsible third parties (1 CR 178-184).

AIG also filed a cross-claim against Holly Aero (located in Wood County), which had overhauled and sold the vacuum pump in 2000 (1 CR 164, 185). AIG alleged it was a "seller" of the vacuum pump and was entitled to statutory indemnity from Holly Aero under TEX. CIV. PRAC. & REM. CODE § 82.002 (1 CR 186-187). AIG also alleged it was a "non-manufacturing seller" entitled to the limitations on liability in § 82.003 (2 CR 1109, 1113). Prior to trial, the court granted summary judgment in favor of Holly Aero and dismissed it from the case (2 CR 1108).

13.  <u>The jury answered two questions in favor of AIG and did not answer the ten remaining, conditionally submitted questions.</u>

Question 1 of the charge asked the jury:

> Was AIG engaged in the business of selling aircraft engines and vacuum pumps?
>
> The "business of selling" means involvement, as a part of its business, in selling, leasing, or otherwise placing in the course of commerce products similar to the products in question by transactions that are essentially commercial in character.

The jury answered "No" (2 CR 1166; Appendix 1 at pg. 8). As a result, the jury did not answer the conditionally submitted products liability questions (2 CR 1167-1169; Appendix 1 at pgs. 9-11).

19

Question 5 of the charge presented the negligence questions in broad form:

> Did the negligence, if any, of those named below proximately cause the occurrence or deaths in question?
>
> Answer "Yes" or "No" for each of the following:
>
> 1. AIG     No
> 2. The Ruhes     No
> 3. Air-Tec, Inc.     No
> 4. Scooter Phillips     Yes

(2 CR 1170; Appendix 1 at pg. 12). Because of these answers, the jury did not answer the question on proportionate responsibility or the questions on damages (2 CR 1171-1182; Appendix 1 at pgs. 13-24).

14. <u>The trial court entered a take-nothing judgment.</u>

Based on the jury's verdict, the trial court entered a take-nothing judgment in favor of AIG and against the families of Amy Clay and Scooter Phillips (2 CR 1159; Appendix 1 at pg. 1). The families timely filed a motion for new trial asserting all the complaints raised in this brief, which was overruled by operation of law (2 CR 1187). The families now appeal the judgment to this Court (2 CR 1248).

## SUMMARY OF THE ARGUMENT

AIG had a continuously operating aviation website dedicated solely to selling to the public a wide variety of used engines, airframes, instruments, or aircraft.[7] Any person, anywhere in the world, at any time of the day or night, could see the items AIG had for sale and could submit an offer to purchase by faxing a one-page form. AIG's website generated a high volume of interest from buyers: its advertisement and bid form said "Due to the high volume of bids received by [AIG], we cannot confirm receipt of your bid" (Appendix 10). During the three years before AIG sold the aircraft and engine to Robert Ruhe, AIG sold <u>1,140</u> used engines, airframes, instruments, or aircraft on its website. AIG received more than <u>$17.7 million</u> from such sales (Appendix 12).

AIG's corporate representative testified that AIG "recycled" airplane parts into the stream of commerce through its website (2 RR 160). AIG advertised on its aviation website, for sale to the public, the specific engine in question, identifying its manufacturer, model, serial number, and hours of use (Appendix 10). Robert Ruhe saw the advertisement and submitted an offer to purchase the aircraft and its engine. AIG accepted his offer. Ruhe sent a check to AIG for $28,400.00 and AIG deposited his check. AIG delivered a clean engine logbook and bill of sale to Ruhe and gave him

---

[7] http://www.aigaviation.com/aviationsalvage/SalvageList.aspx

possession of the engine (2 RR 103-105, 127-128; DX-64). AIG's transaction with Ruhe was no different than AIG's other 1,140 sales to buyers during the prior three years, which produced more than $17.7 million in revenue to AIG from selling used goods.

When asked, "Was AIG engaged in the business of selling aircraft engines and vacuum pumps?" the jury answered "No." The answer is so against the great weight and preponderance of the evidence that it is clearly wrong and should be set aside. The error caused the jury not to answer the products liability and damages questions, and was harmful because the record contains evidence of AIG's products liability and damages to the families of Amy Clay and Scooter Phillips.

The remaining points in this brief shed light on what probably contributed to the jury's decision to ignore the evidence in answering this question, but the other points are not necessary for the disposition of this case. The first issue is controlling because if the jury's answer is clearly wrong, the case should be reversed and remanded. The families of Amy Clay and Scooter Phillips respectfully urge the Court to set aside the jury's answer and remand the case for a new trial.

## ARGUMENT

I. The Court should grant a new trial because the jury's refusal to find that AIG was in the "business of selling aircraft engines and vacuum pumps" is clearly wrong.

    A. The standard of review for factual insufficiency is well-settled.

"When a party attacks the factual sufficiency of an adverse finding on an issue on which it has the burden of proof, it must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *McClung v. Ayers*, 352 S.W.3d 723, 727 (Tex. App. – Texarkana 2011, no pet.). "In determining factual sufficiency, we must consider and weigh all of the evidence, and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id.*

    B. The legal standards for a defendant engaging in the business of selling a product are also well-settled.

Question 1 tracked TEXAS PATTERN JURY CHARGES 70.5 (2012) and asked the jury:

> Was AIG engaged in the business of selling aircraft engines and vacuum pumps?
>
> The "business of selling" means involvement, as a part of its business, in selling, leasing, or otherwise placing in the course of commerce products similar to the products in question by transactions that are essentially commercial in character.

23

(2 CR 1166; Appendix 1 at pg. 8).

It has long been the rule in Texas that strict products liability applies to a seller of used goods. *See, e.g., Parsons v. Ford Motor Co.*, 85 S.W.3d 323, 329 n.1 (Tex. App. – Austin 2002, pet. denied); *Mid Continent Aircraft Corp. v. Curry County Spraying Service, Inc.*, 553 S.W.2d 935 (Tex. Civ. App. – Amarillo 1977), *rev'd on other grounds*, 572 S.W.2d 308 (Tex. 1978) (used aircraft engine); *Hovenden v. Tenbush*, 529 S.W.2d 302, 306 (Tex. Civ. App. – San Antonio 1975, no writ); *McLain v. Hodge*, 474 S.W.2d 772, 776 (Tex. Civ. App. – Waco 1971, writ ref'd n.r.e.). Last year, the Supreme Court held that a downstream purchaser of used goods can sue the original seller for breach of the implied warranty of merchantability. *MAN Engines & Components, Inc. v. Shows*, 434 S.W.3d 132 (Tex. 2014).

A seller of used goods is also subject to products liability under Sections 1, 8, and 20 of the RESTATEMENT (THIRD) OF TORTS: PRODUCT LIABILITY (1998). The Supreme Court has cited the Third Restatement with approval. *See, e.g., Fresh Coat, Inc. v. K-2, Inc.*, 318 S.W.3d 893, 897 (Tex. 2010) (citing the definitions of "seller" and "product" in the Third Restatement). Illustration 1 to Section 8 of the Third Restatement applies strict liability to a company selling used goods in a similar context:

24

> ABC Car Rental purchases and maintains a fleet of new cars for its business of short-term car leases. At regular intervals it sells these rental cars at public auctions. In connection with these auctions, ABC is in the business of selling used products within the meaning of this Section.

The doctrine of strict liability "applies to any person engaged in the business of selling products for use or consumption.... [I]t is not necessary that the defendant actually sell the product, but only that he be engaged in the business of introducing the product into channels of commerce." *Armstrong Rubber Co. v. Urquidez*, 570 S.W.2d 374, 375 (Tex. 1978). A "seller's liability is not based on fault; it is imputed by law." *SSP Partners v. Gladstrong Investments (USA) Corp.*, 275 S.W.3d 444, 457 (Tex. 2008). To have strict liability for a product, it "is not necessary that the seller be engaged solely in the business of selling such products...." RESTATEMENT (SECOND) OF TORTS § 402A (1965), Comment f.

C.   <u>The jury erred in refusing to find AIG was in the business of selling aircraft engines and vacuum pumps.</u>

As explained below, the jury's answer of "No" to Question 1 is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust (2 CR 1166; Appendix 1 at pg. 8). Four reasons demonstrate why the Court should set aside the jury's answer.

25

First, as a part of its business, AIG had a dedicated, continuous website[8] for selling and placing in the course of commerce products similar to the product in question by transactions that were essentially commercial in character. AIG's internal report for the period from January 1, 2003, to December 31, 2005, was introduced into evidence (PX-311, 2 RR 8-9). The report proved that during the three years before AIG sold the aircraft and its engine to Robert Ruhe, AIG had sold 1,140 similar aircraft or aircraft components on its aviation website and received in return more than $17.7 million from such sales (PX-311, 2 RR 8-9; Appendix 12).

AIG advertised on its website, for sale to the public, the specific engine in question, identifying its manufacturer, model, serial number, and hours of use. AIG advertised the engine as "Engine(s): Lycoming O-540 E4B5," "Serial Number: L-20394-40A," "Approximate total hours: (estimated from logbooks or other info) Engines: TSMOH:[9] 679.37 hrs" (DX-13; Appendix 10). Robert Ruhe saw this advertisement on AIG's website and submitted an offer to purchase the aircraft and its engine. AIG accepted his offer. Ruhe sent a check to AIG for $28,400.00 and AIG accepted his check (2 RR 103-105; DX-64, AIG000010).

---

[8] http://www.aigaviation.com/aviationsalvage/SalvageList.aspx

[9] TSMOH stands for "Time Since Major Overhaul." http://www.acronymfinder.com.

26

AIG had possession of the engine and paid for its storage at a commercial storage facility in Florida (DX-64, AIG000056-58). On December 15, 2005, AIG sent a letter to Ruhe, confirming AIG's receipt of his payment, delivering the clean engine logbook and bill of sale to him, and authorizing him to take possession of the engine from AIG's storage facility in Florida (2 RR 127-128; DX-64, AIG000006). The engine was then shipped in a box from AIG's storage facility to Ruhe in Ohio (4 RR 88; 5 RR 43, 46). AIG was clearly a seller of the engine to Ruhe.

Second, AIG's corporate representative admitted at trial that AIG was a seller of aircraft when it sold the aircraft and engine to Robert Ruhe. He testified as follows:

Q.    ...Was AIG in 2005 a seller of salvaged aircraft?
A.    Yes.

(2 RR 104). In the words of AIG's corporate representative, when AIG sold the aircraft, it was "recycling" aviation parts like the engine and its vacuum pump:

Q.    And y'all never considered scrapping it or any part of it, did you?
A.    We sold the salvage, no, sir.
Q.    You wanted to get the money, didn't you?
A.    We sold the salvage to reduce the amount  that -- the overall amount on the claim, yes, sir.
Q.    You got money, didn't you, $28,000 --
A.    Yes, sir, we got $28,000 and *we recycled parts*, yes, sir.
Q.    Now, do you see a difference between *recycling* automotive parts and *plane parts*?
A.    Not really, no, sir.

(2 RR 160).

27

Third, AIG judicially admitted in its pleadings that it was engaged in the business of selling aircraft engines and vacuum pumps. "Assertions of fact, not plead in the alternative, in the live pleadings of a party are regarded as formal judicial admissions. A judicial admission that is clear and unequivocal has conclusive effect and bars the admitting party from later disputing the admitted fact." *French v. Gill*, 252 S.W.3d 748, 754 (Tex. App. – Texarkana 2008, pet. denied).

In its live pleading, AIG made the following assertions of fact:

- "Holly Aero overhauled and sold the vacuum pump in 1999 and 2000."

- "The overhaul was also performed in a negligent manner, rendering the vacuum pump defective."

- "Holly Aero was responsible for or contributed to [Scooter's] aircraft crashing on February 20, 2012."

- "Holly Aero is a manufacturer" within the meaning of TEX. CIV. PRAC. & REM. CODE § 82.002.

- *AIG "is a 'seller'* under that statute solely for the purposes of ... § 82.002, and not for any other purposes, including Texas product liability law."

(1 CR 186-187).

Also, in its motion for directed verdict, AIG asserted that the Phillips and Clay families "have failed to prove the existence of at least one of the seven grounds upon which *AIG, as a nonmanufacturing seller*, could be held liable to [the families] for

28

the harm they suffered as a result of the occurrence in question" (2 CR 1109). AIG asserted that under § 82.003, "*a party that sells a product* that it did not manufacture cannot be held liable under any theory asserted in this case unless the plaintiff proves the existence of one of seven exceptions" specified in the statute (2 CR 1113).

By asserting the fact that it was a "seller" of the vacuum pump under § 82.002, and a "non-manufacturing seller" under § 82.003, AIG factually admitted it was "a person who is engaged in the business of distributing or otherwise placing, for any commercial purpose, in the stream of commerce for use" – i.e., a "seller" as defined in § 82.001(3). It is impossible for AIG to be a "seller" of the vacuum pump under § 82.002 and § 82.003, but not be "in the business of selling aircraft engines and vacuum pumps" within the meaning of Question 1, as the following table demonstrates:

| "Seller" of vacuum pump under § 82.001(3) as alleged in AIG's pleading (1 CR 186-187; 2 CR 1109, 1113). | "Engaged in the business of selling aircraft engines and vacuum pumps" as defined in Question 1 (2 CR 1166). |
| --- | --- |
| A "person who is engaged in the business of distributing or otherwise placing, for any commercial purpose, in the stream of commerce for use or consumption a product or any component part thereof." | "The 'business of selling' means involvement, as a part of its business, in selling, leasing, or otherwise placing in the course of commerce products similar to the products in question by transactions that are essentially commercial in character." |

As much as it would like to, AIG cannot have it both ways: it cannot sue another party for the benefits of statutory indemnity under § 82.002 – and seek the benefits of

29

the limitations on liability under § 82.003 – without being a "seller" as defined in the statute. As a result, AIG's assertions of fact that it was the "seller" of the defective vacuum pump as defined in § 82.001(3) are judicial admissions that AIG was "engaged in the business of selling aircraft engines and vacuum pumps" as defined in Question 1 (2 CR 1166).

Fourth, in determining factual sufficiency, the Court "must consider and weigh all of the evidence ...." *McClung v. Ayers*, 352 S.W.3d 723, 727 (Tex. App. – Texarkana 2011, no pet.). What evidence supports the jury's answer of "No" to Question 1? There is none. During closing argument, AIG's counsel could not refer the jury to any evidence that AIG was *not* "engaged in the business of selling aircraft engines and vacuum pumps" as defined in Question 1 (6 RR 55-62).

Instead, AIG's counsel argued that AIG "sold an aircraft. Not a vacuum pump, not an engine, they sold a piece of aircraft salvage" (6 RR 55-56). This is the equivalent of Ford Motor Company arguing it sold a Pinto car, but did not sell the defective gas tank in the car that caused the car to explode on impact. Products liability extends to any party who sells a product that has a defective component; it is not limited to the party who sells only the defective component. *See, e.g., Gen. Motors Corp. v. Hudiburg Chevrolet, Inc.*, 199 S.W.3d 249, 252 (Tex. 2006).

AIG specifically advertised the engine itself for sale on its website, identifying its manufacturer, model, serial number, and hours of use (DX-13, Appendix 10). AIG's corporate representative testified that AIG "recycled parts" through its website sales (2 RR 160). AIG delivered a clean logbook for the engine to Ruhe when it sold the engine to him. Contrary to AIG's jury argument, AIG sold the engine containing the defective vacuum pump to Ruhe and thereby placed it in the stream of aviation commerce without any warning in the logbook of the prop strike or damage to the engine.

AIG's counsel also argued to the jury that AIG was "in the business of selling insurance," not "in the business of selling aircraft engines and vacuum pumps," and its sales of aircraft components was only "incidental to that business" (6 RR 61-62). AIG's argument violates the legal principle that it "is not necessary that the seller be engaged solely in the business of selling such products...." RESTATEMENT (SECOND) OF TORTS § 402A (1965), Comment f. *See also* RESTATEMENT (THIRD) OF TORTS: PRODUCT LIABILITY § 8, Illustration 1 (1998) (car rental company that at regular intervals sells used rental cars at public auctions is in the business of selling).

In short, for these four reasons, the evidence overwhelmingly proved AIG was engaged in the business of selling aircraft engines and vacuum pumps as defined in Question 1. The Court should set aside the jury's answer of "No" to Question 1

31

because it is clearly wrong. Upon doing so, the Court "must reverse the judgment of the trial court and remand for new trial." *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401-402 (Tex. 1981).

> D. <u>The error was harmful because the record contains evidence of AIG's products liability and the damages resulting from the deaths of Amy Clay and Scooter Phillips.</u>

The trial court conditionally submitted the products liability questions on a "Yes" answer to Question 1, as specified in TEXAS PATTERN JURY CH. 70 (2012). As a result of the jury's erroneous answer of "No" to Question 1, the jury did not answer the liability issues submitted under Questions 2, 3, and 4, which asked:

- "Did AIG fail to provide an adequate warning?"

- "Did AIG know of a defect to the aircraft engine and vacuum pump?"

- "Was there a defect in the marketing of the aircraft engine and vacuum pump at the time they left the possession of AIG that was a producing cause of the occurrence or deaths in question?"

(2 CR 1167-1169; Appendix 1 at pgs. 9-11). The trial court ruled correctly that the evidence supported the submission of these questions by denying AIG's motion for directed verdict (5 RR 30, 194-198; 2 CR 1109). Thus, the jury's error in answering "No" to Question 1 was harmful because the record contains evidence of AIG's products liability, which caused the deaths of Amy Clay and Scooter Phillips, and caused significant damages to their families, as explained below.

32

Appendix 9 contains photographs showing the condition of Don Gregoire's upside-down plane after Hurricane Wilma (DX-64; PX-61 to 64, 289 to 291). Gregoire testified the hurricane "destroyed" his plane, which was "well beyond repair." The propeller was bent at a ninety-degree angle. As a result, Gregoire – an experienced pilot – believed the engine "would need a complete overhaul" (4 RR 174-175, 179).

AIG's adjuster in Arizona deemed the plane a total loss merely by looking at its photos (2 RR 68-69, 102; 4 RR 102). He saw the propeller suffered a strike and was bent at a ninety-degree angle (PX-289; DX-64). AIG's adjuster knew that when there is this kind of strike to the propeller, "you're going to have some kind of engine damage" (2 RR 74). AIG also knew the FAA had an airworthiness directive that said if there is a prop strike, the engine may have to be torn down to determine if the prop strike caused damages to the engine (4 RR 107-108). AIG did not have a mechanic inspect the engine, however, to determine if it would be suitable for future use in aviation (2 RR 80; 4 RR 110-111,120-121, 128). The adjuster knew that if AIG disclosed there was damage to the engine, AIG would get less money from selling the aircraft (2 RR 80). AIG's advertisement and bid form did not indicate there was any damage to the engine, although it referred to other damages (DX-13).

Federal regulations require that an engine must have an accompanying logbook detailing its history before the engine can be used in an airplane (3 RR 108). For that

reason, the logbook is considered the "Bible of the engine" in the aviation industry (4 RR 95). AIG's corporate representative agreed that "[t]here's no history to the aircraft if you don't put it in the logbooks" (2 RR 159). He agreed that without an entry about the damage to the aircraft in the logbook, a reader would not know from the logbook whether the aircraft was damaged at all (2 RR 158-159).

When other insurance companies sell an airplane and its engine in this situation, they record in the logbooks that the aircraft was involved in an accident and was deemed a total loss, and provide the claim number, name, and address of the insurance company (2 RR 142-143; 3 RR 116, 177-182; PX-9; Appendix 11). By recording this information in the engine logbook, an insurance company selling the engine can easily provide vital, life-saving information to a downstream purchaser like Scooter Phillips (3 RR 118). It would have taken AIG less than five minutes and cost nothing to make the logbook entry (2 RR 134-135). But when the engine and its clean logbook were delivered to Scooter Phillips, the logbook did not indicate the engine had ever been damaged in any way or involved in any accident. Upon visual inspection, the engine "looked perfect" (4 RR 95-96).

AIG intentionally sold the engine with a clean logbook. AIG's internal valuation worksheet reflects that AIG knew the logbook – absent any record of the hurricane damage – would indicate to a buyer that the engine had a significant useful life

34

remaining before its next major overhaul (PX-22; DX-64, AIG000031). Richard Waters at Air-Tec confirmed this fact. Based on what he saw in the engine's logbook, he told Scooter Phillips the engine had an "exceptionally" low number of hours on it (4 RR 90-91, 94). Nothing in the engine logbook indicated to Scooter's FAA certified mechanic that he needed to tear down or further inspect the engine before Scooter could use it (3 RR 189). Waters had bought and re-sold more than 2,000 Lycoming engines during his 40 years in the aviation industry (4 RR 80-82). He testified that AIG should have recorded the hurricane damage in the logbook and that AIG should not have delivered the clean engine logbook to Ruhe. AIG should have sold the engine without a logbook so it could not be used in an airplane (4 RR 89).

Michael Gallagher worked for 24 years as an aircraft mechanic, flight engineer, and flight mechanic. He then worked for the Federal Aviation Administration for 16 years. He was the manager of the FAA's small airplane division in Kansas City, where he was responsible for all the rules concerning the design and manufacturing of all general aviation aircraft, from the small two-seater up to business jets. He started the FAA division that dealt with unapproved parts and unsalvageable aviation scrap. He then moved to Washington, D.C., and became the FAA's manager of production and airworthiness, responsible for all the rules concerning quality assurance, production, and airworthiness of aircraft (3 RR 66-67).

When he was with the FAA, Gallagher was in contact with aviation insurance companies like AIG and aircraft manufacturers. In connection with this case, he investigated what insurance companies do in this type of situation to make certain that a downstream buyer like Scooter Phillips is informed about the condition of an engine he purchased. Some insurance companies make entries in logbooks to disclose the fact that the aircraft was involved in an incident or accident and deemed a total loss, and to disclose the contact information for the insurance company (3 RR 81-83, 86). Other insurance companies selling salvage aircraft remove the data plate from the aircraft so it cannot be used again in aviation and destroy the airworthiness certificate (3 RR 86-88).

Gallagher testified that the FAA is the only organization that can mandate changes to an aircraft once it is in use. If the FAA determines there is an unsafe condition in an aircraft, the FAA will issue an "airworthiness directive" that mandates either an inspection, a replacement of a part, or removal of the aircraft to resolve the unsafe condition. Before AIG sold the engine, the FAA had issued an airworthiness directive that if a prop strike occurred to this type of Lycoming engine, the engine must be inspected per the manufacturer's service bulletin (PX-368.4; 3 RR 90-92). AIG's adjuster was aware of the prop strike directive before AIG sold the engine (4 RR 107-108). The directive makes the owner of the aircraft responsible for complying

36

with the directive. AIG was therefore required to comply with the directive before returning the engine to service. Instead of returning the engine to service, however, AIG sold the engine to Robert Ruhe (3 RR 93-94).

Gallagher testified that by AIG not making an entry regarding the prop strike in the engine logbook, there was no way for downstream owners and mechanics involved with the engine to know "that there was a potentially unsafe condition caused by the prop strike, which would require the airworthiness directive to be complied with ...." (3 RR 96). AIG did not comply with the prop strike directive for the engine, and because it did not make any entry in the engine logbook regarding that fact, there was no way for Scooter Phillips or his FAA certified mechanic to know there had been a prop strike, that it created a dangerous condition, and that it required action per the FAA airworthiness directive and manufacturer's service bulletin (3 RR 96).

Another FAA regulation requires the "registered owner or operator" of the aircraft to make entries in the engine logbook regarding compliance with FAA airworthiness directives, such as the one regarding the prop strike to the engine. AIG evaded this safety rule by not becoming the "registered owner" of the aircraft with the FAA (3 RR 98; PX-368.1A). In Gallagher's opinion, however, a reasonably prudent insurance company who chose not to register itself as the "registered owner" should still record the prop strike in the engine logbook to make certain that downstream

37

purchasers were informed of the condition of the engine. Gallagher explained:

> everybody within the ... aviation industry has respon-
> sibilities to keep aircraft safe and keep people safe. That
> includes salvagers, insurance companies, operators, pilots.
> ... [AIG] should have documented ... that there was an
> airworthiness directive that had not been ... completed yet
> to let folks down the stream understand that there needed to
> be some further work on that engine.

(3 RR 98-99).

Dr. Robert Block holds a B.S. in Metallurgy from the Massachusetts Institute of Technology, a Master's in Metallurgical Engineering from Columbia University, and a Ph.D. in Metallurgical Engineering from the University of Illinois. He is registered engineer and is a Professor Emeritus from the University of Oklahoma, Department of Chemical Engineering and Material Science. He is an expert on aviation engine failures (4 RR 134-136).

Dr. Block examined the vacuum pump and its parts by visual and microscopic means (4 RR 138). The heat damage to the shaft from the aircraft engine to the vacuum pump indicates the rotor inside the pump stopped turning during the flight but the engine drive shaft continued turning (4 RR 149). When he opened the case for the vacuum pump, he discovered very fine powder particles inside the pump, which proved the inside of the pump was grinding itself up during the failure process until the pump jammed and stopped working (4 RR 151).

38

The propeller was attached to the crankshaft, which ran through the engine to the back of the engine case. During the hurricane, when the propeller struck the ground or another object with such force as to bend it, the energy transferred from the propeller through the crankshaft in the engine to the vacuum pump, and damaged the central shaft inside the vacuum pump. This is not something that happens in the ordinary use of the plane. The engine is on shock mounts and does not normally generate the level of impact that occurred when the propeller was struck and bent during the hurricane. The vacuum pump continued working for a time, but the damage to the central shaft caused the rotor to bounce as it was turning, which made marks inside the case and caused the grinding that resulted in the fine powder inside the case, until the pump jammed and stopped working (4 RR 153-156).

Lee Coffman holds three FAA certifications: as an airframe mechanic, a power-plant mechanic, and an inspector. He has performed aviation engine maintenance and overhauls for 50 years. He has been an expert in about 400 aviation accident cases, including some involving failures of vacuum pumps (3 RR 128-131, 136-137). He examined the vacuum pump and the facts regarding the crash.

The vacuum pump was located on a pad at the back of the engine, and a drive shaft from the engine to the vacuum pump powered the pump (3 RR 154). The vacuum pump, in turn, powered the attitude indicator, which was the instrument in the aircraft

panel (3 RR 149). Coffman's examination of the vacuum pump confirmed that it failed during the flight. The coupling between the engine drive and the pump drive melted, proving the engine drive continued to turn after the pump drive stopped turning, which created the friction and heat that melted the material (3 RR 161). Coffman agreed with Dr. Block that the strike to the propeller during the hurricane could have damaged the vacuum pump and caused it to fail (3 RR 169).

As an experienced mechanic, Coffman also addressed another factor that contributed to the failure. There is a hose from the vacuum pump that points downward. During normal operation, air goes from the vacuum pump down through the hose to help cool the engine. When the airplane was flipped upside-down, the hose was pointed upward so water and debris could flow through the hose into the vacuum pump (4 RR 171-172). When upside-down for three weeks after the hurricane, 4 to 5 inches of rain were dumped on the plane and its engine (4 RR 176, 178; 2 RR 245-247). The presence of any moisture or foreign particles can easily damage the vacuum pump and cause it to fail (3 RR 169). Coffman concluded that moisture or foreign particles entered the vacuum pump as a result of the hurricane, which contributed to the pump failure (3 RR 171-174).

In Coffman's opinion, AIG's failure to record the prop strike and hurricane damage in the engine's logbook was "totally improper because as a mechanic, we

40

depend on that logbook to provide us the history of this engine so that we know how to treat it to continue its airworthiness .... If various things happen, then there are procedures we are to follow to make it airworthy again and to sign it off properly, and if we don't know the history, we cannot do that as mechanics" (3 RR 175). FAA regulations do not restrict who can record information in the engine logbook: "Anybody can make an entry into a logbook" (3 RR 177). Based on his 50 years of experience with engine logbooks, it was customary and common-place for individuals to record non-maintenance information about the history of an engine in its logbook. Logbooks often record damages so the mechanic will know what work may be necessary in response to the damage (3 RR 175-176).

Coffman had personally seen numerous entries in logbooks by many insurance companies, going back to the 1970's, in which an insurance company recorded the fact that the aircraft or engine was damaged in an accident and provided the name of the insurance company so the person reading the logbook could contact the insurance company for more information. In his opinion, AIG should have recorded such information in this engine logbook (3 RR 177-182).

The jury's error in answering Question 1 and resulting failure to answer the products liability issues also caused the jury not to answer the damages questions, which were likewise conditionally submitted (1 CR 1173-1180; Appendix 1 at pgs.

41

15-22). The record contains overwhelming evidence that the deaths of Amy Clay and Scooter Phillips caused substantial damages to their estates and families (3 RR 234-260; 4 RR 6-79; 196-227, 231-270). Economists testified that the pecuniary loss to the family of Amy Clay was more than $2.2 million, and the economic loss to the family of Scooter Phillips was over $4.2 million (3 RR 252; 4 RR 32).

In summary, the record contains evidence that –

- AIG failed to provide an adequate warning;

- AIG knew of a defect to the aircraft engine and vacuum pump;

- there was a defect in the marketing of the aircraft engine and vacuum pump at the time they left the possession of AIG that was a producing cause of the occurrence or deaths in question; and

- the deaths caused significant damages to the families of Amy Clay and Scooter Phillips.

As a result, the jury's erroneous answer to Question 1 was harmful and requires a reversal and remand for a new trial. *Blanton v. E. & L. Transp. Co.*, 207 S.W.2d 368, 369 (Tex. 1948) (jury's failure to answer a question raised by the evidence is harmful error).

E.    This error alone requires a reversal and remand of the entire case for the claims of the family of Amy Clay.

When questions are properly submitted conditionally, a party has "no right to insist on an unconditional submission." *Sanchez v. Texas Employers Ins. Ass'n*, 618

42

S.W.2d 837, 844 (Tex. Civ. App. – Amarillo 1981, writ ref'd n.r.e.). When "the jury's finding on the dominant issue is against the weight and preponderance of the evidence, there is no presumption of a deemed finding on the unanswered subordinate issue(s)." *Id. See* 4 MCDONALD & CARLSON, TEXAS CIVIL PRACTICE § 22:58 (2d. ed. 2015). The Court cannot presume how the jury would have answered an unanswered question based upon the jury's answer to another question. *Blanton v. E. & L. Transp. Co.*, 207 S.W.2d 368, 369 (Tex. 1948). If the Court finds the jury's answer to Question 1 is clearly wrong, Amy Clay's family is entitled to a reversal and a remand for a new trial on their claims. *Strauss v. LaMark*, 366 S.W.2d 555, 558 (Tex. 1963).

Amy Clay had flown with Scooter Phillips a number of times and knew he was a good pilot (4 RR 262). AIG continually attacked Scooter Phillips throughout the trial, but never once suggested Amy was responsible for the crash. Amy did not cause the crash and her own death. She had no ability to protect herself from AIG's conscious decision – motivated by nothing but greed – not to disclose in the engine logbook the critical information that the engine had been in an airplane destroyed by a hurricane and had suffered a prop strike so severe it bent the prop at a ninety-degree angle. For almost fifty years, Texas law has recognized the plight of a victim in Amy's position by allowing the person or her family to assert a products liability claim. *See* RESTATEMENT (SECOND) OF TORTS § 402A (1965) at Comment l (a "user" of a product

43

entitled to the protection of § 402A includes "those who are passively enjoying the benefit of the product, as in the case of passengers in automobiles or airplanes ...."); *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787 (Tex. 1967) (adopting § 402A). The Court should set aside the jury's erroneous answer to Question 1 and grant Amy's family a new trial.

F. <u>This error alone also requires a reversal and remand of the entire case for the claims of the family of Scooter Phillips.</u>

Question 5 presented the negligence questions in broad form:

> Did the negligence, if any, of those named below proximately cause the occurrence or deaths in question?
>
> Answer "Yes" or "No" for each of the following:
>
> 1. AIG                             No
> 2. The Ruhes                       No
> 3. Air-Tec, Inc.                   No
> 4. Scooter Phillips                Yes

(2 CR 1170; Appendix 1 at pg. 12).

The trial court gave a conditional instruction that if the jury found there was a marketing defect by AIG (Question 4) or that AIG was negligent (Question 5), then the jury should answer the proportionate responsibility issue (Question 6) (2 CR 1171; Appendix 1 at pg. 13). As a result of the jury's erroneous answer to Question 1, the jury did not answer the marketing defect issue in Question 4 and the proportionate

44

responsibility issue in Question 6.

AIG may argue the jury's finding that Scooter Phillips was negligent bars his family's right to a new trial. It does not. The Phillips family would be barred from a recovery only if a jury finds Scooter's "percentage of responsibility is greater than 50 percent." TEX. CIV. PRAC. & REM. CODE § 33.001. The jury did not assign any percentage of responsibility to Scooter Phillips. Because of the jury's error in answering "No" to Question 1, the jury did not answer Question 4 on AIG's marketing defect, and did not answer Question 6 on proportionate responsibility. Because the questions were properly submitted conditionally, the Court cannot presume or deem how the jury would have answered Questions 4 or 6. *Sanchez v. Texas Employers Ins. Ass'n*, 618 S.W.2d 837, 844 (Tex. Civ. App. – Amarillo 1981, writ ref'd n.r.e.).

A reversal as to Question 1 requires a reversal of the entire case. *Strauss v. LaMark*, 366 S.W.2d 555, 558 (Tex. 1963). The issues of a defendant's strict liability or negligence, on one hand, and a plaintiff's comparative negligence, on the other, are "indivisible;" thus, in remanding the issue of the defendant's liability, the Court of Appeals must also remand the issue of the plaintiff's comparative negligence. *Otis Elevator Co. v. Bedre*, 776 S.W.2d 152, 153 (Tex. 1989).

G.    Conclusion: the Court should reverse and remand the entire case for a new trial.

The jury's answer to Question 1 is clearly wrong and should be set aside for the four reasons presented above. The jury's error is harmful because the record contains evidence of AIG's products liability and the damages to the families of Amy Clay and Scooter Phillips. Consequently, the Court should reverse and remand for a new trial. The following alternative points require consideration only if the Court finds this point is not dispositive or does not set aside the jury's answer to Question 1.

II.    Alternatively, the Court should grant a new trial because the jury's negligence findings are clearly wrong.

A.    The jury's refusal to find that AIG was negligent is clearly wrong.

The jury's refusal to find that AIG was negligent is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *McClung v. Ayers*, 352 S.W.3d 723, 727 (Tex. App. – Texarkana 2011, no pet.). The evidence regarding AIG's negligence is set forth above under section I.D. and is incorporated under this point.

In ruling on a factual insufficiency point, the Court "must consider and weigh all of the evidence." *Id.* AIG presented the following evidence at trial regarding its conduct. AIG's corporate representative testified that AIG did not take "legal title" to the aircraft (2 RR 130-131). AIG sold the aircraft "as is, where is" with damage

46

notations on the advertisement and bid sheet (2 RR 133). AIG "had no idea" that Air-Tec or Scooter Phillips would purchase the engine (2 RR 134). AIG did not sell the engine to Scooter Phillips (2 RR 106).

AIG's representative testified that the purpose of the logbooks is to record the aircraft's "maintenance events," not to document the history of the aircraft (2 RR 135-136). The hurricane damage was not a "maintenance event" (2 RR 155). He had heard that some insurance companies made entries in logbooks to disclose that the aircraft was damaged in an accident or other occurrence, but it was his understanding that "there's no industry standard of what is put into a logbook with respect to salvaged aircraft" (2 RR 142-143). He testified it is "up to the sellers to disclose what they know about the airplane to future buyers" (2 RR 148).

AIG's expert, Dr. Ken Orloff, testified that under FAA regulations, an owner of an aircraft is not *required* to enter information regarding damages in the aircraft's logbooks, but the owner *may* do so (5 RR 122-123). Under FAA regulations, to become the "registered owner" of an aircraft, the new owner must send the FAA the bill of sale, a completed form, and $5.00. AIG had its insured, Don Gregorie, provide a signed bill of sale that left blank the name of the new owner of the aircraft (5 RR 123-126). AIG did not insert its name as the new owner in the bill of sale and did not submit it to the FAA to become the "registered owner" of the aircraft, so Orloff

believed the FAA regulations requiring the "registered owner" to maintain logbooks and records for the aircraft and its engine did not apply to AIG (5 RR 129-131). When asked why a reasonably prudent insurance company in this situation would not disclose the damages to the plane and its engine in the logbooks, Orloff answered that the FAA does not *require* that such damages be recorded in logbooks (5 RR 131-134).

Considering and weighing all the evidence, the jury's refusal to find that AIG was negligent is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust.

B.    The jury's finding that Scooter Phillips was negligent is also clearly wrong.

The issue of whether Scooter Phillips acted reasonably was hotly contested at trial. AIG presented Dr. Ken Orloff as an expert witness on pilot error. Orloff testified the vacuum pump on the engine had exceeded its useful life (5 RR 82-83). The original manufacturer of the vacuum pump had issued service bulletins to mechanics, and Scooter should have known about and complied with those service bulletins (5 RR 83-90). He also testified that the engine installed in Scooter's plan had not had annual inspections during the time it was in the possession of the Ruhes, and Scooter's mechanic should have performed an annual inspection on the engine before returning his plane to service (5 RR 92-98).

48

AIG also presented Robert "Hoot" Gibson as an expert witness. Gibson testified that Scooter Phillips showed "poor judgment" due to the weather conditions and marginal visibility. VFR conditions were the "bare minimum" for VFR flight (5 RR 141). Gibson testified that Scooter made the correct decision to turn around after the vacuum pump failed, but because he had limited visual horizons, he had difficulty turning around (5 RR 147-148).

The logbook for Scooter's plane indicated that seven months earlier, he had an autopilot installed in the plane, and the logbook stated the autopilot was "tested in accordance with the installation manual." From this, Gibson concluded the autopilot was functional, even though it was undisputed that Scooter was hand-flying his plane without the autopilot engaged and there was no way to know if the autopilot even worked. Gibson opined that if Scooter had used the autopilot, the aircraft would have competed the 180 degree turn on its own and flown towards Abilene (5 RR 153-154, 157-158). AIG presented no evidence, however, that the autopilot was actually operational. Gibson also testified that the original manufacturer of the vacuum pump had issued bulletins or instructions regarding the replacement of the pump, and Scooter should have known about the bulletins or instructions and replaced the vacuum pump (5 RR 155-156). AIG presented no evidence, however, that Scooter ever received or knew about the bulletins. And the experts disagreed on whether the

original manufacturer's bulletins even applied to the vacuum pump after Holly Aero performed a complete overhaul of the vacuum pump and returned it to service before Scooter Phillips purchased the engine (3 RR 198-200, 229-232).

The Phillips family also presented an expert witness on piloting an airplane. Lee Coffman, who holds multiple FAA certifications as a mechanic, flew for many years as a VFR pilot (one who uses visual references outside the plane and instruments) and is now an IFR pilot (one who is certified to fly by instruments alone). He holds both commercial and private licensees. He had himself flown the same model airplane as Scooter's plane (3 RR 123-135). Coffman testified it was proper for Scooter to take-off on the night of February 20, 2012. Scooter had experience flying at night and more than 500 hours of total flight time. Of his prior fifteen flights from Abilene to Oklahoma City, Scooter had flown thirteen of them at night (3 RR 137-138). Visibility was at least eight miles when Scooter and Amy took off from Abilene. Visibility improved during the flight as they flew away from Abilene and climbed (3 RR 141-147). In Coffman's opinion, the failure of the vacuum pump caused Scooter to experience spatial disorientation and lose control. The failure of the vacuum pump caused the crash, not Scooter (3 RR 154-157, 160).

In short, the jury's finding that Scooter Phillips was negligent is so against the great weight and preponderance of the evidence and should be set aside. *Champion*

50

*v. Robinson*, 392 S.W.3d 118, 124 (Tex. App. – Texarkana 2012, writ ref'd n.r.e.) (court should reverse when the evidence is too weak to support a finding or the great weight of the evidence is against the finding).

III.     Alternatively, the Court should grant a new trial because of the trial judge's harmful comments on the evidence about AIG's expert.

       A.     The judge bolstered the credibility of AIG's main expert.

Robert "Hoot" Gibson – AIG's main expert on pilot error – was the final witness to testify, so his testimony was the last evidence heard by the jurors before they deliberated (5 RR 184-185). When AIG called Hoot Gibson to testify, the trial judge made the following inexplicable comments:

| The Court: | Call your next witness. |
|---|---|
| AIG's counsel: | Your Honor, we call Hoot Gibson. |
| The Court: | ***I've heard that name before.*** Mr. Gibson, come on up and let me get you sworn in. ***I've been wanting to meet you for years.*** (Witness sworn.) |
| The Court: | Please have a seat. |
| AIG's counsel: | Mr. Gibson, can you introduce yourself to the judge and the jury. |
| The Court: | But you might really want to do it to ***the jury***. |

(5 RR 135-136).

Gibson then told the jury that after graduating from college, he joined the Navy, became a fighter pilot, and flew F-4 Phantoms and F-14 Tomcats in combat in Viet Nam. In 1978, NASA selected him for the first space shuttle class of astronauts. He went to space five times on the space shuttle, the first as the copilot and then four times as the captain. He had 36 days in space. He continued to fly NASA jets, the T-38s, and in 18 years with NASA, had over 3,000 hours in the T-38s (5 RR 137-138).

The judge's comments significantly boosted the credibility of Hoot Gibson and AIG by communicating to the jury that Gibson was a famous and preeminent authority ("I've heard that name before"); had special importance to the judge ("come on up and let me get you sworn in ... I've been wanting to meet you for years"); and the jury should pay close attention to Gibson's qualifications as an expert (it was not necessary for Gibson to introduce himself to the judge "but you might really want to do it to the jury") (5 RR 135-136).

B.     The judge's error was harmful.

Although Hoot Gibson was the last witness to testify, he was present throughout the trial. For all five days of the trial, the jury saw Gibson sitting in the courtroom with AIG's corporate representative and lawyers, saw Gibson talking to them during breaks, saw Gibson helping them with their defense, and even saw Gibson carrying their boxes up and down the stairs at the start and end of each day (5 RR 179-180). By

52

the time Gibson testified, the jury closely identified Gibson with AIG. Consequently, the judge's highly prejudicial comments about Gibson in effect told the jury that the position of AIG in the case was correct and the position of Amy and Scooter's families was not. AIG continually attacked Scooter Phillips throughout the trial and the issue of his negligence was hotly contested. With the judge's comments fresh in their minds, the jurors found that AIG was not engaged in the business of selling aircraft engines and vacuum pumps and was not negligent (despite overwhelming evidence to the contrary) and that Scooter Phillips was negligent (just as Hoot Gibson told them to find) (2 CR 1166, 1170).

"Neither by word nor by act ... may the judge, either consciously or unintentionally, convey to the jury his or her own views concerning the credibility of the witnesses, the weight of their evidence, or the merits of the controversy. This prohibition is designed to protect the litigants right to a trial by juror based upon the jury's weighing of the evidence presented." 4 MCDONALD & CARLSON, TEXAS CIVIL PRACTICE § 21:41 (2d. ed.). "Prohibited comments extend to those pertaining to the weight of the evidence and the credibility of the witnesses as these are matters for the jury's determination." *Id.*

For example, in *Thompson v. Janes*, 227 S.W.2d 330 (Tex. Civ. App. – Austin 1950, no writ), in response to an objection that a witness was not qualified to express

an opinion, the trial judge stated: "I believe this witness would be better qualified to answer the question than anybody else ...." *Id.* at 331. The Court of Appeals held this comment was reversible error because the judge indicated that the witness knew more than anyone else about the disputed issue. *Id.* "Our judicial system, in which the right to trial by jury is held inviolable, denies the right of a trial judge, in the presence and hearing of the jury, to comment upon the credibility of a witness or the weight to be given his testimony." *Id.* at 332.

Counsel for the Clay and Phillips families did not immediately object to the judge's comments because doing so would only have emphasized to the jury the importance of the comments. "[W]hen the impact of the court's action is such that its harmful effect could not be prevented by its withdrawal, no objection by counsel is required, and an attempted withdrawal by the court will be futile." 4 MCDONALD & CARLSON, TEXAS CIVIL PRACTICE § 21:41 (2d. ed.). *See Connecticut Gen. Life Ins. Co. v. Moore*, 75 S.W.2d 329, 332 (Tex. Civ. App. – Beaumont 1934, writ dis'd) (judge's comment about an affidavit that "it could have been sworn and subscribed to by anybody... let it go in... the jury can pass on it" was "of a nature so injurious that the failure of appellant to except thereto at the time it was made did not render it harmless"). Consequently, the families were not required to make an objection at the time the judge made his comments. The families made the trial court aware of this

error in their motion for new trial, which was overruled by operation of law (2 CR 1187).

In short, the judge's comments bolstering the credibility of AIG's main witness on pilot error – whom the jury closely identified with AIG – probably caused the rendition of an improper judgment. The Court should therefore reverse and remand for a new trial. TEX. R. APP. P. 44.1.

IV.   Alternatively, the Court should grant a new trial because the trial court erred in not instructing the jury about the "as is" clause.

    A.   An "as is" clause in the seller's contract with its buyer does not immunize the seller from products liability to a downstream consumer or user.

The "as is" clause has its origin in the law of sales and the Uniform Commercial Code. The UCC recognizes that in a contract for the sale of goods, the seller can disclaim or exclude express and implied warranties to the buyer by including an "as is" clause in the sales contract. UCC § 2.316 provides:

> unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is' ... or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty....

TEX. BUS. & COM. CODE § 2.316(c)(1).

Texas adopted the Restatement (Second) of Torts § 402A in 1967. *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787 (Tex. 1967). Section 402A makes it clear that

55

a disclaimer like an "as is" clause does not immunize a seller from products liability to a downstream consumer or user of the product, regardless of whether the "as is" disclaimer is contained in the initial contract between the original seller and buyer, or is attached to the product itself and received by the downstream consumer. Comment m to § 402A states:

> The rule stated in this Section [402A] is not governed by the provisions ... of the Uniform Commercial Code, as to warranties; and it is not affected by limitations on the scope and content of warranties .... ***The consumer's cause of action*** does not depend upon the validity of his contract with the person from whom he acquires the product, and it ***is not affected by any disclaimer*** or other agreement, whether it be between the seller and his immediate buyer, or attached to and accompanying the product into the consumer's hands.

RESTATEMENT (SECOND) OF TORTS § 402A (1965), Comment m.

Thirty-eight years ago, the Amarillo Court of Appeals recognized this principle of products liability law in *Mid Continent Aircraft Corp. v. Curry County Spraying Service, Inc.*, 553 S.W.2d 935 (Tex. Civ. App. – Amarillo 1977), *rev'd on other grounds*, 572 S.W.2d 308 (Tex. 1978). In that case, Defendant #1 bought "a 1971 single engine Piper Pawnee aircraft, designed for agricultural work, in a wrecked condition." *Id.* at 937. FAA certified mechanics repaired the airframe, overhauled the engine, and noted the repairs in the logbooks. Defendant #1 then sold the aircraft "as

is" to Defendant #2, who sold it "as is" to the Plaintiff. Thereafter, during a flight, the engine failed, and the Plaintiff's pilot was forced to make a rough landing, which damaged the airplane. The pilot was not injured. The Plaintiff sued Defendants #1 and #2 in strict liability for the economic damages to the plane.

The Court of Appeals held that strict products liability applied to a seller of a used aircraft engine. *Id.* at 940. The Court also held the "as is" clause in the invoice from Defendant #2 to the Plaintiff "exonerated" Defendant #2 "from any liability under contract law," but did not absolve it "of the strict liability imposed for physical harm by tort law." *Id.* at 942. The Court of Appeals also recognized that a "separate log book reflecting each type of repairs is required to be maintained with the aircraft." *Id.* at 936.

On further appeal, the Supreme Court held that "[i]n transactions between a commercial seller and commercial buyer, when no physical injury has occurred to persons or other property, injury to the defective product itself is an economic loss governed by the Uniform Commercial Code," not by strict liability, and the "as is" disclaimer effectively negated the implied warranties arising under the UCC. 572 S.W.2d at 313. The Supreme Court reversed on the ground that the Plaintiff's economic damages to the product itself were not recoverable in a products liability action.

More recently, the Dallas Court of Appeals also held that a contractual "as is" clause does not apply to tort claimants in a similar context. In *City of Irving v. Seppy*, 301 S.W.3d 435 (Tex. App. – Dallas 2009, no pet.), the city rented a civic theater to a community theater organization. The rental contract stated the organization was renting the space from the city "as is." Thereafter, during a production, a volunteer for the organization was walking on a catwalk at the theater, slipped, fell to the ground, and was killed. The city contended that the "as is" clause in its rental agreement with the organization barred the tort claims of the family of the volunteer. Rejecting that argument, the Court of Appeals held that an "as is" provision "is not binding on those who were not parties or third-party beneficiaries of the contract containing the provision" and was "inapplicable under these circumstances." *Id.* at 446.

B.     The trial court erred in not instructing the jury about the "as is" clause.

As explained above, the bottom of AIG's advertisement and bid form for the aircraft and its engine said: "You are advised that the described aircraft is for sale 'AS IS/WHERE IS'...," and Robert Ruhe signed the form (DX-13; Appendix 10). The trial court initially granted the motion in limine of the Clay and Phillips families, which carefully limited how AIG could present and refer to the "as is" clause (2 CR 1085-1086). AIG then persuaded the court to vacate its order regarding the "as is" clause and allow it to present and refer to it with virtually no limitations (2 CR 1107).

58

AIG argued relentlessly at every opportunity during each phase of the trial that the "as is" clause at the bottom of the bid form signed by Robert Ruhe protected AIG from any liability for the deaths of Amy Clay and Scooter Phillips. AIG discussed the "as is" clause during voir dire with potential jurors[10] and repeatedly questioned witnesses about it (e.g., 2 RR 51-52, 53-54, 59- 62, and 3 RR 107-108). In closing argument, AIG's counsel told the jury:

- "So what's this case about? This case is about the sale of a salvage aircraft that was sold as-is/where-is and was installed by Mr. Scooter Phillips on his airplane" (5 RR 51).

- "Ruhe ... knew that it was as-is/where-is, and that ... he was buying salvage; not an aircraft, not an engine..." (5 RR 56).

- "Was there a defect in the marketing ... ? How did AIG market that vacuum pump, that engine, that aircraft salvage? They marketed it with a definition of it's as-is/where-is" (5 RR 63).

- "As-is/where-is means it may have damage, but we don't know what it is. It's a term of art. It's a term that's used in aviation" (5 RR 64).

In the charge, at the request of the Clay and Phillips families, the trial court instructed the jury that –

> An "As Is" or an "As Is / Where Is" clause in a contract is legally binding only on the parties to that contract.

(2 CR 1165; Appendix 1 at pg. 7).

---

[10] The court reporter did not include the voir dire in her record and is filing a supplemental record containing the voir dire.

The Clay and Phillips families requested, but the trial court denied, the following additional instruction:

> The clause does not have any effect on a person who is not
> a party to the contract containing the clause.

(2 CR 1130). This instruction is a correct statement of Texas law, as explained above. The trial court's failure to give this additional instruction enabled AIG to improperly argue that the "as is clause" had an effect on Amy Clay and Scooter Phillips, and protected AIG from any liability to their families, contrary to Texas law. The court's failure to instruct the jury fully on this issue probably caused the rendition of an improper judgment; thus, the Court should reverse and remand for a new trial. TEX. R. APP. P. 44.1.

## PRAYER

For these reasons, the families of Amy Clay and Scooter Phillips request the Court to reverse the trial court, to remand the case for a new trial, and to order AIG to pay all costs of the appeal. They also request the general and special relief at law and in equity they are entitled to receive.

Respectfully submitted,

M. Keith Dollahite, P.C.
5457 Donnybrook Avenue
Tyler, Texas  75703
(903) 581-2110
(903) 581-2113 (Facsimile)
keith@mkdlaw.us

/s/ Keith Dollahite

By:_____
M. Keith Dollahite
State Bar No. 05958550

## CERTIFICATE OF COMPLIANCE

Pursuant to TEX. R. APP. P. 9.4(i)(3), I certify that this document contains 14,545 words based on the word count of the computer program used to prepare the document, excluding the sections not counted under TEX. R. APP. P. 9.4(i)(1), which is below the maximum of 15,000 words in TEX. R. APP. P. 9.4(i)(2).

/s/ Keith Dollahite

_____

## CERTIFICATE OF SERVICE

This document was filed and served electronically on all attorneys of record on November 4,  2015.

/s/ Keith Dollahite

_____

© 2015 M. Keith Dollahite, P.C.

CAUSE NO. 2013-215

| | | |
|---|---|---|
| MONTY CLAY, ET AL., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | WOOD COUNTY, TEXAS |
| | § | |
| AIG AEROSPACE INSURANCE | § | |
| SERVICES, INC., ET AL., | § | |
| | § | |
| Defendants. | § | 402nd JUDICIAL DISTRICT |

### FINAL JUDGMENT

On January 20, 2015, this case was called to trial. Plaintiffs Monty Clay, individually and as next friend of Jacob Clay and Jonathan Clay and as personal representative for the estate of Amy Clay, Lynda Wilson, individually, Brendan Phillips, individually, Dale Phillips, Sr., individually and as the executor and personal representative of the estate of Dale Leighroy Phillips, Jr., and as next friend of Grace Ann Phillips, and Karen B. Phillips, individually, (collectively "Plaintiffs") appeared in person and through counsel, and announced ready for trial. Defendants AIG Aerospace Insurance Services, Inc., Chartis Aerospace Insurance Services, Inc. and Chartis Aerospace Adjustment Services, Inc. (collectively "Defendants" or "AIG") also appeared in person and through counsel, and announced ready for trial.

After a jury was impaneled and sworn, it heard the evidence and arguments of counsel on all of Plaintiffs' claims other than their claims for breach of express and implied warranties, which were dismissed by way of summary judgment before trial. After Plaintiffs rested, the Court denied Defendants' motion for directed verdict on all of Plaintiffs' remaining claims. Defendants reurged their directed verdict after both sides rested, and the Court again denied that motion.

On January 27, 2015, all parties rested. Thereafter, the Court in consultation with attorneys for all parties prepared a written charge to submit the case to the Jury. All parties

through their attorneys were allowed to examine the charge and were provided with an opportunity to make objections to the charge. The Court then read its written charge to the jury, and thereafter the parties through their counsel were allowed to present final arguments to the jury, and the jury thereafter retired to deliberate the verdict.

On January 27, 2015, the Jury returned to open Court and announced through its presiding juror that the jurors had reached a unanimous verdict. The verdict was read aloud in open Court in the presence of the Jury and the attorneys representing the parties. Thereafter, the Court determined that no party through their attorneys had any objection to the receipt of the verdict. The Court then received the verdict to be filed among the papers of this cause, and discharged the Jury. The questions submitted to the jury and the jury's findings are attached as Exhibit A and fully incorporated herein by reference.

WHEREFORE, the Court having considered the contents of the docket before it, including but not limited to all orders, pleadings and motions, as well as the arguments of counsel, the evidence presented at trial, and the verdict of the jury rendered on January 27, 2015, all of which are incorporated herein by reference, now renders final judgment in favor of Defendants. Accordingly, the Court ORDERS, ADJUDGES, AND DECREES that Plaintiffs take nothing by way of their claims against Defendants, and that a final take-nothing judgment is hereby entered in favor of Defendants and against Plaintiffs.

All costs of court expended or incurred in connection with this case are hereby awarded in favor of Defendants and against Plaintiffs.

This judgment finally disposes of all claims and all parties, and is appealable.

SO ORDERED this /2 day of _F Bruary_ 2015.

_____
The Hon. G. Timothy Boswell
Judge Presiding

FINAL JUDGMENT     **APPENDIX 1**
           **000002**     Page 2   001160

# Exhibit "A"

001161

CAUSE NO. 2013-215

| | | |
|---|---|---|
| MONTY CLAY, ET AL. | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| V. | § | 402ND JUDICIAL DISTRICT |
| | § | |
| AIG AEROSPACE INS. SERVS., INC., | § | |
| ET AL. | § | WOOD COUNTY, TEXAS |

## CHARGE OF THE COURT

MEMBERS OF THE JURY:

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason. I will give you a number where others may contact you in case of an emergency.

Here are the instructions for answering the questions.

1.    Do not let bias, prejudice, or sympathy play any part in your decision.

2.    Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

3.    You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

4.    If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

-1-

**APPENDIX 1**
**000004**

001162

5. All the questions and answers are important. No one should say that any question or answer is not important.

6. Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence unless you are told otherwise. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence unless you are told otherwise.

   The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

7. Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8. Do not answer questions by drawing straws or by any method of chance.

9. Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10. Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

11. Unless otherwise instructed, the answers to the questions must be based on the decision of at least ten of the twelve jurors. The same ten jurors must agree on every answer. Do not agree to be bound by a vote of anything less than ten jurors, even if it would be a majority.

   As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

-2-

APPENDIX 1
000005

001166

Here are additional instructions for answering the questions.

1. A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

2. "Negligence" means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

3. "Ordinary care" means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.

4. "Producing cause" means a cause that was a substantial factor in bringing about the occurrence or injury, and without which the occurrence or injury would not have occurred. There may be more than one producing cause.

5. "Proximate cause" means a cause, unbroken by any new and independent cause, that was a substantial factor in bringing about an occurrence or injury, and without which cause such occurrence or injury would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the occurrence or injury, or some similar occurrence or injury, might reasonably result therefrom. There may be more than one proximate cause of an occurrence or injury.

6. "New and independent cause" means the act or omission of a separate and independent agency, not reasonably foreseeable, that destroys the causal connection, if any, between the act or omission inquired about and the occurrence in question and thereby becomes the immediate cause of such occurrence.

7. There may be more than one cause of an occurrence or injury, but if an act or omission of any person not a party to the suit was the "sole cause" of the occurrence or injury, then no act or omission of any party could have been a cause of the occurrence or injury.

8. "AIG" means AIG Aerospace Insurance Services, Inc.

-3-

**APPENDIX 1**
**000006**

001164

9. "The Ruhes" means Robert G. Ruhe, Eric J. Ruhe, and their affiliated companies, Ruhe Sales, Inc. and Bob Ruhe AG Service, Inc.

10. An "As Is" or an "As Is / Where Is" clause in a contract is legally binding only on the parties to that contract.

-4-

001165

## QUESTION 1

Was AIG engaged in the business of selling aircraft engines and vacuum pumps?

The "business of selling" means involvement, as a part of its business, in selling, leasing, or otherwise placing in the course of commerce products similar to the products in question by transactions that are essentially commercial in character.

Answer "Yes" or "No."

Answer: ___NO___

-5-

001166

If you answered "Yes" to Question 1, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 2

Did AIG fail to provide an adequate warning?

"Fail to provide an adequate warning" means:

1. AIG exercised substantial control over the content of a warning or instruction that accompanied the aircraft engine and vacuum pump;

2. the warning or instruction was inadequate; and

3. the harm to Scooter Phillips and Amy Clay resulted from the inadequacy of the warning or instruction.

Answer "Yes" or "No."

Answer: _____

-6-

APPENDIX 1
000009

001167

If you answered "Yes" to Question 1, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 3

Did AIG know of a defect to the aircraft engine and vacuum pump?

"Know of a defect" means:

1.  AIG actually knew of a defect to the aircraft engine and vacuum pump at the time AIG supplied the aircraft engine and vacuum pump; and

2.  the harm to Scooter Phillips and Amy Clay resulted from the defect.

Answer "Yes" or "No."

Answer: _____

001168


If you answered "Yes" to Question 1, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 4

Was there a defect in the marketing of the aircraft engine and vacuum pump at the time they left the possession of AIG that was a producing cause of the occurrence or deaths in question?

A "marketing defect" with respect to the product means the failure to give adequate warnings of the product's dangers that were known or by the application of reasonably developed human skill and foresight should have been known or failure to give adequate instructions to avoid such dangers, which failure rendered the product unreasonably dangerous as marketed.

"Adequate" warnings and instructions mean warnings and instructions given in a form that could reasonably be expected to catch the attention of a reasonably prudent person in the circumstances of the product's use; and the content of the warnings and instructions must be comprehensible to the average user and must convey a fair indication of the nature and extent of the danger and how to avoid it to the mind of a reasonably prudent person.

An "unreasonably dangerous" product is one that is dangerous to an extent beyond that which would be contemplated by the ordinary user of the product with the ordinary knowledge common to the community as to the product's characteristics.

Answer "Yes" or "No."

Answer: _____

-8-

001169

## QUESTION 5

Did the negligence, if any, of those named below proximately cause the occurrence or deaths in question?

Answer "Yes" or "No" for each of the following:

1. AIG _____No_____

2. The Ruhes _____No_____

3. Air-Tec, Inc. _____No_____

4. Scooter Phillips _____Yes_____

-9-

001170

If you answered "Yes" to Questions 4 or 5 as to AIG, and if you answered "Yes" to Question 5 for more than one of those named below, then answer the following question. Otherwise, do not answer the following question and go to the next page.

Assign percentages of responsibility only to those you found caused or contributed to cause the occurrence or deaths. The percentages you find must total 100 percent. The percentages must be expressed in whole numbers. The percentage of responsibility attributable to any one is not necessarily measured by the number of acts or omissions found. The percentage attributable to any one need not be the same percentage attributed to that one in answering another question.

## QUESTION 6

For each person you found caused or contributed to cause the occurrence or deaths, find the percentage of responsibility attributable to each:

1.   AIG                _____

2.   The Ruhes          _____

3.   Air-Tec, Inc.      _____

4.   Scooter Phillips   _____

            Total:         100 %

-10-

APPENDIX 1
000013

001171

Here are additional instructions for answering the following questions about damages:

1.    In answering questions about damages, answer each question separately.

2.    Do not increase or reduce the amount in one answer because of your answer to any other question about damages.

3.    Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

-11-

**APPENDIX 1**
**000014**

001172

Answer Question 7 if you answered "Yes" for AIG to Questions 4 or 5, Otherwise, do not answer Question 7.

## QUESTION 7

What sum of money, if paid now in cash, would fairly and reasonably compensate those named below for his or her damages, if any, resulting from the death of Amy Clay?

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Answer separately, in dollars and cents, for damages, if any.

1.   <u>Pecuniary loss sustained in the past by</u>

Monty Clay                     Answer: _____

Jacob Clay                     Answer: _____

Jonathan Clay                  Answer: _____

"Pecuniary loss" means the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that the person, in reasonable probability, would have received from Amy Clay had she lived.

2.   <u>Pecuniary loss that, in reasonable probability, will be sustained in the future by</u>

Monty Clay                     Answer: _____

Jacob Clay                     Answer: _____

Jonathan Clay                  Answer: _____

-12-

**APPENDIX 1**
**000015**

3.  <u>Loss of companionship and society sustained in the past by</u>

Monty Clay                    Answer: _____

Jacob Clay                    Answer: _____

Jonathan Clay                 Answer: _____

Lynda Wilson                  Answer: _____

"Loss of companionship and society" means the loss of the positive benefits flowing from the love, comfort, companionship, and society that the person, in reasonable probability, would have received from Amy Clay had she lived.

4.  <u>Loss of companionship and society that, in reasonable probability, will be sustained in the future by</u>

Monty Clay                    Answer: _____

Jacob Clay                    Answer: _____

Jonathan Clay                 Answer: _____

Lynda Wilson                  Answer: _____

5.  <u>Mental anguish sustained in the past by</u>

Monty Clay                    Answer: _____

Jacob Clay                    Answer: _____

Jonathan Clay                 Answer: _____

Lynda Wilson                  Answer: _____

"Mental anguish" means the emotional pain, torment, and suffering experienced by the person because of the death of Amy Clay.

-13-

APPENDIX 1
000016

001174

6.  <u>Mental anguish that, in reasonable probability, will be sustained in the future by</u>

Monty Clay                    Answer: _____

Jacob Clay                    Answer: _____

Jonathan Clay                 Answer: _____

Lynda Wilson                  Answer: _____

-14-

001175

Answer Question 8 if you answered "Yes" for AIG to Questions 4 or 5, Otherwise, do not answer Question 8.

## QUESTION 8

What sum of money would have fairly and reasonably compensated Amy Clay for—

1.  <u>Pain and mental anguish</u>

"Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by Amy Clay before her death as a result of the occurrence in question.

Answer in dollars and cents for damages, if any.

Answer: _____

2.  <u>Funeral and burial expenses</u>

"Funeral and burial expenses" means the reasonable amount of expenses for funeral and burial for Amy Clay reasonably suitable to her station in life.

Answer in dollars and cents for damages, if any.

Answer: _____

-15-

C01176

Answer Question 9 if you answered "Yes" for AIG to Questions 4 or 5, and answered:

1. "No" for Scooter Phillips to Question 5, or
2. 50 percent or less for Scooter Phillips to Question 6.

Otherwise, do not answer Question 9.

## QUESTION 9

What sum of money, if paid now in cash, would fairly and reasonably compensate those named below for his or her damages, if any, resulting from the death of Scooter Phillips?

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Answer separately, in dollars and cents, for damages, if any. Do not reduce the amounts, if any, in your answers because of the negligence, if any, of Scooter Phillips. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

1. <u>Pecuniary loss sustained in the past by</u>

Grace Phillips            Answer: _____

Brendan Phillips          Answer: _____

Dale Phillips, Sr.        Answer: _____

Karen Phillips            Answer: _____

"Pecuniary loss" means the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that the person, in reasonable probability, would have received from Scooter Phillips had he lived.

-16-

APPENDIX 1
000019

001177

2. <u>Pecuniary loss that, in reasonable probability, will be sustained in the future by</u>

Grace Phillips        Answer: _____

Brendan Phillips       Answer: _____

Dale Phillips, Sr.       Answer: _____

Karen Phillips        Answer: _____

3. <u>Loss of companionship and society sustained in the past by</u>

Grace Phillips        Answer: _____

Brendan Phillips       Answer: _____

Dale Phillips, Sr.       Answer: _____

Karen Phillips        Answer: _____

"Loss of companionship and society" means the loss of the positive benefits flowing from the love, comfort, companionship, and society that the person, in reasonable probability, would have received from Scooter Phillips had he lived.

4. <u>Loss of companionship and society that, in reasonable probability, will be sustained in the future by</u>

Grace Phillips        Answer: _____

Brendan Phillips       Answer: _____

Dale Phillips, Sr.       Answer: _____

Karen Phillips        Answer: _____

-17-

**APPENDIX 1**
**000020**

001178

5.  <u>Mental anguish sustained in the past by</u>

Grace Phillips                    Answer: _____

Brendan Phillips                  Answer: _____

Dale Phillips, Sr.                Answer: _____

Karen Phillips                    Answer: _____

"Mental anguish" means the emotional pain, torment, and suffering experienced by the person because of the death of Scooter Phillips.

6.  <u>Mental anguish that, in reasonable probability, will be sustained in the future by</u>

Grace Phillips                    Answer: _____

Brendan Phillips                  Answer: _____

Dale Phillips, Sr.                Answer: _____

Karen Phillips                    Answer: _____

-18-

001179

Answer Question 10 if you answered "Yes" for AIG to Questions 4 or 5, and answered:

1.   "No" for Scooter Phillips to Question 5, or
2.   50 percent or less for Scooter Phillips to Question 6.

Otherwise, do not answer Question 10.

**QUESTION 10**

What sum of money would have fairly and reasonably compensated Scooter Phillips for –

1.   Pain and mental anguish

"Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by Scooter Phillips before his death as a result of the occurrence in question.

Answer in dollars and cents for damages, if any.

Answer: _____

2.   Funeral and burial expenses

"Funeral and burial expenses" means the reasonable amount of expenses for funeral and burial for Scooter Phillips reasonably suitable to his station in life.

Answer in dollars and cents for damages, if any.

Answer: _____

Do not reduce the amount, if any, in your answers because of the negligence, if any, of Scooter Phillips. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

-19-

Answer the following question regarding AIG only if you unanimously answered "Yes" to Questions 4 or 5 regarding AIG. Otherwise, do not answer the following question regarding AIG.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.

**QUESTION 11**

Do you find by clear and convincing evidence that the harm to Amy Clay resulted from gross negligence?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Gross negligence" means an act or omission by AIG,

1.      which when viewed objectively from the standpoint of AIG at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

2.      of which AIG has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

Answer "Yes" or "No."

Answer: _____

-20-

**APPENDIX 1**
**000023**

001181

Answer the following question regarding AIG only if you unanimously answered "Yes" to Questions 4 or 5 regarding AIG. Otherwise, do not answer the following question regarding AIG.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.

## QUESTION 12

Do you find by clear and convincing evidence that the harm to Scooter Phillips resulted from gross negligence?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Gross negligence" means an act or omission by AIG,

1.    which when viewed objectively from the standpoint of AIG at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

2.    of which AIG has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

Answer "Yes" or "No."

Answer: _____

-21-

**APPENDIX 1**
**000024**

001182

## Presiding Juror:

1. When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

2. The presiding juror has these duties:

   a. have the complete charge read aloud if it will be helpful to your deliberations;

   b. preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;

   c. give written questions or comments to the bailiff who will give them to the judge;

   d. write down the answers you agree on;

   e. get the signatures for the verdict certificate; and

   f. notify the bailiff that you have reached a verdict.

3. Do you understand the duties of the presiding juror? If you do not, please tell me now.

## Instructions for Signing the Verdict Certificate:

1. Unless otherwise instructed, you may answer the questions on a vote of ten jurors. The same ten jurors must agree on every answer in the charge. This means you may not have one group of ten jurors agree on one answer and a different group of ten jurors agree on another answer.

2. If ten jurors agree on every answer, those ten jurors sign the verdict.

   If eleven jurors agree on every answer, those eleven jurors sign the verdict.

   If all twelve of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

-22-

**APPENDIX 1**
**000025**

001183

3.  All jurors should deliberate on every question. You may end up with all twelve of you agreeing on some answers, while only ten or eleven of you agree on other answers. But when you sign the verdict, only those ten who agree on every answer will sign the verdict.

4.  There are some special instructions before Questions 11 and 12 explaining how to answer those questions. Please follow the instructions. If all twelve of you answer those questions, you will need to complete a second verdict certificate for those questions.

5.  Do you understand these instructions? If you do not, please tell me now.

01-26-15
@ 4:15 p.m.

_____
JUDGE PRESIDING

-23-

**APPENDIX 1**
**000026**

001184

# Verdict Certificate

Check one:

✓        Our verdict is unanimous. All twelve of us have agreed to each and every answer. The presiding juror has signed the certificate for all twelve of us.

*Patricia Smiley*
Signature of Presiding Juror

PATRICIA SmiLEY
Printed Name of Presiding Juror

_____     Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

_____     Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.

| Signature | Printed Name |
|---|---|
| 1. | |
| 2. | |
| 3. | |
| 4. | |
| 5. | |
| 6. | |
| 7. | |
| 8. | |
| 9. | |
| 10. | |
| 11. | |

-24-

001185


If you have answered Questions 11 and 12, then you must sign this certificate also.

## Additional Certificate

I certify that the jury was unanimous in answering Questions 11 and 12. All twelve of us agreed to each of the answers. The presiding juror has signed the certificate for all twelve of us.


_____
Signature of Presiding Juror


_____
Printed Name of Presiding Juror

-25-

**APPENDIX 1**
**000028**

001186


PLAINTIFF'S
EXHIBIT
1
tabbies®



Lynda Wilson
Mother
62



Johnathan Clay
Son
7



Amy Clay
31



Jacob Clay
Son
8



Monty Clay
Husband
35





**Karen Phillips**
**Mother**
**71**

**Dale Phillips, Sr.**
**Father**
**72**



**Dale "Scooter" Phillips, Jr.**
**48**



**Grace Phillips**
**Daughter**
**15**



**Brendan Phillips**
**Son**
**19**

PLAINTIFF'S EXHIBIT 3



# Federal Aviation Administration

# Memorandum

Date:     June 20, 2013

To:       Aircraft Accident File ABI-ATCT-0421

From:     Abilene Airport Traffic Control Tower

Subject:  **INFORMATION**: Full Transcript
          Aircraft Accident, N7147P
          Albany, TX, February 21, 2012

This transcription covers the Abilene Airport Traffic Control Tower (ATCT) RLC AC position for the time period from February 21, 2012, 0117 UTC, to February 21, 2012, 0215 UTC.

| Agencies Making Transmissions | Abbreviations |
|---|---|
| ABI ATCT Radar at Local Control | RLC_AC |
| N7147P, PA24 | N7147P |
| AMR AMERICAN EAGLE, INC. (DALLAS/FT. WORTH, TX), EGF2773, E135 | EGF2773 |
| BARON AVIATION SERVICES, INC. (VICHY, MO), BVN7793, C208 | BVN7793 |
| Fort Worth Air Route Traffic Control Center | ZFW |
| MARTINAIRE (ADDISON, TX), MRA666, C208 | MRA666 |
| Air Evac Life Team, B222 | LFT63 |
| Unknown | UNK |
| ABI ATCT Local Control | LC_LC |
| BARON AVIATION SERVICES, INC. (VICHY, MO), BVN7844, C208 | BVN7844 |
| N65672, C182 | N65672 |
| AMR AMERICAN EAGLE, INC. (DALLAS/FT. WORTH, TX), EGF2712, E135 | EGF2712 |

I certify that the following is a true transcription of the recorded conversations pertaining to the subject aircraft accident involving N7147P.



Ricardo Cevallos
Staff Support Specialist
Abilene ATCT

0117
(0118-0121)
0122
0122:08     RLC_AC     i can try thanks ah a d

| 0122:31 | N7147P | abilene departure comanche seven one four seven papa with you two thousand six hundred for nine thousand five hundred |
|---|---|---|
| 0122:38 | RLC_AC | comanche seven one four seven papa abilene departure radar contact |
| 0123 |  |  |
| 0124 |  |  |
| 0125 |  |  |
| 0125:19 | RLC_AC | eagle flight twenty seven seventy three airport one o'clock and five miles |
| 0125:23 | EGF2773 | we're searching eagle twenty seven seventy three it's ah kinda hard to make much out |
| 0125:28 | RLC_AC | eagle flight twenty seven seventy three turn left heading one seven zero vector for downwind |
| 0125:34 | EGF2773 | one seventy heading eagle twenty seven seventy three |
| 0125:51 | EGF2773 | ah it was just in our hairs i guess we have the runway in sight eagle twenty seven seventy three |
| 0125:55 | RLC_AC | eagle flight twenty seven seventy three is cleared visual approach runway three five right make straight in contact tower on one two zero point one |
| 0126 |  |  |
| 0126:01 | EGF2773 | cleared for the visual three five right and ah twenty point one for tower eagle twenty seven seventy three |
| 0127 |  |  |
| 0127:05 | RLC_AC | showme seventy seven ninety three contact fort worth center one two seven point four five |
| 0127:10 | BVN7793 | twenty seven point four five showme seventy seven ninety three good night |
| 0128 |  |  |
| 0129 |  |  |
| 0129:12 | ZFW | abilene ednas twenty four |
| 0129:18 | RLC_AC | abilene |
| 0129:19 | ZFW | three echo bravo going into eastland cancelled |
| 0129:21 | RLC_AC | a d |

| 0129:22 | ZFW | thanks (unintelligible) |

0130
0131

| 0131:08 | MRA666 | abilene departure martex triple six three point one for five thousand heading zero seven zero |

| 0131:13 | RLC_AC | martex six sixty six abilene departure radar contact fly heading zero niner zero when able proceed direct glen rose join the glen rose niner arrival and climb and maintain niner thousand |

| 0131:23 | MRA666 | zero nine zero direct glen rose nine thousand martex triple six |

0132
0133

| 0133:55 | N7147P | ah abilene departure comanche seven one four seven papa we're going to have to turn around |

0134

| 0134:01 | RLC_AC | comanche four seven papa roger you're going to return to abilene |

| 0134:04 | N7147P | ah affirmative we've lost our suction and our attitude indicator |

| 0134:20 | RLC_AC | comanche four seven papa roger enter right downwind runway three five left |

| 0134:33 | RLC_AC | comanche four seven papa did you copy |

| 0134:35 | N7147P | (unintelligible) yeah i did i copied we're going to we're going to try to turn around four seven papa |

0135

| 0135:11 | LFT63 | abilene departure lifeguard lifeteam six three with bravo |

| 0135:13 | RLC_AC | lifeteam six three abilene approach abilene altimeter is three zero zero six say direction of flight |

| 0135:21 | LFT63 | three zero zero six will be zero six zero heading to breckenridge |

| 0135:25 | RLC_AC | lifeteam six three roger |

| 0135:38 | RLC_AC | comanche four seven papa verify you are ah v f r |

| 0135:42 | UNK | squelch break |
| 0135:43 | N7147P | affirmative we are v f r but we are having trouble four seven |
| 0135:46 | RLC_AC | comanche four seven papa the closest airport to your position is the albany airport currently five miles southeast of your position you're ah altitude appears to be ah going up and down pretty erratically |
| 0136 | | |
| 0136:04 | UNK | squelch break |
| 0136:07 | RLC_AC | comanche four seven papa you've lost a thousand feet in the last six seconds |
| 0136:14 | UNK | squelch break |
| 0136:17 | UNK | squelch break |
| 0136:21 | RLC_AC | comanche four seven papa altimeter is three zero zero six albany airport is five miles southeast of your position |
| 0136:54 0137 | RLC_AC | comanche four seven papa how do you copy |
| 0137:21 | RLC_AC | comanche seven one four seven papa abilene approach |
| 0137:33 | RLC_AC | martex six sixty six are you receiving a reply from comanche four seven papa |
| 0137:39 | MRA666 | negative |
| 0137:54 0138 | RLC_AC | comanche seven one four seven papa abilene approach |
| 0138:52 0139 | RLC_AC | comanche seven one four seven papa abilene approach |
| 0139:27 | RLC_AC | possum abilene |
| 0139:30 | ZFW | possum |

| 0139:31 | RLC_AC | yes sir can you tell me if you're receiving a five two four three code about five miles northwest of the albany airport |
|---|---|---|
| 0139:40 | ZFW | let me see here is that martex six sixty six (unintelligible) him |
| 0139:45 | RLC_AC | no it's a v f r comanche seven one four seven papa we've lost radio contact with him |
| 0139:49 | ZFW | oh okay ah and the code is what again |
| 0139:52 | RLC_AC | five two four three |
| 0139:55 | ZFW | alright i'm not seeing him out there |
| 0139:58 | RLC_AC | alright thank you |
| 0139:59 | ZFW | jay oh |
| 0140:00 | RLC_AC | a d |
| 0140:04 | RLC_AC | comanche five one four seven papa abilene approach |
| 0140:20 | LFT63 | hey abilene approach lifeteam six three have you tried albany's ah c taf |
| 0140:24 | RLC_AC | ah lifeteam six three not yet we're fixing to call the sheriff's office up there |
| 0140:29 | LFT63 | what is albany's c taf i don't remember it off the top of my head i'll monitor for you |
| 0140:35 0141 | RLC_AC | stand by |
| 0141:09 | ZFW | abilene twenty four falls low |
| 0141:12 | RLC_AC | abilene |
| 0141:13 | ZFW | yeah comanche four seven papa i saw him handing off |

...

|  |  |  |
|---|---|---|
|  |  | earlier but i don't see anything out there now did he turn around or what |
| 0141:18 | RLC_AC | comanche four seven papa lost his attitude indicator ah he had some erratic climbs and descents and we've lost radar contact with him |
| 0141:27 | ZFW | oh man |
| 0141:27 | RLC_AC | have you see ah are you ah still viewing the transponder off the five two four three code |
| 0141:30 | ZFW | no that's why i was calling you for i didn't didn't even see a target out there so |
| 0141:34 | RLC_AC | alright well we're still looking for him thank you |
| 0141:36 | ZFW | okay thanks |
| 0141:36 | RLC_AC | a d |
| 0142:13 | RLC_AC | lifeteam six three co common traffic advisory is one two two point niner for albany |
| 0142:21 | LFT63 | roger that i've been trying on one two two point niner haven't copied anything on that frequency ah came out here to the northeast of here it's pretty bad as far as the bases it's pretty hard to make out a horizon so ah i'll keep listening to one two two point nine lifeteam six three |
| 0142:37 | RLC_AC | lifeteam six three thank you for your assistance |
| 0142:41 | LFT63 | you betcha and ah approach lifeteam six three we're actually going to turn around ourselves it's pretty bad out here it's pretty hard to make out a horizon so will be heading back to the (unintelligible) |
| 0142:51 | RLC_AC | lifeteam six three roger you can reverse course abilene wind three three zero at eight altimeter three zero zero seven proceed direct |
| 0142:59 | LFT63 | three zero zero seven proceeding direct lifeteam six |

three

| 0143:02 | RLC_AC | comanche seven one four seven papa abilene approach |
| | | |
| 0143:32 | LC_LC | radar local local apreq release and heading showme seventy eight forty four off of runway two two |
| | | |
| 0143:39 | RLC_AC | showme seventy eight forty four released runway two two right turn on course direct lubbock |
| | | |
| 0143:44 | LC_LC | charlie whiskey |
| | | |
| 0143:44 | RLC_AC | and ah point out for you |
| | | |
| 0143:49 | LC_LC | lifeteam six three |
| | | |
| 0143:50 | RLC_AC | lifeteam six three direct hendrick |
| | | |
| 0143:51 | LC_LC | point out approved |
| | | |
| 0143:52 | RLC_AC | a d |
| | | |
| 0143:59 0144 | RLC_AC | comanche seven one four seven papa abilene approach |
| | | |
| 0144:34 | RLC_AC | lifeteam six three can you broadcast to comanche seven one four seven papa on this frequency and see if he responds |
| | | |
| 0144:41 0145 | LFT63 | i sure will ah comanche seven one seven four papa this is lifeguard lifeteam six three do you copy on ah one two seven point two |
| | | |
| 0145:01 | LFT63 | ah that's a negative on ah getting any contact to them approach and like i said once i got out here past this windmills to the northeast man it's ah i know you're calling ten vis but couldn't even make out a horizon at all so ah hopefully they're okay |
| | | |
| 0145:17 | RLC_AC | life team six three roger thank you |
| | | |
| 0145:19 | LFT63 | you bet |

...

| 0145:31 0146 | RLC_AC | comanche seven one four seven papa abilene approach |
| 0146:47 | RLC_AC | lifeteam six three approach can you monitor guard frequency one two one point five and see if you can re ah hear an e l t |
| 0146:54 0147 | LFT63 | sure i will pull one two one point five right now i got ah two radios but that may be a problem with the altitude though |
| 0147:05 | RLC_AC | comanche seven one four seven papa abilene approach |
| 0147:16 | ZFW | abilene ednas twenty four line |
| 0147:21 | RLC_AC | abilene |
| 0147:22 | ZFW | try switching martex six sixty six again please |
| 0147:23 | RLC_AC | wilco |
| 0147:26 | ZFW | thank you |
| 0147:26 | LFT63 | abilene approach didn't hear anything on guard |
| 0147:27 | RLC_AC | tex six sixty six contact fort worth center on one two seven point one five |
| 0147:32 | MRA666 | one two seven one five martex triple six |
| 0147:33 | RLC_AC | lifeteam six three thank you |
| 0147:38 | BVN7844 | and departure showme seventy eight forty four four point two for six thousand direct glen rose |
| 0147:44 | RLC_AC | showme seventy eight forty four abilene departure radar contact altimeter is three zero zero seven climb and maintain six thousand |
| 0147:51 | BVN7844 | okay four point four for six thousand zero zero seven on the meter eighty eight forty four seventy eight forty four |

...

| 0147:59<br>0148<br>0149 | RLC_AC | comanche seven one four seven papa abilene approach |
| 0149:23<br>0150 | RLC_AC | comanche seven one four seven papa abilene approach |
| 0150:55 | RLC_AC | comanche seven one four seven papa abilene approach |
| 0150:56 | ZFW | abilene twenty four falls low |
| 0151:00 | RLC_AC | abilene |
| 0151:01 | ZFW | yeah reference that four seven papa |
| 0151:03 | RLC_AC | yes sir |
| 0151:04 | ZFW | i had another aircraft try and relay for him and he said no response |
| 0151:06 | RLC_AC | alright thank you for the help |
| 0151:07 | ZFW | that ah primary i had out there i've lost it now so and i couldn't tell sometimes it look like it had a history behind it sometimes it didn't so i don't know |
| 0151:14 | RLC_AC | yeah we're getting one about ah five miles west of ah albany also |
| 0151:19 | ZFW | okay |
| 0151:20 | RLC_AC | alright thank you a d |
| 0151:20 | BVN7844 | abilene departure showme seventy eight forty four |
| 0151:25 | RLC_AC | showme seventy eight forty four abilene departure say again |
| 0151:28 | ZFW | yes sir seventy eight forty four here at six thousand it's kind of choppy ah i know we asked for six for final can we get the original final eight |
| 0151:37 | RLC_AC | showme seventy eight forty four climb and maintain eight |

···

thousand

| 0151:41 0152 | BVN7844 | departing for eight thousand thank you sir |
| 0152:33 | RLC_AC | comanche seven one four seven papa abilene approach |
| 0152:46 | RLC_AC | showme seventy eight forty four can you monitor guard frequency and advise me if you are receiving an e l t |
| 0152:53 | BVN7844 | monitor guard and listen for an e l t seventy eight forty four wilco |
| 0153:00 | LFT63 | and approach lifeguard lifeteam excuse me lifeteam six three final at hendricks |
| 0153:04 | RLC_AC | lifeteam six three roger surface wind at abilene is three one zero at niner change to advisory frequency is approved thanks for your assistance earlier |
| 0153:12 0154 0155 | LFT63 | oh no problem i sure hope that those guys are okay lifeteam six three |
| 0155:23 | BVN7844 | approach showme seventy eight forty four |
| 0155:25 | RLC_AC | showme seventy eight forty four go ahead |
| 0155:29 | BVN7844 | i thought i heard ah four seven papa on frequency wasn't sure this one or guard |
| 0155:36 | RLC_AC | showme seventy eight forty four roger i did hear ah ah two other aircraft broadcasting his call sign on guard frequency |
| 0155:48 | RLC_AC | showme seventy eight forty four at your altitude can you broadcast four seven ah comanche seven one four seven papa and see if he can hear you |
| 0155:58 0156 | BVN7844 | eh four seven wilco seventy eight forty four |
| 0156:02 | BVN7844 | comanche seven one four seven papa showme seventy eight forty four can you hear us |

...

| 0156:17 | BVN7844 | comanche seven one four seven papa |
|---|---|---|
| 0156:41 | BVN7844 | comanche seven one four seven papa |
| 0156:49 | BVN7844 | and abilene seventy eight forty four no joy |
| 0156:54<br>0157<br>0158 | RLC_AC | showme seventy eight forty four thank you |
| 0158:41<br>0159<br>0200 | RLC_AC | comanche seven one four seven papa abilene approach |
| 0200:15 | N65672 | abilene approach skylane six five six seven two is with you eight thousand five hundred |
| 0200:19 | RLC_AC | skylane six five six seven two abilene approach abilene altimeter is three zero zero seven |
| 0200:25 | N65672 | three zero zero seven six seven two |
| 0200:41 | RLC_AC | cessna six five six seven two request that you monitor guard frequency one two one point five and advise if you receive an e l t transmitter |
| 0200:54<br>0201 | N65672 | ah monitor one two one point five will advise six seven two |
| 0201:16 | RLC_AC | showme seventy eight forty four thank you for your help earlier contact fort worth center on one two seven point four five |
| 0201:22<br>0202 | BVN7844 | any time you need it will do it for you seventy eight forty four |
| 0202:57<br>0203<br>0204 | RLC_AC | comanche seven one four seven papa abilene approach |
| 0204:57 | RLC_AC | alright walter the ah briefing for ah radar local and c i c the s i a is up to date position equipment status normal everything is ah up and functional as far as i know radar panel is in alarm but seems to be working okay weather is v f r with low visibility especially to the northeast special activities instructions or restrictions we have no eh eh instructions or restrictions activities i'll ah advise you on four seven papa in a second coordination agreements none your |

...

active traffic on frequency is ah skylane six five six
seven two eight thousand five hundred going to v f r
northwest bound clovis clovis and ah comanche seven one
four seven papa's data tag is in ah in coast five miles
northwest of albany we lost radar contact with him he
had an inflight difficulty ah somewhere around zero one
forty and we have been trying to contact and locate him
ah we're been getting several phone calls regarding him
and ah there is no training in progress up here i have
it l s alpha delta

0205
(0206-0207)
0208
0208:46    RLC_AC    two minutes a d
0209

0209:13    EGF2712   abilene eagle flight twenty seven twelve twenty point
                     five for one three thousand with charlie

0209:19    RLC_AC    eagle flight twenty seven twelve abilene approach roger
                     descend at pilot's discretion maintain niner thousand

0209:26    EGF2712   discretion to nine niner thousand eagle flight twenty
                     seven twelve
0210
(0211-0214)
0215

End of Transcript





United States  Texas

N717P
February 21, 2012
Albany, TX
CEN12FA164

-The red dots depict radar targets
-The white text boxes contain information on the local time,
altitude, and lat/long of the radar target
-The Maltese Cross indicates wreckage locations
-The Scale bar (statute miles) is located in top right hand corner

01:35:44.860  9700 msl
32.79965, -99.30643
PILOT INFORMED ATC THAT
HE WAS "HAVING TROUBLE"

01:33:58.620  9600MSL
32.79864, -99.37002
PILOT INFORMED ATC THAT
HE NEEDED TO TURN AROUND

01:34:03.620  9600 MSL
32.80006, -99.36487
PILOT REPORTED LOSS OF
SUCTION AND ATTITUDE
INDICATOR

CR-148

Private Road 1480

1084





FAA-H-8083-3A

Airplane Flying Handbook

U.S. Department
of Transportation
**Federal Aviation
Administration**

Airplane Flying Handbook   FAA-H-8083-3A

APPENDIX 6
000001

When using the rudder pedals, pressure should be applied smoothly and evenly by pressing with the ball of one foot. Since the rudder pedals are interconnected, and act in opposite directions, when pressure is applied to one pedal, pressure on the other must be relaxed proportionately. When the rudder pedal must be moved significantly, heavy pressure changes should be made by applying the pressure with the ball of the foot while the heels slide along the cockpit floor. Remember, the ball of each foot must rest comfortably on the rudder pedals so that even slight pressure changes can be felt.

In summary, during flight, it is the *pressure* the pilot exerts on the control yoke and rudder pedals that causes the airplane to move about its axes. When a control surface is moved out of its streamlined position (even slightly), the air flowing past it will exert a force against it and will try to return it to its streamlined position. It is this force that the pilot feels as pressure on the control yoke and the rudder pedals.

## FEEL OF THE AIRPLANE

The ability to sense a flight condition, without relying on cockpit instrumentation, is often called "feel of the airplane," but senses in addition to "feel" are involved.

Sounds inherent to flight are an important sense in developing "feel." The air that rushes past the modern light plane cockpit/cabin is often masked by soundproofing, but it can still be heard. When the level of sound increases, it indicates that airspeed is increasing. Also, the powerplant emits distinctive sound patterns in different conditions of flight. The sound of the engine in cruise flight may be different from that in a climb, and different again from that in a dive. When power is used in fixed-pitch propeller airplanes, the loss of r.p.m. is particularly noticeable. The amount of noise that can be heard will depend on how much the slipstream masks it out. But the relationship between slipstream noise and powerplant noise aids the pilot in estimating not only the present airspeed but the trend of the airspeed.

There are three sources of actual "feel" that are very important to the pilot. One is the pilot's own body as it responds to forces of acceleration. The "G" loads imposed on the airframe are also felt by the pilot. Centripetal accelerations force the pilot down into the seat or raise the pilot against the seat belt. Radial accelerations, as they produce slips or skids of the airframe, shift the pilot from side to side in the seat. These forces need not be strong, only perceptible by the pilot to be useful. An accomplished pilot who has excellent "feel" for the airplane will be able to detect even the minutest change.

The response of the aileron and rudder controls to the pilot's touch is another element of "feel," and is one that provides direct information concerning airspeed. As previously stated, control surfaces move in the airstream and meet resistance proportional to the speed of the airstream. When the airstream is fast, the controls are stiff and hard to move. When the airstream is slow, the controls move easily, but must be deflected a greater distance. The pressure that must be exerted on the controls to effect a desired result, and the lag between their movement and the response of the airplane, becomes greater as airspeed decreases.

Another type of "feel" comes to the pilot through the airframe. It consists mainly of vibration. An example is the aerodynamic buffeting and shaking that precedes a stall.

Kinesthesia, or the sensing of changes in direction or speed of motion, is one of the most important senses a pilot can develop. When properly developed, kinesthesia can warn the pilot of changes in speed and/or the beginning of a settling or **mushing** of the airplane.

The senses that contribute to "feel" of the airplane are inherent in every person. However, "feel" must be developed. The flight instructor should direct the beginning pilot to be attuned to these senses and teach an awareness of their meaning as it relates to various conditions of flight. To do this effectively, the flight instructor must fully understand the difference between perceiving something and merely noticing it. It is a well established fact that the pilot who develops a "feel" for the airplane early in flight training will have little difficulty with advanced flight maneuvers.

## ATTITUDE FLYING

In contact (VFR) flying, flying by attitude means visually establishing the airplane's attitude with reference to the natural horizon. [Figure 3-1] Attitude is the angular difference measured between an airplane's axis and the line of the Earth's horizon. Pitch attitude is the angle formed by the longitudinal axis, and bank attitude is the angle formed by the lateral axis. Rotation about the airplane's vertical axis (yaw) is termed an attitude relative to the airplane's flightpath, but not relative to the natural horizon.

In attitude flying, airplane control is composed of four components: pitch control, bank control, power control, and trim.

- Pitch control is the control of the airplane about the lateral axis by using the elevator to raise and lower the nose in relation to the natural horizon.

- Bank control is control of the airplane about the longitudinal axis by use of the ailerons to attain a desired bank angle in relation to the natural horizon.

3-2



Figure 3-1. Airplane attitude is based on relative positions of the nose and wings on the natural horizon.

- Power control is used when the flight situation indicates a need for a change in thrust.

- Trim is used to relieve all possible control pressures held after a desired attitude has been attained.

The primary rule of attitude flying is:

**ATTITUDE + POWER = PERFORMANCE**

## INTEGRATED FLIGHT INSTRUCTION

When introducing basic flight maneuvers to a beginning pilot, it is recommended that the "Integrated" or "Composite" method of flight instruction be used. This means the use of outside references and flight instruments to establish and maintain desired flight attitudes and airplane performance. [Figure 3-2] When beginning pilots use this technique, they achieve a more precise and competent overall piloting ability. Although this method of airplane control may become second nature with experience, the beginning pilot must make a determined effort to master the technique. The basic elements of which are as follows.

- The airplane's attitude is established and maintained by positioning the airplane in relation to the natural horizon. At least 90 percent of the pilot's attention should be devoted to this end, along with



90% of the time, the pilot's attention should be outside the cockpit.

No more than 10% of the pilot's attention should be inside the cockpit.

Figure 3-2. Integrated or composite method of flight instruction.

3-3

APPENDIX 6
000003

scanning for other airplanes. If, during a recheck of the pitch and/or bank, either or both are found to be other than desired, an immediate correction is made to return the airplane to the proper attitude. Continuous checks and immediate corrections will allow little chance for the airplane to deviate from the desired heading, altitude, and flightpath.

- The airplane's attitude is confirmed by referring to flight instruments, and its performance checked. If airplane performance, as indicated by flight instruments, indicates a need for correction, a specific amount of correction must be determined, then applied with reference to the natural horizon. The airplane's attitude and performance are then rechecked by referring to flight instruments. The pilot then maintains the corrected attitude by reference to the natural horizon.

- The pilot should monitor the airplane's performance by making numerous quick glances at the flight instruments. No more than 10 percent of the pilot's attention should be inside the cockpit. The pilot must develop the skill to instantly focus on the appropriate flight instrument, and then immediately return to outside reference to control the airplane's attitude.

The pilot should become familiar with the relationship between outside references to the natural horizon and the corresponding indications on flight instruments inside the cockpit. For example, a pitch attitude adjustment may require a movement of the pilot's reference point on the airplane of several inches in relation to the natural horizon, but correspond to a small fraction of an inch movement of the reference bar on the airplane's attitude indicator. Similarly, a deviation from desired bank, which is very obvious when referencing the wingtip's position relative to the natural horizon, may be nearly imperceptible on the airplane's attitude indicator to the beginning pilot.

The use of integrated flight instruction does not, and is not intended to prepare pilots for flight in instrument weather conditions. The most common error made by the beginning student is to make pitch or bank corrections while still looking inside the cockpit. Control pressure is applied, but the beginning pilot, not being familiar with the intricacies of flight by references to instruments, including such things as instrument lag and gyroscopic precession, will invariably make excessive attitude corrections and end up "chasing the instruments." Airplane attitude by reference to the natural horizon, however, is immediate in its indications, accurate, and presented many times larger than any instrument could be. Also, the beginning pilot must be made aware that anytime, for whatever reason, airplane attitude by reference to the natural horizon cannot be established and/or maintained, the situation should be considered a bona fide emergency.

3-4

## STRAIGHT-AND-LEVEL FLIGHT
It is impossible to emphasize too strongly the necessity for forming correct habits in flying straight and level. All other flight maneuvers are in essence a deviation from this fundamental flight maneuver. Many flight instructors and students are prone to believe that perfection in straight-and-level flight will come of itself, but such is not the case. It is not uncommon to find a pilot whose basic flying ability consistently falls just short of minimum expected standards, and upon analyzing the reasons for the shortcomings to discover that the cause is the inability to fly straight and level properly.

Straight-and-level flight is flight in which a constant heading and altitude are maintained. It is accomplished by making immediate and measured corrections for deviations in direction and altitude from unintentional slight turns, descents, and climbs. *Level flight*, at first, is a matter of consciously fixing the relationship of the position of some portion of the airplane, used as a reference point, with the horizon. In establishing the reference points, the instructor should place the airplane in the desired position and aid the student in selecting reference points. The instructor should be aware that no two pilots see this relationship exactly the same. The references will depend on where the pilot is sitting, the pilot's height (whether short or tall), and the pilot's manner of sitting. It is, therefore, important that during the fixing of this relationship, the pilot sit in a normal manner; otherwise the points will not be the same when the normal position is resumed.

In learning to control the airplane in level flight, it is important that the student be taught to maintain a light grip on the flight controls, and that the control forces desired be exerted lightly and just enough to produce the desired result. The student should learn to associate the apparent movement of the references with the forces which produce it. In this way, the student can develop the ability to regulate the change desired in the airplane's attitude by the amount and direction of forces applied to the controls without the necessity of referring to instrument or outside references for each minor correction.

The pitch attitude for *level flight* (constant altitude) is usually obtained by selecting some portion of the airplane's nose as a reference point, and then keeping that point in a fixed position relative to the horizon. [Figure 3-3] Using the principles of attitude flying, that position should be cross-checked occasionally against the altimeter to determine whether or not the pitch attitude is correct. If altitude is being gained or lost, the pitch attitude should be readjusted in relation to the horizon and then the altimeter rechecked to determine if altitude is now being maintained. The



Figure 3-3. Nose reference for straight-and-level flight.

application of forward or back-elevator pressure is used to control this attitude.

The pitch information obtained from the attitude indicator also will show the position of the nose relative to the horizon and will indicate whether elevator pressure is necessary to change the pitch attitude to return to level flight. However, the primary reference source is the natural horizon.

In all normal maneuvers, the term "increase the pitch attitude" implies raising the nose in relation to the horizon; the term "decreasing the pitch attitude" means lowering the nose.

*Straight flight* (laterally level flight) is accomplished by visually checking the relationship of the airplane's wingtips with the horizon. Both wingtips should be equidistant above or below the horizon (depending on whether the airplane is a high-wing or low-wing type), and any necessary adjustments should be made with the ailerons, noting the relationship of control pressure and the airplane's attitude. [Figure 3-4] The student should understand that anytime the wings are banked, even though very slightly, the airplane will turn. The objective of straight-and-level flight is to detect small deviations from laterally level flight as soon as they occur, necessitating only small corrections. Reference to the heading indicator should be made to note any change in direction.



Figure 3-4. Wingtip reference for straight-and-level flight.

3-5

APPENDIX 6
000005

Continually observing the wingtips has advantages other than being the only positive check for leveling the wings. It also helps divert the pilot's attention from the airplane's nose, prevents a fixed stare, and automatically expands the pilot's area of vision by increasing the range necessary for the pilot's vision to cover. In practicing straight-and-level-flight, the wingtips can be used not only for establishing the airplane's laterally level attitude or bank, but to a lesser degree, its pitch attitude. This is noted only for assistance in learning straight-and-level flight, and is not a recommended practice in normal operations.

The scope of a student's vision is also very important, for if it is obscured the student will tend to look out to one side continually (usually the left) and consequently lean that way. This not only gives the student a biased angle from which to judge, but also causes the student to exert unconscious pressure on the controls in that direction, which results in dragging a wing.

With the wings approximately level, it is possible to maintain straight flight by simply exerting the necessary forces on the rudder in the desired direction. However, the instructor should point out that the practice of using rudder alone is not correct and may make precise control of the airplane difficult. Straight–and-level flight requires almost no application of control pressures if the airplane is properly trimmed and the air is smooth. For that reason, the student must not form the habit of constantly moving the controls unnecessarily. The student must learn to recognize when corrections are necessary, and then to make a measured response easily and naturally.

To obtain the proper conception of the forces required on the rudder during straight-and-level-flight, the airplane must be held level. One of the most common faults of beginning students is the tendency to concentrate on the nose of the airplane and attempting to hold the wings level by observing the curvature of the nose cowling. With this method, the reference line is very short and the deviation, particularly if very slight, can go unnoticed. Also, a very small deviation from level, by this short reference line, becomes considerable at the wingtips and results in an appreciable dragging of one wing. This attitude requires the use of additional rudder to maintain straight flight, giving a false conception of neutral control forces. The habit of dragging one wing, and compensating with rudder pressure, if allowed to develop is particularly hard to break, and if not corrected will result in considerable difficulty in mastering other flight maneuvers.

For all practical purposes, the airspeed will remain constant in straight-and-level flight with a constant power setting. Practice of intentional airspeed changes, by increasing or decreasing the power, will provide an excellent means of developing proficiency in maintaining straight-and-level flight at various speeds. Significant changes in airspeed will, of course, require considerable changes in pitch attitude and pitch trim to maintain altitude. Pronounced changes in pitch attitude and trim will also be necessary as the flaps and landing gear are operated.

Common errors in the performance of straight-and-level flight are:

- Attempting to use improper reference points on the airplane to establish attitude.

- Forgetting the location of preselected reference points on subsequent flights.

- Attempting to establish or correct airplane attitude using flight instruments rather than outside visual reference.

- Attempting to maintain direction using only rudder control.

- Habitually flying with one wing low.

- "Chasing" the flight instruments rather than adhering to the principles of attitude flying.

- Too tight a grip on the flight controls resulting in overcontrol and lack of feel.

- Pushing or pulling on the flight controls rather than exerting pressure against the airstream.

- Improper scanning and/or devoting insufficient time to outside visual reference. (Head in the cockpit.)

- Fixation on the nose (pitch attitude) reference point.

- Unnecessary or inappropriate control inputs.

- Failure to make timely and measured control inputs when deviations from straight-and-level flight are detected.

- Inadequate attention to sensory inputs in developing feel for the airplane.

# TRIM CONTROL

The airplane is designed so that the primary flight controls (rudder, aileron, and elevator) are streamlined with the nonmovable airplane surfaces when the airplane is cruising straight-and-level at normal weight and loading. If the airplane is flying out of that basic balanced condition, one or more of the control surfaces is going to have to be held out of its streamlined position by continuous control input. The use of trim tabs relieves the pilot of this requirement. Proper trim technique is a very important and

3-6



Federal Aviation
Administration

SPATIAL
DISORIENTATION

## Spatial Orientation

Defines our natural ability to maintain our body orientation and/or posture in relation to the surrounding environment (physical space) at rest and during motion. Genetically speaking, humans are designed to maintain spatial orientation on the ground. The three-dimensional environment of flight is unfamiliar to the human body, creating sensory conflicts and illusions that make spatial orientation difficult, and sometimes impossible to achieve. Statistics show that between 5 to 10% of all general aviation accidents can be attributed to spatial disorientation, 90% of which are fatal.

## Spatial Orientation in Flight

Spatial orientation in flight is difficult to achieve because numerous sensory stimuli (visual, vestibular, and proprioceptive) vary in magnitude, direction, and frequency. Any differences or discrepancies between visual, vestibular, and proprioceptive sensory inputs result in a sensory mismatch that can produce illusions and lead to spatial disorientation. Good spatial orientation relies on the effective perception, integration and interpretation of visual, vestibular (organs of equilibrium located in the inner ear) and proprioceptive (receptors located in the skin, muscles, tendons, and joints) sensory information.



## Vestibular Aspects of Spatial Orientation

The inner ear contains the vestibular system, which is also known as the organ of equilibrium. About the size of an pencil eraser, the vestibular system contains two distinct structures: the semicircular canals, which detect changes in angular acceleration, and the otolith organs (the utricule and the saccule), which detect changes in linear acceleration and gravity. Both the semicircular canals and the otolith organs provide information to the brain regarding our body's position and movement. A connection between the vestibular system and the eyes helps to maintain balance and keep the eyes focused on an object while the head is moving or while the body is rotating.

## The Semicircular Canals

The semicircular canals are three half-circular, interconnected tubes located inside each ear that are the equivalent of three gyroscopes located in three planes perpendicular (at right angles) to each other. Each plane corresponds to the rolling, pitching, or yawing motions of an aircraft.





Illusions involving the semicircular canals of the vestibular system occur primarily under conditions of unreliable or unavailable external visual references and result in false sensations of rotation. These include the Leans, the Graveyard Spin and Spiral, and the Coriolis Illusion.

**The Leans.** This is the most common illusion during flight and is caused by a sudden return to level flight following a gradual and prolonged turn that went unnoticed by the pilot.

The reason a pilot can be unaware of such a gradual turn is that human exposure to a rotational acceleration of 2 degrees per second or lower is below the detection threshold of the semicircular canals. Leveling the wings after such a turn may cause an illusion that the aircraft is banking in the opposite direction. In response to such an illusion, a pilot may lean in the direction of the original turn in a corrective attempt to regain the perception of a correct vertical posture.



**The Graveyard Spin** is an illusion that can occur to a pilot who intentionally or unintentionally enters a spin. For example, a pilot who enters a spin to the left will initially have a sensation of spinning in the same direction. However, if the left spin continues the pilot will have the sensation that the spin is progressively decreasing. At this point, if the pilot applies right rudder to stop the left spin, the pilot will suddenly sense a spin in the opposite direction (to the right). If the pilot believes that the airplane is spinning to the right, the response will be to apply left rudder to counteract the sensation of a right spin. However, by applying left rudder the pilot will unknowingly re-enter the original left spin. If the pilot cross checks the turn indicator, he/she would see the turn needle indicating a left turn while he/she senses a right turn. This creates a sensory conflict between what the pilot sees on the instruments and what the pilot feels. If the pilot believes the body sensations instead of trusting the instruments, the left spin will continue. If enough

❹

---

Each canal is filled with a fluid called endolymph and contains a motion sensor with little hairs whose ends are embedded in a gelatinous structure called the cupula. The cupula and the hairs move as the fluid moves inside the canal in response to an angular acceleration.

The movement of the hairs is similar to the movement of seaweed caused by ocean currents or that of wheat fields moved by wind gusts. When the head is still and the airplane is straight and level, the fluid in the canals does not move and the hairs stand straight up, indicating to the brain that there is no rotational acceleration (a turn).

If you turn either your aircraft or your head, the canal moves with your head, but the fluid inside does not move because of its inertia. As the canal moves, the hairs inside also move with it and are bent in the opposite direction of the acceleration by the stationary fluid (A). This hair movement sends a signal to the brain to indicate that the head has turned. The problem starts when you continue turning your aircraft at a constant rate (as in a coordinated turn) for more than 20 seconds.



A — Angular Acceleration



Stationary



B — Constant Angular Velocity



C — Angular Deceleration

In this kind of turn, the fluid inside the canal starts moving initially, then friction causes it to catch up with the walls of the rotating canal (B). When this happens, the hairs inside the canal will return to their straight up position, sending an erroneous signal to the brain that the turn has stopped--when, in fact, the turn continues.

If you then start rolling out of the turn to go back to level flight, the fluid inside the canal will continue to move (because of its inertia), and the hairs will now move in the opposite direction (C), sending an erroneous signal to the brain indicating that you are turning in the opposite direction, when in fact, you are actually slowing down from the original turn.

## The Otolith Organs






Two otolith organs, the saccule and utricle, are located in each ear and are set at right angles to each other. The utricle detects changes in linear acceleration in the horizontal plane, while the saccule detects gravity changes in the vertical plane. However, the inertial forces resulting from linear accelerations cannot be distinguished from the force of gravity; therefore, gravity can also produce stimulation of the utricle and saccule. These organs are located at the base (vestibule) of the semicircular canals, and their structure consists of small sacs (maculas) covered by hair cell filaments that project into an overlying gelatinous membrane (cupula) tipped by tiny, chalk-like calcium stones called otoconia.

### Change in Gravity

When the head is tilted, the weight of the otoconia of the saccule pulls the cupula, which in turn bends the hairs that send a signal to the brain indicating that the head has changed position. A similar response will occur during a vertical take-off in a helicopter or following the sudden opening of a parachute after a free fall.

### Change in Linear Acceleration

The inertial forces resulting from a forward linear acceleration (take-off, increased acceleration during level flight, vertical climb) produce a backward displacement of the otoconia of the utricle that pulls the cupula, which in

---

altitude is lost before this illusion is recognized and corrective action is taken, impact with terrain is inevitable.

The **Graveyard Spiral** is more common than the Graveyard Spin, and it is associated with a return to level flight following an intentional or unintentional prolonged bank turn. For example, a pilot who enters a banking turn to the left will initially have a sensation of a turn in the same direction. If the left turn continues (~20 seconds or more), the pilot will experience the sensation that the airplane is no longer turning to the left. At this point, if the pilot attempts to level the wings this action will produce a sensation that the airplane is turning and banking in the opposite direction (to the right). If the pilot believes the illusion of a right turn (which can be very compelling), he/she will reenter the original left turn in an attempt to counteract the sensation of a right turn. Unfortunately, while this is happening, the airplane is still turning to the left and losing altitude. Pulling the control yoke/stick and applying power while turning would not be a good idea—because it would only make the left turn tighter. If the pilot fails to recognize the illusion and does not level the wings, the airplane will continue turning left and losing altitude until it impacts the ground.

The **Coriolis Illusion** involves the simultaneous stimulation of two semicircular canals and is associated with a sudden tilting (forward or backwards) of the pilot's head while the aircraft is turning. This can occur when you tilt you head down (to look at an approach chart or to write a note on your knee pad), or tilt it up (to look at an overhead instrument or switch) or tilt it sideways. This



produces an almost unbearable sensation that the aircraft is rolling, pitching, and yawing all at the same time, which can be compared with the sensation of rolling down on a hillside. This illusion can make the pilot quickly become disoriented and lose control of the aircraft.



indication of posture by sensing the relative position of our body parts in relation to each other, and by sensing points of physical contact between body parts and the surrounding environment (floor, wall, seat, arm rest, etc.). For example, proprioceptors make it possible for you to know that you are seated while flying; however, they alone will not let you differentiate between flying straight and level and performing a coordinated turn.

## How to Prevent Spatial Disorientation

The following are basic steps that should help prevent spatial disorientation:

• Take the opportunity to experience spatial disorientation illusions in a Barany chair, a Vertigon, a GYRO, or a Virtual Reality Spatial Disorientation Demonstrator.

• Before flying with less than 3 miles visibility, obtain training and maintain proficiency in airplane control by reference to instruments.

• When flying at night or in reduced visibility, use the flight instruments.

• If intending to fly at night, maintain night-flight currency. Include cross-country and local operations at different airports.

• If only Visual Flight Rules-qualified, do not attempt visual flight when there is a possibility of getting trapped in deteriorating weather.

• If you experience a vestibular illusion during flight, trust your instruments and disregard your sensory perceptions.

## Spatial Disorientation and Airsickness

It is important to know the difference between spatial disorientation and airsickness. Airsickness is a normal response of healthy individuals when exposed to a flight environment characterized by unfamiliar motion and

8

---

turn bends the haircell filaments that send a signal to the brain, indicating that the head and body have suddenly been moved forward. Exposure to a backward linear acceleration, or to a forward linear deceleration has the opposite effect.

## Vestibular Illusions

(**Somatogravic - Utricle and Saccule**) Illusions involving the utricle and the saccule of the vestibular system are most likely under conditions with unreliable or unavailable external visual references. These illusions include: the Inversion Illusion, Head-Up Illusion, and Head-Down Illusion.

**The Inversion Illusion** involves a steep ascent (forward linear acceleration) in a high-performance aircraft, followed by a sudden return to level flight. When the pilot levels off, the aircraft's speed is relatively higher. This combination of accelerations produces an illusion that the aircraft is in inverted flight. The pilot's response to this illusion is to lower the nose of the aircraft.

**The Head-Up Illusion** involves a sudden forward linear acceleration during level flight where the pilot perceives the illusion that the nose of the aircraft is pitching up. The pilot's response to this illusion would be to push the yolk or the stick forward to pitch the nose of the aircraft down. A night take-off from a well-lit airport into a totally dark sky (black hole) or a catapult take-off from an aircraft carrier can also lead to this illusion, and could result in a crash.



**The Head-Down Illusion** involves a sudden linear deceleration (air braking, lowering flaps, decreasing engine power) during level flight where the pilot perceives the illusion that the nose of the aircraft is pitching down. The pilot's response to this illusion would be to pitch the nose of the aircraft up. If this illusion occurs during a low-speed final approach, the pilot could stall the aircraft.

## The Proprioceptive Receptors

The proprioceptive receptors (proprioceptors) are special sensors located in the skin, muscles, tendons, and joints that play a very small role in maintaining spatial orientation in normal individuals. Proprioceptors do give some



Acceleration

Sensation
Actual
G Forces
Reaction

7

orientation clues. Common signs and symptoms of airsickness include: vertigo, loss of appetite, increased salivation and swallowing, burping, stomach awareness, nausea, retching, vomiting, increased need for bowel movements, cold sweating, skin pallor, sensation of fullness of the head, difficulty concentrating, mental confusion, apathy, drowsiness, difficulty focusing, visual flashbacks, eye strain, blurred vision, increased yawning, headache, dizziness, postural instability, and increased fatigue.

The symptoms are usually progressive. First, the desire for food is lost. Then, as saliva collects in the mouth, the person begins to perspire freely, the head aches, and the airsick person may eventually become nauseated and vomit. Severe airsickness may cause a pilot to become completely incapacitated.



Although airsickness is uncommon among experienced pilots, it does occur occasionally (especially among student pilots). Some people are more susceptible to airsickness than others. Fatigue, alcohol, drugs, medications, stress, illnesses, anxiety, fear, and insecurity are some factors that can increase individual susceptibility to motion sickness of any type. Women have been shown to be more susceptible to motion sickness than men of any age. In addition, reduced mental activity (low mental workload) during exposure to an unfamiliar motion has been implicated as a predisposing factor for airsickness.

A pilot who concentrates on the mental tasks required to fly an aircraft will be less likely to become airsick because his/ her attention is occupied. This explains why sometimes a student pilot who is at the controls of an aircraft does not get airsick, but the experienced instructor who is only monitoring the student unexpectedly becomes airsick.

A pilot who has been the victim of airsickness knows how uncomfortable and impairing it can be. Most importantly, it jeopardizes the pilot's flying proficiency and safety, particularly under conditions that require peak piloting skills and performance (equipment malfunctions, instrument flight conditions, bad weather, final approach, and landing).

Pilots who are susceptible to airsickness should not take anti-motion sickness medications (prescription or overthe- counter). These medications can make one drowsy or affect brain functions in other ways. Research has shown that most anti-motion sickness medications cause a temporary deterioration of navigational skills or other tasks demanding keen judgment.

An effective method to increase pilot resistance to airsickness consists of repetitive exposure to the flying conditions that initially resulted in airsickness. In other words, repeated exposure to the flight environment decreases an individual's susceptibility to subsequent airsickness.

If you become airsick while piloting an aircraft, open the air vents, loosen your clothing, use supplemental oxygen, keep your eyes on a point outside the aircraft, place your head against the seat's headrest, and avoid unnecessary head movements. Then, cancel the flight, and land as soon as possible.

## FAA Aeromedical Training Programs for Civil Aviation Pilots

**Physiological Training Course.** The Civil Aerospace Medical Institute offers a 1-day training course to familiarize civil aviation pilots and flight crews with the physiological and psychological stressors of flight. Classroom training subjects include spatial disorientation, oxygen equipment, hypoxia, trapped gas, and decompression sickness.

**Demonstrations.** Spatial disorientation demonstrators provide pilots the experience of vestibular and visual illusions in a safe, ground-based environment—and they teach ways to avoid spatial disorientation while flying. Also, a ground-based altitude chamber flight offers a practical demonstration of rapid decompression and hypoxia. For information and scheduling, call (405) 954-4837, or check the FAA Web site:

www.faa.gov/pilots/training/airman_education/aerospace_physiology/index.cfm



# Medical Facts for Pilots

Publication: AM-400-03/1

Written by: Melchor J. Antunano, M.D.

Prepared by
Federal Aviation Administration
Civil Aerospace Medical Institute
Aerospace Medical Education Division

To request copies of this brochure and others listed below, contact

FAA Civil Aerospace Medical Institute
Shipping Clerk, AAM-400
P.O. Box 25082
Oklahoma City, OK 73125
(405) 954-4831

## Other Pilot Safety Brochures Available

| Number | Title |
|---|---|
| AM-400-94/2 | Alcohol and Flying: A Deadly Combination |
| AM-400-95/2 | Altitude Decompression Sickness |
| OK05-0270 | Carbon Monoxide: A Deadly Threat |
| AM-400-03/2 | Deep Vein Thrombosis and Travel |
| AM-400-98/3 | Hearing and Noise in Aviation |
| AM-400-97/1 | Introduction to Human Factors in Aviation |
| OK05-0005 | Medications and Flying |
| AM-400-01/1 | Physiological Training Courses for Civil Aviation Pilots |
| AM-400-98/2 | Pilot Vision |
| AM-400-91/2 | Seat Belts and Shoulder Harnesses |
| AM-400-95/1 | Smoke! |
| AM-400-00/1 | Spatial Disorientation: Visual Illusions |
| AM-400-03/1 | Spatial Disorientation: Why You Shouldn't Fly By the Seat of Your Pants |
| AM-400-05/1 | Sunglasses for Pilots: Beyond the Image |

To view these pilot and passenger safety brochures, visit the Federal Aviation Administration's Web Site

www.faa.gov/pilots/safety/pilotsafetybrochures/

## Physiological Training Classes for Pilots

If you are interested in taking a one-day aviation physiological training course with altitude chamber and vertigo demonstrations or a one-day survival course, learn about how to sign up for these courses that are offered at 14 locations across the U.S. by visiting this FAA Web site:

www.faa.gov/pilots/training/airman_education/aerospace_physiology/index.cfm



Photo - Main Wreckage Looking East  (NTSB Photo)



Photo - Main Wreckage Looking South (NTSB Photo)



Photo - Separated Right Wing (NTSB Photo)

AIG000036

AIG000038

AIG000039



AIG000041



PLAINTIFF'S EXHIBIT







tabbles

PLAINTIFF'S
EXHIBIT
64

ALLPTF0001719




PLAINTIFF'S
EXHIBIT
289

AIG000039





PLAINTIFF'S
EXHIBIT
290

AIG000040





PLAINTIFF'S
EXHIBIT
291

AIG000041

EXHIBIT
3
PENGAD 800-631-6989

Aircraft: 1975 Piper PA 32 FG, N33033      Serial No.: 32-7500011

Engine(s): Lycoming O-540 E4B5       Serial No.: L-20394-40A
Approximate total hours: (estimated from logbooks or other info.)
Engines: TSMOH: 679.37 hrs          Airframe:    AFTT: 2633.37 hrs
Equipment: Narco 190 DME, Narco ADF, Garmin GTX 327, Narco Com, KX 155
Description of Accident:  Hurricane loss, aircraft flipped over.
Description of Damages:   Both wings, all control surfaces, tail section, prop, fuselage, cowling.
Location of Aircraft:  Quality Aircraft, Don Huntington 352-429-9016 Groveland, FL   352-429-3004
Remarks:
Inquiries (Contact):  Keith Johnson @ AIG Aviation (480) 699-8474

All bids must be returned directly to Atlanta Office or Fax (404) 249-1811 Attn: Salvage Dept.
Please submit your bid on this form and return it so as to be received in this office no later than 4:30 p.m.
(EST), Friday, December 2nd, 2005.  Due to the high volume of bids received by AIG Aviation, Inc. we
cannot confirm receipt of your bid. Confirmation of your facsimile will be your facsimile journal.

| Name of Bidder:  Robert G. Ruhe | Date of Bid: Nov. 17, 2005 |
| --- | --- |
| Bidder Signature: *Robert G. Ruhe* | My Bid is $ 28,400.00 |
| Street Address:  5450 State Route 109 | |

| City: Leipsic | State: Ohio | Zip Code: 45856 |
| --- | --- | --- |
| Phone: (419) 943-3352 | Fax: (419) 943-3971 | Email: |
| | File #: 70551-0003675-1 | |

Please print legibly and provide a street address for delivery of logbooks.

POLICY/AGREEMENT
You are advised that the described aircraft is for sale "AS IS/WHERE IS" and written, sealed bids or faxes will be
accepted no later than 4:30 p.m. (EST), Friday, December 2nd, 2005. Winning bidder will be notified immediately
and agrees to provide wire transfer or money order. Salvage will not be released until receipt of your wire transfer or
money order. All storage and handling charges accrued after to December 16th, 2005 will be the responsibility
of the buyer.

- Seller reserves the right to reject any or all bids.
- By signing this form, buyer acknowledges that they have had the opportunity to inspect and evaluate the aircraft
  salvage before the date of this bid.
- ALL SALES ARE FINAL.

All bids must be returned directly to Atlanta Office or Fax (404) 249-1811 Attn: Salvage Dept.

DX 013
Case No. 2013-215



| YEAR:<br><br>DATE | RECORDING TACH TIME | TODAYS FLIGHT | TOTAL TIME IN SERVICE | Description of Inspections, Tests, Repairs and Alterations<br>Entries must be endorsed with Name, Rating and Certificate Number of Technician or Repair Facility. (See back pages for other specific entries.) |
|---|---|---|---|---|
| | | | | The subject aircraft was involved in an incident/accident on _2011_ render-ing it a Constructive Total Loss as not ___ble within its insured value. For further detail refer to f. _D5403_ Signed ___ Dated _5-9-14_ United States Aviation Underwriters, Inc. _____ Dallas Pkwy., Suite ~~1370~~ _508_ Addison, Texas 75001 |



PLAINTIFF'S EXHIBIT 9

## SUMMARY OF PLAINTIFFS' EXHIBIT 311

| Page | Amount |
|------|--------|
| AIG-178 | 328,227.13 |
| AIG-179 | 714,610.16 |
| AIG-180 | 718,650.81 |
| AIG-181 | 624,134.16 |
| AIG-182 | 805,045.23 |
| AIG-183 | 588,290.07 |
| AIG-184 | 707,895.74 |
| AIG-185 | 567,249.67 |
| AIG-186 | 508,578.06 |
| AIG-187 | 583,705.18 |
| AIG-188 | 611,212.57 |
| AIG-189 | 752,183.09 |
| AIG-190 | 421,580.80 |
| AIG-191 | 574,349.10 |
| AIG-192 | 605,951.86 |
| AIG-193 | 658,062.91 |
| AIG-194 | 698,463.26 |
| AIG-195 | 820,450.89 |
| AIG-196 | 1,100,707.18 |
| AIG-197 | 1,701,071.41 |
| AIG-198 | 1,341,493.27 |
| AIG-199 | 813,401.60 |
| AIG-200 | 711,822.26 |
| AIG-201 | 804,558.96 |
| Total | 17,761,695.37 |

0·00 *



**--- Salvage Payment Reoprt ---**

Claim
Inquiry     Form: 01/01/2003 To:
Home              12/31/2005

Loss
Experience
Reports

Reports

Sign Off

23,185·40 *+
47,933·62 +
277·06 +
2,437·60 +
23,376·00 +
5,501·00 +
6,893·00 +
4,760·00 +
294·95 +
10,119·00 +
12,000·00 +
8,376·00 +
110·00 +
110·50 +
15,100·00 +
2,376·00 +
8,500·00 +
28,000·00 +
6,376·00 +
15,476·00 +
28,710·00 +
8,675·00 +
17,100·00 +
5,250·00 +
13,376·00 +
17,868·00 +
4,676·00 +
11,320·00 +

028

328,227·13 *

| AccidentID | ClaimID | Claimant | Payment | ProcessDat | UserCode |
|---|---|---|---|---|---|
| 51569 | CH03002 | 1 | -23,185.4 | 20030804 | CLAIM20 |
| 43330 | CH04005 | 1 | 47,983.62 | 20050715 | CLAIM15 |
| 46539 | CH9502 | 1 | -277.06 | 20040520 | CLAIM2 |
| 46543 | CH9802 | 1 | -2,437.6 | 20041108 | CLAIM2 |
| 54955 | HG0133 | 1 | -23,376 | 20030129 | AZBR2 |
| 42657 | HG0133 | 1 | -5,501 | 20030723 | AZBR39 |
| 44014 | HG0135 | 1 | -6,893 | 20030317 | AZBR6 |
| 62439 | HG0142 | 1 | -4,760 | 20030205 | CLAIM2 |
| 62439 | HG0142 | 1 | -294.95 | 20040630 | CLAIM2 |
| 41252 | HG0143 | 1 | -10,119.0 | 20051121 | AZBR53 |
| 41870 | HG0145 | 1 | -12,000 | 20030107 | AZBR6 |
| 55112 | HG0146 | 1 | -8,376 | 20040128 | AZBR53 |
| 43281 | HG0207 | 1 | -110 | 20030121 | CLAIM2 |
| 43281 | HG0207 | 1 | -110.5 | 20030224 | AZBR2 |
| 44066 | HG0208 | 1 | -15,100 | 20040226 | CABR12 |
| 54916 | HG0217 | 1 | -2,376 | 20030428 | AZBR6 |
| 40342 | HG0218 | 1 | -8,500 | 20050526 | AZBR53 |
| 60976 | HG0219 | 1 | -28,000 | 20030124 | TXBR4 |
| 43290 | HG0220 | 1 | -6,376 | 20040319 | CLAIM18 |
| 54800 | HG0220 | 1 | -15,476 | 20030508 | AZBR6 |
| 44115 | HG0225 | 1 | - | 20030625 | CLAIM18 |
| 54659 | HG0225 | 1 | -28,710 | 20030710 | TXBR4 |
| 55285 | HG0227 | 1 | -8,675 | 20030130 | CLAIM18 |
| 43287 | HG0228 | 1 | -17,100 | 20030108 | AZBR6 |
| 44230 | HG0228 | 1 | -5,250 | 20030414 | TXBR4 |
| 43625 | HG0228 | 1 | -13,376 | 20030326 | NJBR15 |
| 43541 | HG0229 | 1 | -17,868 | 20030113 | AZBR46 |
| 62226 | HG0229 | 1 | -4,676 | 20030520 | CLAIM18 |
| 44207 | HG0229 | 1 | -11,320 | 20030707 | AZBR6 |
| 55174 | HG0230 | 1 | - | 20030709 | AZBR2 |



PLAINTIFF'S
EXHIBIT
311

**CONFIDENTIAL**

AIG000178

| 55388 | HG0230 | 1 | -3,266 | 20030416 | TXBR4 |
|---|---|---|---|---|---|
| 55151 | HG0232 | 1 | -5,676 | 20030528 | AZBR2 |
| 55235 | HG0234 | 1 | -3,710 | 20030110 | AZBR2 |
| 55476 | HG0238 | 1 | -17,525 | 20030204 | AZBR2 |
| 55194 | HG0238 | 1 | -400 | 20030611 | AZBR6 |
| 41822 | HG0239 | 1 | -10,755 | 20050204 | AZBR53 |
| 44084 | HG0240 | 1 | -28,000 | 20030414 | AZBR6 |
| 44015 | HG0241 | 1 | -5,225 | 20030529 | AZBR39 |
| 55783 | HG02418 | 1 | -20,776.76 | 20030416 | AZBR39 |
| 42299 | HG0241 | 1 | -6,500 | 20030430 | AZBR6 |
| 41410 | HG0242 | 1 | -16,000 | 20030509 | AZBR6 |
| 55819 | HG0242 | 1 | -3,656 | 20030204 | AZBR2 |
| 44092 | HG0242 | 1 | -9,750 | 20031209 | AZBR53 |
| 53965 | HG0243 | 1 | -27,000 | 20030422 | AZBR2 |
| 54176 | HG0244 | 1 | -4,676 | 20030522 | AZBR6 |
| 55914 | HG0244 | 1 | -3,000 | 20030314 | AZBR39 |
| 55714 | HG0249 | 1 | -6,701 | 20030502 | AZBR39 |
| 42756 | HG0249 | 1 | -5,210 | 20030416 | AZBR39 |
| 54400 | HG0300 | 1 | -18,755 | 20030522 | ILBR7 |
| 55890 | HG0302 | 1 | -23,246 | 20030508 | AZBR6 |
| 44202 | HG03028 | 1 | -13,679.54 | 20030618 | AZBR2 |
| 55857 | HG0303 | 1 | -8,507 | 20030530 | AZBR46 |
| 54101 | HG0304 | 1 | -15,600 | 20030530 | AZBR46 |
| 57410 | HG0304 | 1 | -8,779 | 20030508 | AZBR2 |
| 55992 | HG0305 | 1 | -32,175 | 20030702 | AZBR39 |
| 55566 | HG0305 | 1 | -18,683 | 20031021 | AZBR53 |
| 55943 | HG0306 | 1 | -6,750 | 20030729 | NJBR15 |
| 55721 | HG03070 | 1 | -31,776.76 | 20031002 | AZBR6 |
| 42991 | HG0308 | 1 | -17,100 | 20031210 | AZBR2 |
| 54974 | HG0309 | 1 | -13,210 | 20030722 | AZBR39 |
| 55665 | HG0309 | 1 | -14,800 | 20030710 | AZBR6 |
| 37067 | HG0309 | 1 | -3,500 | 20031013 | AZBR46 |
| 55109 | HG0310 | 1 | -16,501 | 20030616 | TXBR4 |
| 43960 | HG0311 | 1 | -2,440 | 20030709 | AZBR2 |
| 55377 | HG0311 | 1 | -7,376 | 20030625 | AZBR2 |
| 55699 | HG0313 | 1 | -3,700 | 20050315 | AZBR53 |
| 55558 | HG0313 | 1 | -3,785 | 20030723 | AZBR39 |
| 36955 | HG0315 | 1 | -8,759 | 20031015 | CLAIM18 |
| 54338 | HG0315 | 1 | -39,510 | 20031007 | AZBR6 |
| 42624 | HG0316 | 1 | -26,656 | 20030918 | TXBR4 |
| 36967 | HG0316 | 1 | -40,000 | 20031029 | AZBR46 |
| 53578 | HG03168 | 1 | -12,256.1 | 20031009 | CABR12 |
| 54452 | HG0317 | 1 | -33,876 | 20030808 | ILBR7 |
| 44236 | HG0317 | 1 | -3,176 | 20030922 | AZBR39 |
| 62327 | HG0318 | 1 | -8,378 | 20030908 | AZBR6 |
| 43076 | HG0318 | 1 | -9,611 | 20030918 | AZBR2 |
| 41989 | HG0318 | 1 | -21,012 | 20030828 | AZBR6 |
| 55768 | HG0318 | 1 | -61,826 | 20040305 | AZBR53 |
| 57379 | HG0319 | 1 | -11,360 | 20030825 | AZBR39 |

3,266.00 *+
5,676.00 +
3,710.00 +
17,525.00 +
400.00 +
10,755.00 +
28,000.00 +
5,225.00 +
20,776.76 +
6,500.00 +
16,000.00 +
3,656.00 +
9,750.00 +
27,000.00 +
4,676.00 +
3,000.00 +
6,701.00 +
5,210.00 +
18,755.00 +
23,246.00 +
13,679.50 +
13,679.50 -
13,679.54 +
8,507.00 +
15,600.00 +
8,779.00 +
32,175.00 +
18,683.00 +
6,750.00 +
31,776.76 +
17,100.00 +
13,210.00 +
14,800.00 +
3,500.00 +
16,501.00 +
2,440.00 +
7,376.00 +
3,700.00 +
3,785.00 +
8,759.00 +
39,510.00 +
26,656.00 +
40,000.00 +
12,256.10 +
33,876.00 +
3,176.00 +
8,378.00 +
9,611.00 +
21,012.00 +
61,826.00 +
11,360.00 +

049

714,610.16 *

**CONFIDENTIAL**

AIG000179

| | | | | | |
|---|---|---|---|---|---|
| 37103 | HG0319 | 1 | -25,000 | 20031013 | AZBR2 |
| 54087 | HG0319 | 1 | -6,155 | 20030926 | AZBR6 |
| 43628 | HG0319 | 1 | -9,376 | 20031209 | AZBR53 |
| 55524 | HG0320 | 1 | -3,320 | 20031007 | AZBR6 |
| 55798 | HG0320 | 1 | -2,676 | 20030827 | AZBR39 |
| 37059 | HG0320 | 1 | -9,125 | 20031021 | AZBR53 |
| 56055 | HG0320 | 1 | -19,280 | 20040206 | AZBR53 |
| 43126 | HG0321 | 1 | -9,050 | 20031201 | AZBR53 |
| 41458 | HG0323 | 1 | -6,878 | 20031104 | NJBR15 |
| 43629 | HG03238 | 1 | -11,339.2 | 20031107 | AZBR53 |
| 43277 | HG0323 | 1 | -23,688 | 20031118 | AZBR6 |
| 54744 | HG0324 | 1 | -11,363 | 20031215 | AZBR53 |
| 37101 | HG03252 | 1 | 18,000.01 | 20031105 | AZBR53 |
| 56167 | HG0327 | 1 | -14,376 | 20031215 | ILBR7 |
| 62443 | HG0327 | 1 | -18,376 | 20040507 | AZBR53 |
| 62434 | HG0328 | 1 | -6,775 | 20031001 | AZBR53 |
| 55979 | HG0328 | 1 | -3,626 | 20050328 | AZBR53 |
| 53604 | HG0328 | 1 | -12,176 | 20041130 | CLAIM20 |
| 54354 | HG0329 | 1 | -8,880 | 20031020 | AZBR39 |
| 55966 | HG0329 | 1 | -4,326 | 20040106 | ILBR7 |
| 42402 | HG0329 | 1 | -3,500 | 20031201 | AZBR53 |
| 55089 | HG0329 | 1 | -6,300 | 20031027 | AZBR2 |
| 56161 | HG0329 | 1 | -81,250 | 20040204 | AZBR53 |
| 61886 | HG0330 | 1 | -10,000 | 20030916 | TXBR4 |
| 54454 | HG0330 | 1 | -41,500 | 20031205 | CLAIM18 |
| 62326 | HG0331 | 1 | -2,676 | 20031211 | AZBR53 |
| 55695 | HG0331 | 1 | -9,376 | 20031223 | ILBR7 |
| 62375 | HG0332 | 1 | -5,675 | 20040106 | AZBR53 |
| 54940 | HG0333 | 1 | -3,222 | 20031209 | AZBR53 |
| 37111 | HG0334 | 1 | -1,351 | 20040812 | AZBR53 |
| 54140 | HG0334 | 1 | -450 | 20050120 | AZBR53 |
| 53904 | HG0335 | 1 | -5,330 | 20050823 | AZBR53 |
| 42980 | HG0335 | 1 | -10,380 | 20031105 | AZBR53 |
| 37113 | HG0335 | 1 | -7,000 | 20040629 | AZBR53 |
| 62192 | HG0335 | 1 | -20,111 | 20031119 | AZBR6 |
| 55784 | HG03372 | 1 | -115,467.67 | 20040608 | AZBR53 |
| 56136 | HG0337 | 1 | -6,555 | 20040112 | AZBR53 |
| 55574 | HG0337 | 1 | -8,305 | 20040121 | AZBR53 |
| 56000 | HG0338 | 1 | -15,800 | 20031202 | AZBR53 |
| 54350 | HG0338 | 1 | -5,551.5 | 20040527 | CLAIM20 |
| 54637 | HG0339 | 1 | -4,256 | 20040106 | AZBR53 |
| 55000 | HG0339 | 1 | -13,111 | 20031202 | AZBR53 |
| 54546 | HG0340 | 1 | -30,676 | 20031219 | AZBR53 |
| 36964 | HG0340 | 1 | - | 20050809 | AZBR53 |
| 62112 | HG03419 | 1 | -44,666.67 | 20031201 | AZBR53 |
| 55938 | HG0342 | 1 | -8,600 | 20031202 | AZBR53 |
| 55170 | HG0342 | 1 | -501.76 | 20031124 | AZBR53 |
| 53979 | HG0342 | 1 | -30,003 | 20031229 | CLAIM18 |
| 55880 | HG0343 | 1 | -3,251 | 20040113 | AZBR53 |

**AIG000180**

CONFIDENTIAL

```
                25,000·00*+
                 6,155·00 +
                 9,376·00 +
                 3,320·00 +
                 2,676·00 +
                 9,125·00 +
                19,280·00 +
                 9,050·00 +
                 6,878·00 +
                11,339·20 +
                23,688·00 +
                11,363·00 +
                18,000·01 +
                14,376·00 +
                18,376·00 +
                 6,775·00 +
                 3,626·00 +
                12,176·00 +
                 8,880·00 +
                 4,326·00 +
                 3,500·00 +
                 6,300·00 +
                81,250·00 +
                10,000·00 +
                41,500·00 +
                 2,676·00 +
                 9,376·00 +
                 5,675·00 +
                 3,222·00 +
                 1,351·00 +
                   450·00 +
                 5,330·00 +
                10,380·00 +
                 7,000·00 +
                20,111·00 +
               115,467·67 +
                 6,555·00 +
                 8,305·00 +
                15,800·00 +
                 5,551·50 +
                 4,256·00 +
                13,111·00 +
                30,676·00 +
                44,666·67 +
                 8,600·00 +
                   501·76 +
                30,003·00 +
                 3,251·00 +
                               048
               718,650·81 *
```

| 56261 | HG0343 | 1 | -9,010.5 | 20040106 | AZBR53 |
|---|---|---|---|---|---|
| 53953 | HG0343 | 1 | -7,050 | 20040212 | AZBR53 |
| 37102 | HG0344 | 1 | -13,200 | 20031223 | AZBR53 |
| 36976 | HG0344 9 | 1 | -70,666.66 | 20031219 | AZBR53 |
| 54567 | HG0345 | 1 | -600 | 20040421 | AZBR53 |
| 55467 | HG0345 | 1 | -10,855 | 20031223 | AZBR53 |
| 55146 | HG0346 | 1 | -3,676 | 20040331 | AZBR53 |
| 44100 | HG0347 | 1 | -11,300 | 20040219 | AZBR53 |
| 43437 | HG0347 | 1 | -6,388 | 20040112 | AZBR53 |
| 55615 | HG0347 | 1 | -26,376 | 20041223 | CABR12 |
| 55531 | HG0348 | 1 | -12,000 | 20040113 | CLAIM18 |
| 44054 | HG0349 | 1 | -8,656 | 20040505 | AZBR53 |
| 54757 | HG0350 | 1 | -10,000 | 20040210 | AZBR53 |
| 56313 | HG0350 | 1 | -31,376 | 20040310 | AZBR53 |
| 42680 | HG0350 | 1 | -2,100 | 20040121 | AZBR53 |
| 43630 | HG0351 | 1 | -21,100 | 20040315 | AZBR53 |
| 56351 | HG0352 | 1 | -4,176 | 20040325 | AZBR53 |
| 56285 | HG0355 | 1 | -5,000 | 20040329 | AZBR53 |
| 56109 | HG0355 | 1 | -7,176 | 20040802 | AZBR53 |
| 53912 | HG0401 | 1 | -11,376 | 20040420 | AZBR53 |
| 62455 | HG0401 | 1 | -17,588 | 20040709 | AZBR6 |
| 56439 | HG0401 | 1 | -20,526 | 20040621 | AZBR53 |
| 56125 | HG0402 | 1 | -8,555 | 20040414 | AZBR53 |
| 56477 | HG0403 | 1 | -9,124 | 20040527 | AZBR53 |
| 56044 | HG0403 | 1 | -8,050 | 20050422 | AZBR60 |
| 42932 | HG0404 | 1 | 65,600 | 20050511 | AZBR6 |
| 42932 | HG0404 | 1 | -65,600 | 20050512 | AZBR6 |
| 62645 | HG0405 | 1 | -37,000 | 20040426 | AZBR2 |
| 55737 | HG0405 | 1 | -8,250 | 20040528 | AZBR53 |
| 56088 | HG0405 | 1 | -7,878 | 20040503 | AZBR53 |
| 63001 | HG0406 | 1 | -33,750 | 20040825 | AZBR53 |
| 37073 | HG0406 | 1 | -308 | 20040512 | AZBR53 |
| 56293 | HG0407 | 1 | -10,125 | 20040716 | AZBR53 |
| 44195 | HG0407 | 1 | -22,666 | 20040709 | AZBR6 |
| 56443 | HG0407 | 1 | -10,376 | 20040907 | AZBR53 |
| 57385 | HG0408 | 1 | -14,100 | 20040709 | AZBR6 |
| 41878 | HG0409 | 1 | -13,376 | 20040812 | AZBR53 |
| 56391 | HG0409 | 1 | - | 20041104 | AZBR53 |
| 55912 | HG0410 | 1 | -1,676 | 20040709 | AZBR6 |
| 56395 | HG0410 | 1 | -6,252 | 20041007 | AZBR53 |
| 54728 | HG0410 | 1 | -18,600 | 20040625 | AZBR53 |
| 21692 | HG0411 | 1 | -7,950 | 20040827 | AZBR53 |
| 56320 | HG0412 | 1 | -11,376 | 20040827 | AZBR53 |
| 56307 | HG0412 | 1 | -5,676 | 20040721 | AZBR53 |
| 56534 | HG0412 | 1 | -6,634 | 20050525 | AZBR53 |
| 21452 | HG0412 | 1 | -21,333 | 20040924 | AZBR53 |
| 56426 | HG0412 | 1 | -5,856 | 20040827 | AZBR53 |
| 56041 | HG0413 | 1 | -1,435 | 20041013 | AZBR53 |
| 55237 | HG0413 | 1 | -17,556 | 20041006 | AZBR53 |
| 56362 | HG0414 | 1 | 7,150.55 | 20050405 | AZBR53 |
| 56362 | HG0414 | 1 | -7,150 | 20050406 | AZBR53 |
| 56490 | HG0414 | 1 | -8,660 | 20040721 | AZBR53 |
| 53985 | HG0414 | 1 | -11,126 | 20041007 | AZBR53 |
| 43723 | HG0415 | 1 | -6,250 | 20040806 | AZBR53 |

0·00 *
9,010·50 *+
7,050·00 +
13,200·00 +
70,666·66 +
600·00 +
10,855·00 +
3,676·00 +
11,300·00 +
6,388·00 +
26,376·00 +
12,000·00 +
8,656·00 +
10,000·00 +
31,376·00 +
2,100·00 +
21,100·00 +
4,176·00 +
5,000·00 +
7,176·00 +
11,376·00 +
17,588·00 +
20,526·00 +
8,555·00 +
9,124·00 +
8,050·00 +
65,600·00 +
65,600·00 −
37,000·00 +
8,250·00 +
7,878·00 +
33,750·00 +
308·00 +
10,125·00 +
22,666·00 +
10,376·00 +
14,100·00 +
13,376·00 +
1,676·00 +
6,252·00 +
18,600·00 +
7,950·00 +
11,376·00 +
5,676·00 +
6,634·00 +
21,333·00 +
5,856·00 +
1,435·00 +
17,556·00 +
7,150·55 +
7,150·55 −
8,660·00 +
11,126·00 +
6,250·00 +

051

624,134·16 *

CONFIDENTIAL

AIG000181

| 55669 | HG0415 | 1 | -5,787 | 20040723 | AZBR2 |
|---|---|---|---|---|---|
| 55659 | HG0415 | 1 | -10,116.1 | 20050811 | AZBR53 |
| 56219 | HG0415 | 1 | -3,676 | 20040806 | AZBR2 |
| 42681 | HG0415 | 1 | -125 | 20040701 | AZBR2 |
| 42681 | HG0415 | 1 | -8,000 | 20040709 | AZBR2 |
| 44171 | HG0416 | 1 | -1,650 | 20040713 | AZBR2 |
| 43711 | HG0417 | 1 | -45,000 | 20041027 | AZBR53 |
| 21484 | HG0417 | 1 | -4,700 | 20040812 | AZBR53 |
| 56500 | HG0418 | 1 | -4,256 | 20041013 | AZBR53 |
| 56470 | HG0418 | 1 | -28,130 | 20041116 | AZBR53 |
| 56470 | HG0418 | 1 | -28,103 | 20041203 | AZBR60 |
| 55879 | HG0419 | 1 | -1,276 | 20050422 | AZBR6 |
| 56126 | HG0419 | 1 | -5,480 | 20040824 | AZBR53 |
| 42634 | HG0419 | 1 | -46,600 | 20050215 | AZBR53 |
| 56493 | HG0420 | 1 | -4,676 | 20040924 | AZBR53 |
| 54088 | HG0421 | 1 | -9,119 | 20041007 | AZBR53 |
| 37130 | HG0421 | 1 | -4,706 | 20040806 | AZBR2 |
| 56519 | HG0422 | 1 | -48,777 | 20050201 | AZBR53 |
| 37095 | HG0422 | 1 | - | 20041006 | AZBR53 |
| 37109 | HG0423 | 1 | -8,888 | 20040818 | AZBR53 |
| 62316 | HG0423 | 1 | -14,676 | 20040928 | AZBR53 |
| 43700 | HG0423 | 1 | -6,650 | 20041209 | AZBR53 |
| 56170 | HG0423 | 1 | -9,176 | 20040922 | AZBR53 |
| 54417 | HG0424 | 1 | -18,505 | 20040930 | AZBR53 |
| 55499 | HG0424 | 1 | -2,676 | 20041201 | AZBR6 |
| 43102 | HG0425 | 1 | -11,680 | 20040910 | AZBR53 |
| 54370 | HG0425 | 1 | -6,950 | 20050606 | AZBR60 |
| 37143 | HG0426 | 1 | -6,605 | 20040827 | AZBR53 |
| 45248 | HG0426 | 1 | -2,001 | 20050106 | NJBR15 |
| 36949 | HG0426 | 1 | -14,588 | 20040914 | AZBR2 |
| 54997 | HG0426 | 1 | -3,887 | 20050623 | AZBR53 |
| 36982 | HG0427 | 1 | -13,800 | 20050315 | AZBR53 |
| 42940 | HG0427 | 1 | -4,280 | 20041013 | AZBR2 |
| 56571 | HG0428 | 1 | -12,195 | 20051019 | AZBR53 |
| 54804 | HG0429 | 1 | -33,020 | 20041102 | AZBR53 |
| 54804 | HG0429 | 1 | -33,002 | 20041203 | AZBR6 |
| 55148 | HG0429 | 1 | -16,255 | 20050411 | CLAIM18 |
| 55676 | HG0429 | 1 | -1,118.13 | 20050422 | AZBR6 |
| 62426 | HG0429 | 1 | -82,666 | 20051028 | AZBR53 |
| 55740 | HG0429 | 1 | -3,700 | 20050316 | AZBR53 |
| 41872 | HG0430 | 1 | -8,112 | 20041207 | AZBR53 |
| 56421 | HG0430 | 1 | -9,121 | 20041109 | AZBR53 |
| 55340 | HG0430 | 1 | -51,376 | 20041201 | AZBR6 |
| 41475 | HG0431 | 1 | -20,000 | 20050328 | AZBR53 |
| 37105 | HG0431 | 1 | -500 | 20041117 | AZBR53 |
| 56566 | HG0432 | 1 | -10,701 | 20050124 | AZBR53 |
| 56585 | HG0432 | 1 | -6,676 | 20050314 | AZBR53 |
| 55666 | HG0433 | 1 | -9,229 | 20041216 | AZBR53 |
| 55634 | HG0433 | 1 | -9,211 | 20050113 | AZBR53 |
| 56364 | HG0433 | 1 | -12,777 | 20050124 | AZBR53 |
| 54643 | HG0433 | 1 | -10,727 | 20050315 | ILBR7 |
| 56273 | HG0433 | 1 | -20,676 | 20050223 | AZBR53 |
| 54989 | HG0433 | 1 | -6,126 | 20050119 | AZBR53 |
| 21677 | HG0434 | 1 | -8,616 | 20041213 | AZBR53 |
| 56144 | HG0434 | 1 | -18,326 | 20050307 | AZBR53 |
| 56486 | HG0434 | 1 | -36,376 | 20050223 | AZBR53 |

5,787·00*+
10,116·10 +
3,676·00 +
125·00 +
8,000·00 +
1,650·00 +
45,000·00 +
4,700·00 +
4,256·00 +
28,130·00 +
28,103·00 +
1,276·00 +
5,480·00 +
46,600·00 +
4,676·00 +
9,119·00 +
4,706·00 +
48,777·00 +
8,888·00 +
14,676·00 +
6,650·00 +
9,176·00 +
18,505·00 +
2,676·00 +
11,680·00 +
6,950·00 +
6,605·00 +
2,001·00 +
14,588·00 +
3,887·00 +
13,800·00 +
4,280·00 +
12,195·00 +
33,020·00 +
33,002·00 +
16,255·00 +
1,118·13 +
82,666·00 +
3,700·00 +
8,112·00 +
9,121·00 +
51,376·00 +
20,000·00 +
500·00 +
10,701·00 +
6,676·00 +
9,229·00 +
9,211·00 +
12,777·00 +
10,727·00 +
20,676·00 +
6,126·00 +
8,616·00 +
18,326·00 +
36,376·00 +

055

805,045·23 *

CONFIDENTIAL

AIG000182

| | | | | | |
|---|---|---|---|---|---|
| 55296 | HG0434 | 1 | -47,750 | 20041217 | AZBR6 |
| 60449 | HG0435 | 1 | -3,101 | 20041207 | AZBR53 |
| 56625 | HG0435 | 1 | -7,107 | 20050121 | AZBR53 |
| 56236 | HG04354 | 1 | 18,113.25 | 20050512 | TXBR4 |
| 55637 | HG0435 | 1 | -20,676 | 20050429 | AZBR60 |
| 56564 | HG0435 | 1 | 13,676 | 20050505 | AZBR6 |
| 56564 | HG0435 | 1 | -13,676 | 20050512 | AZBR6 |
| 54063 | HG0436 | 1 | -3,333 | 20041220 | AZBR53 |
| 55426 | HG0436 | 1 | -6,326 | 20050119 | AZBR53 |
| 56593 | HG0436 | 1 | -10,200 | 20050228 | AZBR53 |
| 56268 | HG0437 | 1 | -17,376 | 20041216 | AZBR53 |
| 55757 | HG0439 | 1 | -36,166 | 20050214 | AZBR53 |
| 56280 | HG0440 | 1 | -7,112 | 20050209 | AZBR6 |
| 56570 | HG0440 | 1 | -11,126 | 20050119 | AZBR53 |
| 56218 | HG0441 | 1 | -8,176 | 20041201 | AZBR6 |
| 21532 | HG0442 | 1 | -16,302 | 20050202 | AZBR53 |
| 55726 | HG0442 | 1 | -16,376 | 20041110 | AZBR53 |
| 56581 | HG0443 | 1 | -4,230 | 20041223 | AZBR53 |
| 62273 | HG0443 | 1 | -7,556 | 20050616 | AZBR6 |
| 55027 | HG0445 | 1 | -5,136 | 20050131 | AZBR53 |
| 21383 | HG0445 | 1 | -8,256 | 20050422 | AZBR6 |
| 21675 | HG0445 | 1 | -8,550 | 20050127 | AZBR53 |
| 56336 | HG0445 | 1 | -5,256 | 20050422 | AZBR60 |
| 56254 | HG0446 | 1 | -13,850 | 20050728 | AZBR53 |
| 56531 | HG04465 | 1 | 19,261.9 | 20041214 | AZBR53 |
| 21482 | HG0447 | 1 | -7,160 | 20050318 | AZBR53 |
| 55401 | HG0448 | 1 | -8,238 | 20041206 | AZBR53 |
| 43198 | HG0448 | 1 | -27,600 | 20050215 | AZBR53 |
| 56533 | HG0448 | 1 | -37,676 | 20050201 | AZBR53 |
| 55913 | HG0449 | 1 | -24,320 | 20050307 | AZBR53 |
| 56590 | HG0450 | 1 | -5,376 | 20041229 | AZBR53 |
| 21614 | HG0453 | 1 | 28,755 | 20050405 | AZBR53 |
| 21614 | HG0453 | 1 | -28,755 | 20050406 | AZBR53 |
| 59702 | HG0454 | 1 | 8,552 | 20050405 | AZBR53 |
| 59702 | HG0454 | 1 | -8,552 | 20050406 | AZBR53 |
| 55946 | HG0455 | 1 | -21,602 | 20050217 | AZBR53 |
| 56171 | HG0455 | 1 | -6,118 | 20041214 | AZBR53 |
| 21198 | HG0456 | 1 | -6,028 | 20051228 | AZBR64 |
| 55651 | HG0456 | 1 | -9,251 | 20050308 | AZBR53 |
| 44003 | HG0457 | 1 | -13,000 | 20050303 | AZBR53 |
| 56452 | HG0459 | 1 | -11,112 | 20050408 | AZBR53 |
| 55660 | HG0460 | 1 | -7,676 | 20050531 | AZBR60 |
| 21222 | HG0461 | 1 | -11,260 | 20050606 | AZBR60 |
| 56680 | HG0461 | 1 | -15,326 | 20050614 | AZBR6 |
| 21693 | HG0462 | 1 | -27,610 | 20050614 | AZBR60 |
| 55292 | HG0463 | 1 | 12,281 | 20050405 | AZBR53 |
| 55292 | HG0463 | 1 | -12,281 | 20050406 | AZBR53 |
| 37172 | HG0465 | 1 | -5,100 | 20051121 | AZBR53 |
| 37174 | HG04658 | 1 | 12,256.1 | 20050519 | AZBR53 |
| 55932 | HG0466 | 1 | -29,251 | 20050503 | AZBR53 |
| 56552 | HG0500 | 1 | -17,107 | 20050330 | AZBR53 |
| 56574 | HG0500 | 1 | 16,113.18 | 20050512 | AZBR6 |

```
                    0·00  *
           47,750·00 *+
            3,101·00  +
            7,107·00  +
           18,113·25  +
           20,676·00  +
           13,675·00  +
           13,676·00  -
            3,333·00  +
            6,326·00  +
           10,200·00  +
           17,376·00  +
           36,166·00  +
            7,112·00  +
           11,126·00  +
            8,176·00  +
           16,302·00  +
           16,376·00  +
            4,230·00  +
            7,556·00  +
            5,136·00  +
            8,256·00  +
            8,550·00  +
            5,256·00  +
           13,850·00  +
           19,261·90  +
            7,160·00  +
            8,238·00  +
           27,600·00  +
           37,676·00  +
           24,320·00  +
            5,376·00  +
           28,755·00  +
           28,755·00  -
            8,552·00  +
            8,552·00  -
           21,602·00  +
            6,118·00  +
            6,028·00  +
            9,251·00  +
           13,000·00  +
           11,112·00  +
            7,676·00  +
           11,260·00  +
           15,326·00  +
           27,610·00  +
           12,281·00  +
           12,281·00  -
            5,100·00  +
           12,256·10  +
           29,251·00  +
           17,107·00  +
           16,113·18  -

     044
          583,290·07  *
```

**CONFIDENTIAL**

AIG000183

| | | | | | |
|---|---|---|---|---|---|
| 56574 | HG05006 | 1 | -16,113.18 | 20050512 | AZBR6 |
| 55887 | HG0501 | 1 | 41,443.2 | 20050512 | AZBR6 |
| 55887 | HG05017 | 1 | -41,443.2 | 20050512 | AZBR6 |
| 56573 | HG0502 | 1 | 71,876 | 20050513 | AZBR6 |
| 56573 | HG0502 | 1 | -71,876 | 20050610 | AZBR6 |
| 21615 | HG0503 | 1 | -57,831 | 20050728 | AZBR53 |
| 55064 | HG05034 | 1 | -47,301.91 | 20050415 | AZBR53 |
| 43631 | HG0503 | 1 | 31,150 | 20050405 | AZBR53 |
| 43631 | HG0503 | 1 | -31,150 | 20050406 | AZBR53 |
| 37128 | HG0505 | 1 | -60,000 | 20050616 | AZBR6 |
| 43986 | HG0506 | 1 | -8,165 | 20050512 | AZBR53 |
| 21225 | HG0507 | 1 | 5,700 | 20050520 | AZBR60 |
| 21225 | HG0507 | 1 | -5,700 | 20050520 | AZBR60 |
| 21225 | HG0507 | 1 | -5,700 | 20050520 | AZBR60 |
| 21524 | HG0508 | 1 | -6,176 | 20050809 | AZBR53 |
| 55751 | HG0508 | 1 | - | 20050811 | AZBR53 |
| 54716 | HG0508 | 1 | -35,501 | 20050518 | AZBR53 |
| 53791 | HG9812 | 1 | -14,106 | 20031202 | CLAIM2 |
| 45099 | HG9940 | 1 | -750 | 20030904 | AZBR2 |
| 57273 | HN9502 | 1 | -5,376 | 20030220 | CLAIM2 |
| 66002 | HP0B06 | 1 | -19,059 | 20030207 | AZBR39 |
| 65429 | HP0C01 | 1 | -400 | 20030429 | AZBR2 |
| 55738 | HP0C02 | 1 | -4,111 | 20030411 | AZBR2 |
| 62605 | HP0C04 | 1 | -17,876 | 20030317 | AZBR6 |
| 59000 | HP0C04 | 1 | -7,101 | 20030718 | AZBR6 |
| 42205 | HP0C04 | 1 | -30,763 | 20040917 | AZBR2 |
| 64517 | HP0C04 | 1 | -10,112 | 20030320 | AZBR39 |
| 63863 | HP0C05 | 1 | -10,552 | 20030806 | AZBR39 |
| 63863 | HP0C05 | 1 | -3,376 | 20030821 | AZBR2 |
| 54542 | HP0C06 | 1 | -13,676 | 20031125 | CABR12 |
| 61044 | HP0C08 | 1 | -1,866 | 20030121 | AZBR6 |
| 60867 | HP0C09 | 1 | -10,376 | 20030313 | AZBR2 |
| 63665 | HP0C10 | 1 | -5,695 | 20030320 | AZBR2 |
| 64436 | HP0C110 | 1 | -13,755.55 | 20030515 | AZBR39 |
| 66004 | HP0C12 | 1 | -6,304.1 | 20030421 | AZBR39 |
| 21584 | HP0C12 | 1 | -5,780 | 20030731 | AZBR2 |
| 55901 | HP0C13 | 1 | -5,676 | 20030303 | AZBR2 |
| 55680 | HP0C14 | 1 | -3,376 | 20030619 | AZBR6 |
| 63868 | HP0C14 | 1 | -21,376 | 20030722 | AZBR39 |
| 49597 | HP0C15 | 1 | -6,676 | 20050526 | AZBR53 |
| 61105 | HP0C16 | 1 | -13,900 | 20031010 | AZBR39 |
| 63483 | HP0C17 | 1 | -55,000 | 20030505 | AZBR2 |
| 54512 | HP0C17 | 1 | -101,000 | 20030729 | AZBR2 |
| 64230 | HP0C17 | 1 | -10,510 | 20040408 | CLAIM18 |
| 64558 | HP0C18 | 1 | -5,699 | 20030603 | AZBR2 |
| 64268 | HP0C19 | 1 | -5,507 | 20030508 | AZBR6 |
| 65212 | HP0C19 | 1 | -5,200 | 20030715 | AZBR2 |
| 55824 | HP0C21 | 1 | -7,676 | 20030423 | AZBR2 |
| 54674 | HP0C21 | 1 | -40,101 | 20030603 | AZBR2 |
| 63559 | HP0C21 | 1 | -8,376 | 20030417 | AZBR39 |

```
16,113.18*+
41,443.20 +
41,443.20 -
71,876.00 +
71,876.00 -
57,831.00 +
47,301.91 +
31,150.00 +
31,150.00 -
60,000.00 +
8,165.00 +
5,700.00 +
5,700.00 -
5,700.00 +
6,176.00 +
35,501.00 +
14,106.00 +
750.00 +
5,376.00 +
19,059.00 +
400.00 +
4,111.00 +
17,876.00 +
7,101.00 +
30,763.00 +
10,112.00 +
10,552.00 +
3,376.00 +
13,676.00 +
1,866.00 +
10,376.00 +
5,695.00 +
13,755.55 +
6,304.10 +
5,780.00 +
5,676.00 +
3,376.00 +
21,376.00 +
6,676.00 +
13,900.00 +
55,000.00 +
101,000.00 +
10,510.00 +
5,699.00 +
5,507.00 +
5,200.00 +
7,676.00 +
40,101.00 +
8,376.00 +

041

707,395.74 *
```

**CONFIDENTIAL**

AIG000184

| 48528 | HPoC22 | 1 | -10,279 | 20040511 | CABR12 |
|---|---|---|---|---|---|
| 43787 | HPoC22 | 1 | -5,676 | 20030424 | AZBR46 |
| 64205 | HPoC23 | 1 | -5,676 | 20030404 | AZBR2 |
| 64240 | HPoC24 | 1 | -2,500 | 20030317 | AZBR2 |
| 54912 | HPoC24 | 1 | -13,876 | 20030617 | AZBR2 |
| 65423 | HPoC27 | 1 | -6,500 | 20030912 | AZBR39 |
| 43750 | HPoD00 | 1 | -7,860.4 | 20040210 | AZBR53 |
| 56258 | HPoD00 | 1 | -18,000 | 20040624 | AZBR53 |
| 63784 | HPoD00 8 | 1 | -28,151.0 | 20040414 | AZBR53 |
| 65406 | HPoD01 | 1 | -1,008 | 20040729 | AZBR53 |
| 64581 | HPoD01 | 1 | -4,888 | 20040112 | AZBR53 |
| 36917 | HPoD01 | 1 | -15,326 | 20040610 | AZBR53 |
| 21681 | HPoD02 | 1 | -3,333 | 20040413 | AZBR53 |
| 56186 | HPoD02 | 1 | -7,376 | 20040519 | AZBR53 |
| 64539 | HPoD04 | 1 | -52,800 | 20040716 | AZBR53 |
| 64556 | HPoD06 | 1 | -8,127 | 20040326 | AZBR2 |
| 65936 | HPoD06 | 1 | -1,000 | 20040226 | AZBR53 |
| 65298 | HPoD07 | 1 | -2,300 | 20040211 | AZBR53 |
| 56314 | HPoD08 | 1 | -5,266 | 20040223 | AZBR53 |
| 64599 | HPoD08 | 1 | -7,169 | 20050705 | AZBR53 |
| 55803 | HPoD08 | 1 | - | 20040311 | AZBR53 |
| 64066 | HPoD09 | 1 | -10,376 | 20040709 | AZBR6 |
| 63719 | HPoD10 | 1 | -19,555 | 20040330 | AZBR53 |
| 56396 | HPoD10 | 1 | 1,000 | 20050406 | AZBR53 |
| 56396 | HPoD10 | 1 | -1,000 | 20050406 | AZBR53 |
| 54712 | HPoD12 | 1 | -5,870 | 20040805 | AZBR53 |
| 56036 | HPoD13 | 1 | -16,322 | 20040226 | AZBR53 |
| 64678 | HPoD14 | 1 | -13,520 | 20040308 | AZBR53 |
| 61035 | HPoD18 | 1 | -24,610 | 20040917 | AZBR53 |
| 56308 | HPoD19 | 1 | -8,750 | 20050714 | AZBR53 |
| 56525 | HPoE01 6 | 1 | -17,230.15 | 20050315 | AZBR53 |
| 36912 | HPoE03 | 1 | -8,210 | 20050328 | AZBR53 |
| 65037 | HPoE04 | 1 | -16,376 | 20050222 | AZBR53 |
| 36904 | HPoE06 | 1 | -3,256 | 20050524 | AZBR60 |
| 62841 | HPoE06 | 1 | -44,676 | 20050307 | AZBR53 |
| 65136 | HPoE07 | 1 | -1,650 | 20050207 | AZBR53 |
| 64075 | HPoE09 | 1 | -14,100 | 20051212 | AZBR53 |
| 63356 | HPoE09 | 1 | -4,632 | 20050228 | AZBR53 |
| 56290 | HPoE09 | 1 | 8,259.12 | 20050504 | AZBR6 |
| 56290 | HPoE09 | 1 | - | 20050610 | AZBR6 |
| 64950 | HPoE09 | 1 | -7,110 | 20050303 | AZBR53 |
| 65140 | HPoE10 | 1 | -15,527 | 20050308 | AZBR53 |
| 64961 | HPoE13 | 1 | -16,176 | 20050527 | AZBR53 |
| 64620 | HPoE13 | 1 | -18,115 | 20051115 | AZBR64 |
| 56660 | HPoE15 | 1 | -2,349 | 20050321 | AZBR53 |
| 64635 | HPoE16 | 1 | -8,207 | 20050420 | AZBR53 |
| 64375 | HPoE17 | 1 | -21,501 | 20050311 | AZBR53 |
| 55936 | HPoE17 | 1 | -6,998 | 20051025 | CLAIM2 |
| 64008 | HPoE18 | 1 | -9,112 | 20050422 | AZBR60 |
| 56640 | HPoE18 | 1 | -8,250 | 20050328 | AZBR53 |
| 64779 | HPoE19 | 1 | -4,811 | 20050314 | CABR12 |
| 56693 | HPoE20 | 1 | -3,256 | 20050524 | AZBR60 |
| 54678 | HPoE20 | 1 | -21,334 | 20050303 | AZBR53 |

c

10,279.00 *+
5,676.00 +
5,676.00 +
2,500.00 +
13,876.00 +
6,500.00 +
7,860.40 +
18,000.00 +
28,151.00 +
1,008.00 +
4,888.00 +
15,326.00 +
3,333.00 +
7,376.00 +
52,800.00 +
8,127.00 +
1,000.00 +
2,300.00 +
5,266.00 +
7,169.00 +
10,376.00 +
19,555.00 +
1,000.00 +
1,000.00 -
5,870.00 +
16,322.00 +
13,520.00 +
24,610.00 +
8,750.00 +
17,230.15 +
8,210.00 +
16,376.00 +
3,256.00 +
44,676.00 +
1,650.00 +
14,100.00 +
4,632.00 +
8,259.12 +
7,110.00 +
15,527.00 +
16,176.00 +
18,115.00 +
2,349.00 +
8,207.00 +
21,501.00 +
6,998.00 +
9,112.00 +
8,250.00 +
4,811.00 +
3,256.00 +
21,334.00 +

049
567,249.67 *

**CONFIDENTIAL**

AIG000185

| | | | | | |
|---|---|---|---|---|---|
| 49270 | HP0E21 | 1 | -4,612 | 20051117 | AZBR64 |
| 64842 | HP0E23 | 1 | -5,650 | 20050328 | AZBR53 |
| 64885 | HP0E23 | 1 | 12,112 | 20050405 | AZBR53 |
| 64885 | HP0E23 | 1 | -12,112 | 20050406 | AZBR53 |
| 63933 | HP0E24 | 1 | -9,307 | 20051021 | AZBR53 |
| 38701 | HP0000 2 | 1 | 130,113.1 1 | 20050405 | AZBR53 |
| 38701 | HP0000 2 | 1 | - 130,113.1 1 | 20050406 | AZBR53 |
| 52821 | HP0016 | 1 | -19,900 | 20030130 | ILBR7 |
| 43160 | HP0044 | 1 | -5,100 | 20040506 | CABR12 |
| 43346 | HP0045 | 1 | -6,208 | 20031013 | CABR12 |
| 60366 | HP0074 | 1 | -6,176 | 20030710 | AZBR2 |
| 58957 | HP0088 | 1 | -50,000 | 20040730 | CABR12 |
| 58934 | HP0089 | 1 | -4,376 | 20031030 | CABR12 |
| 65749 | HP0102 | 1 | -2,200 | 20031015 | AZBR6 |
| 63711 | HP0125 | 1 | -8,735 | 20040514 | AZBR53 |
| 63372 | HP0126 | 1 | -4,250 | 20030205 | CLAIM2 |
| 62516 | HP0142 | 1 | -5,627 | 20040413 | CABR12 |
| 65328 | HP01691 | 1 | -500 | 20040422 | AZBR53 |
| 63692 | HP0170 | 1 | -10,333 | 20040511 | CLAIM18 |
| 43369 | HP0172 | 1 | -7,600 | 20040106 | CABR12 |
| 65284 | HP0174 | 1 | -3,010 | 20030109 | AZBR39 |
| 43739 | HP0176 | 1 | -5,176 | 20031202 | CABR12 |
| 63677 | HP01767 | 1 | -5,376 | 20051222 | AZBR64 |
| 43225 | HP0179 | 1 | -165 | 20030107 | AZBR6 |
| 63451 | HP0183 | 1 | -1,376 | 20030915 | AZBR46 |
| 63751 | HP01931 | 1 | -5,376 | 20030508 | AZBR2 |
| 60794 | HP0194 | 1 | -935 | 20050812 | CLAIM2 |
| 54861 | HP0197 4 | 1 | - 32,113.0 7 | 20030414 | AZBR6 |
| 63932 | HP0208 | 1 | - | 20030226 | AZBR6 |
| 63411 | HP0212 | 1 | -18,337 | 20031203 | CLAIM18 |
| 55403 | HP0217 | 1 | -6,587 | 20051010 | AZBR53 |
| 62570 | HP0219 | 1 | -14,326 | 20030625 | AZBR39 |
| 63801 | HP0219 | 1 | -4,676 | 20030806 | CABR12 |
| 54656 | HP0220 | 1 | -3,376 | 20040527 | AZBR53 |
| 64001 | HP0226 | 1 | -6,189 | 20030307 | AZBR46 |
| 49426 | HP0229 | 1 | -3,376 | 20030417 | CABR12 |
| 63811 | HP0231 | 1 | -25,121 | 20030710 | AZBR6 |
| 48496 | HP0234 | 1 | -18,151 | 20030321 | AZBR39 |
| 64317 | HP0235 | 1 | -26,376 | 20030113 | AZBR39 |
| 52871 | HP0237 4 | 1 | - 20,256.1 2 | 20030421 | AZBR6 |
| 63914 | HP0238 | 1 | -20,000 | 20030113 | AZBR46 |
| 64016 | HP0239 | 1 | -27,876 | 20030603 | AZBR46 |
| 59011 | HP0240 | 1 | -176 | 20030513 | AZBR6 |
| 62935 | HP0241 | 1 | -45,251 | 20030311 | AZBR6 |
| 49490 | HP0242 | 1 | -6,509 | 20030327 | AZBR6 |
| 55593 | HP0244 | 1 | -18,975 | 20030725 | AZBR39 |
| 64222 | HP0244 | 1 | -37,676 | 20030123 | AZBR2 |
| 48466 | HP0248 | 1 | -1,187.87 | 20030430 | CABR12 |
| 65263 | HP0252 | 1 | -55 | 20030110 | NJBR15 |

```
                            0·00G*

                    4,612·00*+
                    5,650·00 +
                   12,112·00 +
                   12,112·00 -
                    9,307·00 +
                  130,113·11 +
                  130,113·11 -
                   19,900·00 +
                    5,100·00 +
                    6,208·00 +
                    6,176·00 +
                   50,000·00 +
                    4,376·00 +
                    2,200·00 +
                    8,735·00 +
                    4,250·00 +
                    5,627·00 +
                      500·00 +
                   10,333·00 +
                    7,600·00 +
                    3,010·00 +
                    5,176·00 +
                    5,376·00 +
                      165·00 +
                    1,376·00 +
                    5,376·00 +
                      935·00 +
                   32,113·07 +
                   18,337·00 +
                    6,587·00 +
                   14,326·00 +
                    4,676·00 +
                    3,376·00 +
                    6,189·00 +
                    3,376·00 +
                   25,121·00 +
                   18,151·00 +
                   26,376·00 +
                   20,256·12 +
                   20,000·00 +
                   27,876·00 +
                      176·00 +
                   45,251·00 +
                    6,509·00 +
                   18,975·00 +
                   37,676·00 +
                    1,187·87 +
                       55·00 +

     044

                  503,578·06 *
```

**CONFIDENTIAL**

AIG000186

| | | | | | |
|---|---|---|---|---|---|
| 63854 | HP0256 5 | 1 | -38,572.9 5 | 20031110 | AZBR2 |
| 62555 | HP0260 | 1 | -2,830 | 20040113 | AZBR53 |
| 54310 | HP0260 | 1 | -4,164 | 20030129 | AZBR2 |
| 55073 | HP0261 | 1 | -27,777 | 20031030 | CABR12 |
| 64395 | HP0261 | 1 | -5,387 | 20030619 | AZBR39 |
| 49643 | HP0261 | 1 | -76,501 | 20050307 | CABR12 |
| 65190 | HP0262 | 1 | -7,651 | 20030206 | AZBR39 |
| 42517 | HP0265 | 1 | -32,878 | 20030620 | CABR12 |
| 65362 | HP0265 | 1 | -1,000 | 20030313 | AZBR46 |
| 48509 | HP0266 | 1 | - | 20030130 | AZBR6 |
| 61167 | HP0266 | 1 | -1,950 | 20041006 | CABR12 |
| 63645 | HP0269 | 1 | -11,612 | 20030214 | AZBR6 |
| 65215 | HP0269 | 1 | -395 | 20030312 | AZBR39 |
| 43878 | HP0271 | 1 | -3,850 | 20030626 | AZBR39 |
| 21628 | HP0272 | 1 | -16,755 | 20030103 | NJBR15 |
| 64074 | HP0276 | 1 | -10,000 | 20030417 | AZBR46 |
| 55724 | HP0276 | 1 | -3,086 | 20030429 | AZBR46 |
| 48512 | HP0277 3 | 1 | -12,001.0 1 | 20030224 | NJBR15 |
| 63989 | HP0279 | 1 | -8,750 | 20030509 | AZBR6 |
| 65363 | HP0279 | 1 | -2,424.11 | 20030521 | AZBR46 |
| 21634 | HP0280 | 1 | -20,500 | 20031203 | AZBR53 |
| 62770 | HP0280 | 1 | -7,601 | 20030116 | CLAIM18 |
| 62598 | HP02811 | 1 | -48,000 | 20030204 | AZBR6 |
| 62598 | HP02811 | 1 | -13,676 | 20040304 | AZBR53 |
| 63956 | HP0281 | 1 | -6,600 | 20030701 | AZBR39 |
| 65230 | HP0281 | 1 | -297 | 20030113 | AZBR46 |
| 63472 | HP0282 | 1 | -23,676 | 20030122 | CABR12 |
| 55533 | HP0282 | 1 | -9,176 | 20030521 | AZBR39 |
| 42314 | HP0284 | 1 | -600 | 20030325 | AZBR2 |
| 54720 | HP0286 | 1 | -1,440 | 20030108 | AZBR6 |
| 55713 | HP0286 | 1 | -3,759 | 20030109 | CABR12 |
| 55097 | HP0288 | 1 | -7,333 | 20030214 | CABR12 |
| 65389 | HP0289 | 1 | -276.91 | 20030305 | TXBR4 |
| 54635 | HP0292 | 1 | -13,260 | 20030129 | CABR12 |
| 49637 | HP0292 | 1 | -11,676 | 20030313 | NJBR15 |
| 64151 | HP0293 | 1 | -18,376 | 20030221 | TXBR4 |
| 49625 | HP0294 | 1 | -10,555 | 20040120 | ILBR7 |
| 60690 | HP0294 | 1 | -926 | 20030521 | ILBR7 |
| 55678 | HP0294 | 1 | -22,256 | 20031208 | AZBR2 |
| 64120 | HP0295 | 1 | -2,650 | 20030327 | AZBR46 |
| 64131 | HP0296 | 1 | -9,200 | 20030212 | AZBR6 |
| 54632 | HP0296 | 1 | -13,578 | 20030313 | NJBR15 |
| 49306 | HP0298 | 1 | -8,122 | 20030225 | AZBR6 |
| 55505 | HP0298 | 1 | -4,526 | 20030110 | AZBR2 |
| 64432 | HP0299 3 | 1 | -16,662.2 | 20030324 | AZBR6 |
| 21632 | HP0299 | 1 | -12,210 | 20030205 | AZBR39 |
| 63777 | HP0300 | 1 | -1,500 | 20031119 | TXBR4 |
| 64216 | HP0300 | 1 | -4,200 | 20030422 | AZBR46 |
| 64047 | HP0300 | 1 | - | 20030428 | AZBR2 |
| 43792 | HP0301 | 1 | -18,379 | 20030404 | AZBR2 |
| 55610 | HP0301 | 1 | -5,110 | 20030424 | AZBR2 |

38,572·95*+
2,830·00 +
4,164·00 +
27,777·00 +
5,337·00 +
76,501·00 +
7,651·00 +
32,878·00 +
1,000·00 +
1,950·00 +
11,612·00 +
395·00 +
3,850·00 +
16,755·00 +
10,000·00 +
3,086·00 +
12,001·01 +
8,750·00 +
2,424·11 +
20,500·00 +
7,601·00 +
48,000·00 +
13,676·00 +
6,600·00 +
297·00 +
23,676·00 +
9,176·00 +
600·00 +
1,440·00 +
3,759·00 +
7,333·00 +
276·91 +
13,260·00 +
11,676·00 +
18,376·00 +
10,555·00 +
926·00 +
22,256·00 +
2,650·00 +
9,200·00 +
13,578·00 +
8,122·00 +
4,526·00 +
16,662·20 +
12,210·00 +
1,500·00 +
4,200·00 +
18,379·00 +
5,110·00 +

049

583,705·18 *

CONFIDENTIAL

AIG000187

| | | | | | |
|---|---|---|---|---|---|
| 54665 | HP0301 | 1 | -12,376 | 20030715 | AZBR6 |
| 21373 | HP0301 | 1 | -92,600 | 20030820 | AZBR6 |
| 63589 | HP0302 | 1 | -2,355 | 20030505 | CLAIM18 |
| 64534 | HP0303 | 1 | -15,176 | 20030627 | AZBR6 |
| 60791 | HP0303 | 1 | -9,090 | 20030522 | TXBR4 |
| 64235 | HP0304 | 1 | -2,676 | 20031219 | CABR12 |
| 21495 | HP0304 | 1 | -1,776 | 20030807 | AZBR39 |
| 65300 | HP0304 | 1 | -5,005 | 20030528 | AZBR2 |
| 64281 | HP0306 | 1 | -11,555 | 20030711 | AZBR2 |
| 58950 | HP0306 | 1 | -2,176 | 20030507 | AZBR39 |
| 62920 | HP0306 | 1 | -15,330 | 20030618 | AZBR2 |
| 64461 | HP0306 | 1 | -7,777 | 20030925 | AZBR6 |
| 64464 | HP0306 | 1 | -4,176 | 20030602 | AZBR6 |
| 49313 | HP0307 | 1 | -2,676 | 20030908 | AZBR39 |
| 63492 | HP0307 | 1 | -9,126 | 20030812 | AZBR39 |
| 55952 | HP0308 | 1 | -12,150 | 20030429 | AZBR2 |
| 49581 | HP0308 | 1 | -8,025 | 20030520 | CLAIM18 |
| 63947 | HP03115 | 1 | -1,420 | 20030715 | AZBR6 |
| 55934 | HP03119 | 1 | -7,376 | 20030625 | AZBR2 |
| 63753 | HP0313 | 1 | -8,101.21 | 20050315 | AZBR53 |
| 61152 | HP0313 | 1 | -7,326 | 20030602 | AZBR6 |
| 48698 | HP0313 | 1 | -9,100 | 20030612 | AZBR6 |
| 65893 | HP03141 | 1 | -6,714 | 20030709 | AZBR2 |
| 64594 | HP0314 | 1 | -8,689 | 20030729 | AZBR2 |
| 64371 | HP03149 | 1 | -44,666.67 | 20031201 | AZBR53 |
| 62908 | HP03155 | 1 | -26,596.69 | 20031030 | AZBR6 |
| 64617 | HP0315 | 1 | -9,176 | 20040202 | AZBR53 |
| 55528 | HP0315 | 1 | -4,713 | 20030721 | AZBR39 |
| 56008 | HP0316 | 1 | -7,188 | 20030729 | AZBR2 |
| 55985 | HP0317 | 1 | -5,376 | 20031121 | CABR12 |
| 63941 | HP0319 | 1 | -3,750 | 20030729 | AZBR2 |
| 55767 | HP0319 | 1 | -11,376 | 20030821 | AZBR2 |
| 21652 | HP0320 | 1 | -30,000 | 20030521 | AZBR46 |
| 43924 | HP0321 | 1 | -25,500 | 20030724 | AZBR39 |
| 63553 | HP0321 | 1 | -18,601 | 20030925 | TXBR4 |
| 55965 | HP0322 | 1 | -13,610 | 20030806 | TXBR4 |
| 55965 | HP0322 | 1 | -10,111 | 20030806 | TXBR4 |
| 63623 | HP0322 | 1 | -2,676 | 20050620 | CABR12 |
| 55575 | HP0322 | 1 | -22,000 | 20030627 | TXBR4 |
| 55386 | HP0323 | 1 | -40,000 | 20030619 | TXBR4 |
| 61209 | HP0323 | 1 | -12,000 | 20030619 | TXBR4 |
| 55359 | HP0323 | 1 | -2,376 | 20030922 | AZBR39 |
| 64302 | HP0325 | 1 | -5,778 | 20030703 | AZBR6 |
| 21196 | HP0326 | 1 | -2,975 | 20030625 | AZBR39 |
| 56038 | HP0326 | 1 | -8,851 | 20030723 | AZBR39 |
| 65204 | HP0327 | 1 | -2,150 | 20030902 | AZBR39 |
| 49284 | HP0327 | 1 | -12,750 | 20031105 | TXBR4 |
| 58890 | HP0328 | 1 | -7,000 | 20030605 | AZBR2 |
| 55578 | HP0329 | 1 | -3,500 | 20031201 | AZBR53 |
| 65847 | HP0329 | 1 | -2,006 | 20030902 | AZBR2 |
| 64591 | HP0329 | 1 | -3,715 | 20030715 | AZBR2 |
| 55463 | HP0330 | 1 | -10,000 | 20040914 | AZBR2 |

Right margin column:

12,376·00 *+
92,600·00 +
2,355·00 +
15,176·00 +
9,090·00 +
2,676·00 +
1,776·00 +
5,005·00 +
11,555·00 +
2,176·00 +
15,330·00 +
7,777·00 +
4,176·00 +
2,676·00 +
9,126·00 +
12,150·00 +
8,025·00 +
1,420·00 +
7,376·00 +
8,101·21 +
7,326·00 +
9,100·00 +
6,714·00 +
8,689·00 +
44,666·67 +
26,596·69 +
9,176·00 +
4,713·00 +
7,188·00 +
5,376·00 +
3,750·00 +
11,376·00 +
30,000·00 +
25,500·00 +
18,601·00 +
13,610·00 +
10,111·00 +
2,676·00 +
22,000·00 +
40,000·00 +
12,000·00 +
2,376·00 +
5,778·00 +
2,975·00 +
8,851·00 +
2,150·00 +
12,750·00 +
7,000·00 +
3,500·00 +
2,006·00 +
3,715·00 +
10,000·00 +

052

611,212·57 *

CONFIDENTIAL

AIG000188

| | | | | | |
|---|---|---|---|---|---|
| 64012 | HP0330 | 1 | -3,376 | 20031211 | AZBR53 |
| 55423 | HP0330 | 1 | -4,720 | 20030710 | AZBR39 |
| 54690 | HP0331 | 1 | -42,676 | 20030819 | TXBR4 |
| 54690 | HP0331 | 1 | -2,676 | 20031211 | AZBR53 |
| 65046 | HP03311 | 1 | -8,176 | 20031120 | AZBR6 |
| 61298 | HP0331 | 1 | -22,810 | 20030828 | AZBR2 |
| 55620 | HP0331 | 1 | -16,001 | 20031201 | AZBR53 |
| 63543 | HP0332 | 1 | -81,050 | 20030814 | AZBR6 |
| 64543 | HP0332 | 1 | -10,100 | 20030801 | AZBR39 |
| 49556 | HP0333 | 1 | -24,000 | 20031002 | AZBR53 |
| 56080 | HP0333 | 1 | -20,100 | 20030903 | AZBR6 |
| 56118 | HP0333 | 1 | -68,357 | 20030910 | TXBR4 |
| 55988 | HP0334 | 1 | -18,626 | 20031106 | CABR12 |
| 56096 | HP03355 | 1 | -14,076.32 | 20030902 | AZBR39 |
| 42595 | HP0335 | 1 | -37,875 | 20030813 | AZBR2 |
| 63917 | HP0336 | 1 | -10,500 | 20031104 | CLAIM18 |
| 65329 | HP0336 | 1 | -4,130 | 20030930 | AZBR39 |
| 64508 | HP0337 | 1 | -7,665 | 20030813 | AZBR6 |
| 64392 | HP0337 | 1 | -7,500 | 20030806 | AZBR6 |
| 65851 | HP0337 | 1 | -500 | 20030904 | AZBR39 |
| 44901 | HP0338 | 1 | -3,626 | 20040205 | AZBR53 |
| 43486 | HP03383 | 1 | -17,277.77 | 20030820 | AZBR39 |
| 64598 | HP0338 | 1 | -14,710 | 20030729 | AZBR2 |
| 64300 | HP0338 | 1 | -3,660 | 20041115 | NJBR15 |
| 42844 | HP0338 | 1 | -6,208 | 20030909 | ILBR7 |
| 64642 | HP0340 | 1 | -8,600 | 20030811 | AZBR39 |
| 65771 | HP0340 | 1 | -2,500 | 20030811 | AZBR39 |
| 43936 | HP0341 | 1 | -7,737 | 20030930 | AZBR53 |
| 55257 | HP0342 | 1 | -7,251 | 20040114 | AZBR53 |
| 49683 | HP0343 | 1 | -18,376 | 20041022 | AZBR53 |
| 64147 | HP0343 | 1 | -9,750 | 20030813 | AZBR6 |
| 55743 | HP0343 | 1 | -14,000 | 20040223 | AZBR53 |
| 64586 | HP0344 | 1 | -26,541 | 20030919 | NJBR15 |
| 64584 | HP0345 | 1 | -5,756 | 20030926 | AZBR6 |
| 61285 | HP0345 | 1 | -11,386 | 20040505 | AZBR53 |
| 65997 | HP0346 | 1 | -3,000 | 20031017 | NJBR15 |
| 64099 | HP0346 | 1 | -7,266 | 20030905 | AZBR6 |
| 42833 | HP0346 | 1 | -5,835 | 20030814 | AZBR2 |
| 42615 | HP0347 | 1 | -40,000 | 20031021 | AZBR2 |
| 36890 | HP0347 | 1 | -10,773 | 20031217 | AZBR53 |
| 36890 | HP0347 | 1 | -8,103 | 20031210 | AZBR53 |
| 56159 | HP0348 | 1 | -8,000 | 20031010 | AZBR39 |
| 65874 | HP0349 | 1 | -511 | 20030821 | AZBR39 |
| 65842 | HP0349 | 1 | -910 | 20031002 | AZBR53 |
| 64323 | HP0350 | 1 | -2,886 | 20040302 | AZBR53 |
| 49310 | HP0350 | 1 | -3,376 | 20031105 | AZBR53 |
| 55856 | HP0350 | 1 | -36,839 | 20031021 | AZBR53 |
| 61226 | HP0351 | 1 | -8,767 | 20031105 | AZBR53 |
| 55955 | HP0352 | 1 | -15,760 | 20031017 | AZBR2 |
| 55492 | HP0353 | 1 | -28,188 | 20031117 | AZBR6 |
| 64654 | HP0353 | 1 | -9,676 | 20031114 | AZBR53 |
| 21642 | HP0353 | 1 | - | 20031001 | AZBR53 |

0.00
3,376.00 *+
4,720.00 +
42,676.00 +
2,676.00 +
8,176.00 +
22,810.00 +
16,001.00 +
81,050.00 +
10,100.00 +
24,000.00 +
20,100.00 +
63,357.00 +
13,626.00 +
14,076.32 +
37,875.00 +
10,500.00 +
4,130.00 +
7,665.00 +
7,500.00 +
500.00 +
3,626.00 +
17,277.77 +
14,710.00 +
3,660.00 +
6,208.00 +
8,600.00 +
2,500.00 +
7,737.00 +
7,251.00 +
18,376.00 +
9,750.00 +
14,000.00 +
26,541.00 +
5,756.00 +
11,386.00 +
3,000.00 +
7,266.00 +
5,835.00 +
40,000.00 +
10,773.00 +
8,103.00 +
8,000.00 +
511.00 +
910.00 +
2,886.00 +
3,376.00 +
36,839.00 +
8,767.00 +
15,760.00 +
28,188.00 +
9,676.00 +

051

752,183.09 *

CONFIDENTIAL

AIG000189

| | | | | | |
|---|---|---|---|---|---|
| 21471 | HP0353 | 1 | -7,179 | 20030917 | AZBR6 |
| 21655 | HP0354 | 1 | -5,678 | 20031023 | AZBR6 |
| 63978 | HP0354 6 | 1 | - 63,251.9 | 20050721 | AZBR53 |
| 49563 | HP0354 | 1 | -31,200 | 20031022 | AZBR6 |
| 64541 | HP0354 | 1 | -3,010 | 20031223 | AZBR53 |
| 63769 | HP0354 | 1 | -10,612 | 20030918 | AZBR2 |
| 21554 | HP0355 | 1 | -2,676 | 20040108 | CABR12 |
| 56016 | HP0355 | 1 | -779.12 | 20031120 | AZBR2 |
| 49598 | HP0356 | 1 | -7,858 | 20031007 | AZBR39 |
| 64364 | HP0356 | 1 | -11,376 | 20031010 | AZBR39 |
| 64486 | HP0359 | 1 | -5,376 | 20040114 | AZBR53 |
| 65839 | HP0359 | 1 | -5,160 | 20031016 | AZBR39 |
| 65833 | HP0360 | 1 | -576 | 20040108 | AZBR2 |
| 64700 | HP0360 | 1 | -4,376 | 20031211 | AZBR53 |
| 65647 | HP0361 | 1 | -1,280 | 20031216 | AZBR53 |
| 65264 | HP0361 | 1 | -597 | 20031008 | AZBR39 |
| 56205 | HP0362 | 1 | -46,895 | 20031126 | AZBR2 |
| 56089 | HP0362 7 | 1 | - 12,774.15 | 20050513 | TXBR4 |
| 42596 | HP0363 | 1 | -1,110.03 | 20031202 | AZBR2 |
| 21597 | HP0364 | 1 | -16,555 | 20031002 | AZBR39 |
| 55834 | HP0365 | 1 | -4,376 | 20050405 | ILBR7 |
| 55822 | HP0365 | 1 | - | 20031114 | AZBR53 |
| 64260 | HP0365 | 1 | -37,688 | 20040112 | AZBR53 |
| 63964 | HP0365 | 1 | - | 20031002 | AZBR39 |
| 37027 | HP0366 | 1 | -4,676 | 20040203 | AZBR2 |
| 64044 | HP0366 | 1 | -3,575 | 20040505 | NJBR15 |
| 55621 | HP0366 | 1 | -7,777 | 20031107 | AZBR53 |
| 48706 | HP0367 | 1 | -21,789 | 20031120 | AZBR46 |
| 55790 | HP0368 | 1 | -400 | 20031202 | AZBR53 |
| 55607 | HP0370 | 1 | -17,100 | 20031015 | AZBR39 |
| 65386 | HP0370 | 1 | -22 | 20031201 | AZBR53 |
| 55556 | HP0375 | 1 | -550 | 20040719 | AZBR53 |
| 64733 | HP0375 | 1 | -4,976 | 20031021 | AZBR2 |
| 43954 | HP0375 | 1 | -1,788 | 20031204 | AZBR53 |
| 65767 | HP0376 | 1 | -856 | 20040203 | AZBR53 |
| 64709 | HP0377 | 1 | - | 20040108 | AZBR53 |
| 36922 | HP0377 | 1 | -9,388 | 20040112 | AZBR53 |
| 49593 | HP0378 | 1 | -1,676 | 20040304 | AZBR53 |
| 43910 | HP0378 | 1 | -12,509 | 20031224 | AZBR53 |
| 64685 | HP0378 | 1 | -3,750 | 20040106 | AZBR53 |
| 64503 | HP0379 | 1 | -6,250 | 20040112 | CABR12 |
| 65126 | HP0380 | 1 | -2,177 | 20040113 | AZBR53 |
| 49655 | HP0380 | 1 | -2,500 | 20041116 | AZBR6 |
| 64246 | HP0381 9 | 1 | - 10,777.7 7 | 20031121 | AZBR46 |
| 65932 | HP0382 | 1 | -850 | 20031103 | AZBR53 |
| 54980 | HP0382 8 | 1 | -5,977.77 | 20031203 | AZBR53 |
| 64569 | HP0383 4 | 1 | 10,332.0 6 | 20040303 | AZBR53 |
| 54789 | HP0383 | 1 | -11,501 | 20040303 | AZBR53 |

7,179·00*+
5,678·00 +
63,251·90 +
31,200·00 +
3,010·00 +
10,612·00 +
2,676·00 +
779·12 +
7,858·00 +
11,376·00 +
5,376·00 +
5,160·00 +
576·00 +
4,376·00 +
1,280·00 +
597·00 +
46,895·00 +
12,774·15 +
1,110·03 +
16,555·00 +
4,376·00 +
37,688·00 +
4,676·00 +
3,575·00 +
7,777·00 +
21,789·00 +
400·00 +
17,100·00 +
22·00 +
550·00 +
4,976·00 +
1,788·00 +
856·00 +
9,388·00 +
1,676·00 +
12,509·00 +
3,750·00 +
6,250·00 +
2,177·00 +
2,500·00 +
10,777·77 +
850·00 +
5,977·77 +
10,332·06 +
11,501·00 +

045

421,530·80 *

**CONFIDENTIAL**

**AIG000190**

| | | | | | |
|---|---|---|---|---|---|
| 49300 | HP0384 | 1 | -5,501 | 20031212 | TXBR4 |
| 43170 | HP0384 | 1 | -2,000 | 20040226 | CABR12 |
| 21533 | HP0384 | 1 | -43,567 | 20040122 | AZBR53 |
| 48515 | HP0385 | 1 | -19,350 | 20040205 | AZBR53 |
| 63876 | HP0385 | 1 | -8,301 | 20040112 | AZBR53 |
| 55917 | HP0387 | 1 | -3,176 | 20040108 | AZBR53 |
| 49311 | HP0387 | 1 | -11,199 | 20040331 | AZBR53 |
| 60599 | HP0388 | 1 | -10,376 | 20040311 | AZBR53 |
| 64507 | HP0389 | 1 | -5,301 | 20040114 | AZBR53 |
| 64747 | HP0389 | 1 | -5,586 | 20040120 | AZBR53 |
| 65040 | HP0390 | 1 | -1,000 | 20040106 | AZBR39 |
| 56050 | HP0390 | 1 | -3,660 | 20031202 | AZBR53 |
| 55904 | HP0391 | 1 | -11,700 | 20040112 | AZBR53 |
| 21563 | HP0394 | 1 | -18,389 | 20040202 | AZBR53 |
| 43743 | HP0394 | 1 | -5,180 | 20031210 | AZBR53 |
| 21617 | HP0394 | 1 | -10,500 | 20040430 | AZBR53 |
| 56342 | HP03949 | 1 | -17,767.23 | 20040913 | AZBR53 |
| 63875 | HP0396 | 1 | -11,751 | 20040212 | AZBR53 |
| 54612 | HP0396 | 1 | -2,888 | 20040129 | AZBR53 |
| 37016 | HP03968 | 1 | -8,737.87 | 20040106 | AZBR53 |
| 64711 | HP0397 | 1 | -8,376 | 20040908 | CABR12 |
| 21389 | HP0398 | 1 | -11,800 | 20040112 | AZBR53 |
| 56128 | HP0398 | 1 | -8,376 | 20040309 | AZBR53 |
| 56180 | HP0399 | 1 | -6,176 | 20040602 | AZBR53 |
| 55961 | HP0399 | 1 | -500 | 20051206 | TXBR4 |
| 64588 | HP0399 | 1 | -5,505 | 20040809 | AZBR53 |
| 65103 | HP0400 | 1 | -36,000 | 20040917 | CABR12 |
| 55290 | HP0401 | 1 | -18,760 | 20040415 | AZBR53 |
| 55290 | HP0401 | 1 | -16,376 | 20040624 | AZBR53 |
| 64466 | HP0401 | 1 | -13,612 | 20040518 | AZBR53 |
| 64466 | HP0401 | 1 | -20,526 | 20040621 | AZBR53 |
| 64385 | HP0404 | 1 | -4,256 | 20040506 | AZBR53 |
| 64468 | HP0406 | 1 | -6,376 | 20040528 | AZBR53 |
| 63756 | HP0407 | 1 | -8,625 | 20040412 | AZBR53 |
| 64708 | HP0407 | 1 | -11,376 | 20040518 | AZBR53 |
| 64533 | HP0407 | 1 | -3,256 | 20040506 | AZBR53 |
| 43735 | HP0408 | 1 | -4,256 | 20040721 | AZBR53 |
| 49317 | HP0409 | 1 | -250 | 20041206 | AZBR2 |
| 63367 | HP0409 | 1 | -27,399 | 20040506 | AZBR53 |
| 63824 | HP0409 | 1 | -22,800 | 20040527 | AZBR53 |
| 65118 | HP0410 | 1 | - | 20040519 | AZBR53 |
| 64843 | HP0411 | 1 | -9,686 | 20040528 | AZBR53 |
| 21412 | HP04115 | 1 | -777 | 20050617 | AZBR53 |
| 64802 | HP0412 | 1 | -17,788 | 20040407 | TXBR4 |
| 56253 | HP0412 | 1 | -16,555 | 20040812 | AZBR53 |
| 21648 | HP0413 | 1 | -4,376 | 20040621 | AZBR53 |
| 56449 | HP0413 | 1 | -8,000 | 20040607 | AZBR53 |
| 64554 | HP0413 | 1 | -2,076 | 20040722 | AZBR53 |
| 64805 | HP0414 | 1 | -12,526 | 20040603 | AZBR53 |
| 55962 | HP0414 | 1 | -10,376 | 20040621 | AZBR53 |
| 37031 | HP0415 | 1 | -2,400 | 20040716 | AZBR53 |
| 64680 | HP0416 | 1 | -8,251 | 20040610 | AZBR53 |
| 49727 | HP0416 | 1 | -41,007 | 20040610 | AZBR53 |

```
5,501·00*+
2,000·00 +
43,567·00 +
19,350·00 +
8,301·00 +
3,176·00 +
11,199·00 +
10,376·00 +
5,301·00 +
5,586·00 +
1,000·00 +
3,660·00 +
11,700·00 +
18,389·00 +
5,180·00 +
10,500·00 +
17,767·23 +
11,751·00 +
2,888·00 +
8,737·87 +
8,376·00 +
11,800·00 +
8,376·00 +
6,176·00 +
500·00 +
5,505·00 +
36,000·00 +
18,760·00 +
16,376·00 +
13,612·00 +
20,526·00 +
4,256·00 +
6,376·00 +
8,625·00 +
11,376·00 +
3,256·00 +
4,256·00 +
250·00 +
27,399·00 +
22,800·00 +
9,686·00 +
777·00 +
17,788·00 +
16,555·00 +
4,376·00 +
8,000·00 +
2,076·00 +
12,526·00 +
10,376·00 +
2,400·00 +
8,251·00 +
41,007·00 +

052
574,349·10 *
```

CONFIDENTIAL

AIG000191

| | | | | | |
|---|---|---|---|---|---|
| 64391 | HP0416 | 1 | -11,111.11 | 20040610 | AZBR53 |
| 21546 | HP0417 | 1 | -4,600 | 20040629 | AZBR53 |
| 21629 | HP0417 | 1 | -7,289 | 20040716 | AZBR53 |
| 64755 | HP0418 | 1 | -10,676 | 20040802 | AZBR53 |
| 64177 | HP04191 | 1 | -9,376 | 20040809 | AZBR53 |
| 49711 | HP0419 | 1 | -18,589 | 20040715 | AZBR2 |
| 65288 | HP0421 | 1 | -907 | 20040709 | AZBR6 |
| 64876 | HP0421 | 1 | -2,855 | 20040929 | AZBR2 |
| 56369 | HP0421 | 1 | -22,300 | 20040610 | AZBR53 |
| 42352 | HP0421 | 1 | -7,150 | 20040524 | AZBR2 |
| 63961 | HP0422 | 1 | -4,950 | 20040824 | AZBR53 |
| 65096 | HP0422 | 1 | -23,030 | 20041028 | AZBR53 |
| 65096 | HP0422 | 1 | -18,111 | 20041109 | AZBR53 |
| 64753 | HP0422 | 1 | -22,700 | 20040823 | AZBR53 |
| 64852 | HP0423 | 1 | -12,750 | 20040623 | AZBR53 |
| 64650 | HP0423 | 1 | -10,676 | 20040922 | AZBR53 |
| 56110 | HP0423 | 1 | -8,525 | 20040802 | AZBR53 |
| 64688 | HP0423 | 1 | - | 20040610 | AZBR53 |
| 64386 | HP0424 | 1 | -9,125 | 20040827 | AZBR53 |
| 56387 | HP0424 | 1 | -3,888 | 20040930 | AZBR53 |
| 63694 | HP0425 | 1 | -47,688 | 20040630 | AZBR53 |
| 54270 | HP0425 | 1 | -7,650 | 20040819 | AZBR53 |
| 21587 | HP0427 | 1 | -2,676 | 20040730 | AZBR53 |
| 21413 | HP0427 | 1 | -6,888 | 20040721 | AZBR53 |
| 54520 | HP0428 4 | 1 | -28,866.25 | 20040722 | AZBR53 |
| 61007 | HP0429 | 1 | -8,878 | 20040629 | AZBR53 |
| 21438 | HP0429 | 1 | -30,000 | 20040526 | AZBR2 |
| 49287 | HP0429 | 1 | -8,855 | 20040817 | AZBR53 |
| 65052 | HP0430 | 1 | -25,201 | 20040802 | AZBR53 |
| 64760 | HP0430 | 1 | -12,001 | 20040805 | AZBR53 |
| 21638 | HP0430 | 1 | -25,000 | 20041006 | AZBR53 |
| 64522 | HP0431 | 1 | -7,856 | 20041006 | AZBR53 |
| 64778 | HP0431 | 1 | -8,226 | 20050211 | AZBR53 |
| 65280 | HP0432 | 1 | -300 | 20040809 | AZBR53 |
| 48704 | HP0432 | 1 | -8,222 | 20040929 | AZBR53 |
| 64228 | HP0432 | 1 | -5,176 | 20050103 | AZBR53 |
| 43798 | HP0433 | 1 | -8,075 | 20041103 | AZBR53 |
| 64826 | HP0433 | 1 | -3,256 | 20040805 | AZBR53 |
| 49718 | HP0434 | 1 | -9,711 | 20041102 | AZBR53 |
| 21401 | HP0435 | 1 | -8,501.5 | 20040923 | AZBR53 |
| 37161 | HP0436 | 1 | -8,632 | 20041007 | AZBR53 |
| 42845 | HP0437 | 1 | -21,550 | 20041203 | AZBR6 |
| 61116 | HP0437 | 1 | -13,198 | 20040913 | AZBR53 |
| 64903 | HP0437 | 1 | -22,376 | 20040914 | AZBR53 |
| 56505 | HP0437 | 1 | -10,100 | 20040909 | AZBR53 |
| 65834 | HP0438 | 1 | -1,001 | 20040917 | AZBR53 |
| 64615 | HP0438 | 1 | -11,176 | 20040902 | AZBR6 |
| 55799 | HP0438 | 1 | -3,950 | 20041007 | AZBR53 |
| 65102 | HP0438 | 1 | -16,481 | 20041123 | AZBR53 |
| 37019 | HP0438 | 1 | -2,666 | 20041119 | AZBR6 |
| 54869 | HP0439 | 1 | -4,700 | 20040812 | AZBR53 |
| 56499 | HP0440 | 1 | -10,376 | 20040823 | AZBR2 |
| 54770 | HP0440 | 1 | -8,111 | 20040820 | AZBR53 |
| 21686 | HP0440 | 1 | - | 20040922 | AZBR53 |

11,111.11 *+
4,600.00 +
7,289.00 +
10,676.00 +
9,376.00 +
18,589.00 +
907.00 +
2,855.00 +
22,300.00 +
7,150.00 +
4,950.00 +
23,030.00 +
18,111.00 +
22,700.00 +
12,750.00 +
10,676.00 +
8,525.00 +
9,125.00 +
3,333.00 +
47,333.00 +
7,650.00 +
2,676.00 +
6,833.00 +
23,366.25 +
8,373.00 +
30,000.00 +
8,855.00 +
25,201.00 +
12,001.00 +
25,000.00 +
7,856.00 +
8,226.00 +
300.00 +
8,222.00 +
5,176.00 +
8,075.00 +
3,256.00 +
9,711.00 +
8,501.50 +
8,632.00 +
21,550.00 +
13,193.00 +
22,376.00 +
10,100.00 +
1,001.00 +
11,176.00 +
3,950.00 +
16,431.00 +
2,666.00 +
4,700.00 +
10,376.00 +
8,111.00 +

052

505,351.86 *

CONFIDENTIAL

AIG000192

| | | | | | |
|---|---|---|---|---|---|
| 55277 | HP0441 | 1 | -15,000 | 20040820 | AZBR53 |
| 56521 | HP0442 | 1 | -3,686 | 20040929 | AZBR53 |
| 58808 | HP0442 | 1 | -1,076 | 20050328 | AZBR53 |
| 43796 | HP0444 | 1 | -19,376 | 20040908 | AZBR2 |
| 56600 | HP0444 | 1 | -4,000 | 20041222 | AZBR53 |
| 65302 | HP0444 | 1 | -10,582 | 20050325 | AZBR6 |
| 65866 | HP0445 | 1 | -3,472 | 20041013 | AZBR53 |
| 65944 | HP0445 | 1 | -101 | 20041203 | AZBR6 |
| 64653 | HP0446 | 1 | -15,112 | 20041025 | AZBR53 |
| 64579 | HP0446 | 1 | -7,676 | 20041118 | AZBR6 |
| 56568 | HP0447 | 1 | -8,260 | 20040916 | AZBR53 |
| 56598 | HP0447 | 1 | -67,667 | 20050223 | AZBR53 |
| 64822 | HP0448 | 1 | -18,100 | 20041027 | AZBR53 |
| 63737 | HP0448 | 1 | -8,525 | 20041027 | AZBR53 |
| 64894 | HP0449 | 1 | -60 | 20051101 | AZBR53 |
| 64894 | HP0449 | 1 | -16,600 | 20051101 | AZBR53 |
| 63685 | HP0450 | 1 | -14,376 | 20041015 | AZBR53 |
| 65397 | HP0450 | 1 | -4,695 | 20041007 | AZBR53 |
| 21579 | HP0450 | 1 | -4,900 | 20041015 | AZBR53 |
| 64871 | HP0451 | 1 | -14,112 | 20041012 | AZBR53 |
| 56158 | HP0451 | 1 | -18,750 | 20041203 | AZBR6 |
| 65823 | HP0452 | 1 | -3,847 | 20041013 | AZBR53 |
| 61188 | HP0452 | 1 | -29,471.5 | 20041007 | AZBR53 |
| 56015 | HP0453 | 1 | -15,101 | 20040922 | AZBR2 |
| 49656 | HP0453 | 1 | -37,500 | 20041201 | CABR12 |
| 64924 | HP0454 | 1 | -18,657 | 20050614 | AZBR60 |
| 65951 | HP0455 | 1 | -2,777 | 20041109 | AZBR53 |
| 64532 | HP0457 | 1 | -18,500 | 20041209 | AZBR53 |
| 42519 | HP0458 | 1 | -31,671 | 20050314 | AZBR53 |
| 64788 | HP0458 | 1 | -13,676 | 20041015 | AZBR53 |
| 64668 | HP0459 | 1 | -14,001 | 20041217 | AZBR6 |
| 48535 | HP0459 | 1 | -1,870 | 20050316 | AZBR53 |
| 56002 | HP0461 | 1 | -222 | 20050422 | AZBR60 |
| 64875 | HP0462 | 1 | -5,689 | 20050211 | AZBR53 |
| 56567 | HP0462 | 1 | 5,376 | 20050405 | AZBR53 |
| 56567 | HP0462 | 1 | -5,376 | 20050406 | AZBR53 |
| 56522 | HP0462 | 1 | -10,107 | 20040929 | AZBR53 |
| 65930 | HP0463 | 1 | -3,150 | 20050302 | AZBR2 |
| 64721 | HP0463 | 1 | -40,676 | 20050609 | CLAIM2 |
| 65937 | HP0463 | 1 | -1,250 | 20041220 | AZBR53 |
| 65357 | HP0463 | 1 | -1,076 | 20041222 | AZBR53 |
| 21644 | HP0464 | 1 | -26,212 | 20050210 | AZBR6 |
| 21644 | HP0464 1 | 1 | -15,137.9 | 20050311 | AZBR53 |
| 62639 | HP0464 | 1 | - | 20050406 | AZBR53 |
| 62639 | HP0464 | 1 | 1,680.22 | 20050407 | AZBR53 |
| 56284 | HP0464 | 1 | -10,508 | 20051101 | AZBR53 |
| 64869 | HP0464 | 1 | -15,676 | 20041013 | AZBR2 |
| 61237 | HP0465 | 1 | -21,500 | 20041029 | AZBR53 |
| 56416 | HP0465 | 1 | -9,861 | 20041027 | AZBR53 |
| 64512 | HP0465 9 | 1 | -24,510.2 9 | 20041229 | AZBR53 |
| 64691 | HP0466 | 1 | -14,333 | 20050125 | AZBR53 |
| 49302 | HP0466 | 1 | -8,500 | 20050127 | AZBR53 |
| 64912 | HP0466 | 1 | -4,777 | 20050125 | AZBR53 |

15,000·00 *+
3,636·00 +
1,076·00 +
19,376·00 +
4,000·00 +
10,582·00 +
3,472·00 +
101·00 +
15,112·00 +
7,676·00 +
8,260·00 +
67,667·00 +
18,100·00 +
8,525·00 +
60·00 +
16,600·00 +
14,376·00 +
4,695·00 +
4,900·00 +
14,112·00 +
18,750·00 +
3,847·00 +
29,471·50 +
15,101·00 +
37,500·00 +
18,657·00 +
2,777·00 +
18,500·00 +
31,671·00 +
13,676·00 +
14,001·00 +
1,870·00 +
222·00 +
5,689·00 +
5,376·00 +
5,376·00 −
10,107·00 +
3,150·00 +
40,676·00 +
1,250·00 +
1,076·00 +
26,212·00 +
15,137·90 +
1,680·22 +
10,508·00 +
15,676·00 +
21,500·00 +
9,861·00 +
24,510·29 +
14,333·00 +
8,500·00 +
4,777·00 +

050

653,062·91 *

**CONFIDENTIAL**

AIG000193

| 64870 | HP0466 | 1 | -6,326 | 20051212 | AZBR53 |
|---|---|---|---|---|---|
| 55867 | HP0467 | 1 | -61,651 | 20041222 | AZBR53 |
| 55853 | HP0467 | 1 | -30,376 | 20050224 | AZBR53 |
| 64833 | HP0467 | 1 | -7,376 | 20050119 | AZBR53 |
| 63708 | HP0467 | 1 | -27,766 | 20041216 | CABR12 |
| 61281 | HP0467 | 1 | -9,333 | 20050124 | AZBR53 |
| 64900 | HP0467 | 1 | -21,600 | 20050302 | AZBR53 |
| 64881 | HP0468 | 1 | -4,817 | 20050204 | AZBR53 |
| 61053 | HP0468 | 1 | 6,676 | 20050405 | AZBR53 |
| 61053 | HP0468 | 1 | -6,676 | 20050406 | AZBR53 |
| 61217 | HP0468 | 1 | -30,895 | 20050114 | AZBR53 |
| 64752 | HP0468 | 1 | -9,178 | 20050114 | AZBR53 |
| 63545 | HP0468 | 1 | -21,333 | 20050124 | AZBR53 |
| 64756 | HP0468 | 1 | -18,750 | 20050207 | AZBR53 |
| 56579 | HP0468 | 1 | -6,678 | 20050127 | AZBR53 |
| 21601 | HP0468 | 1 | -2,879 | 20050113 | AZBR53 |
| 21601 | HP0468 | 1 | -2,676 | 20050119 | AZBR53 |
| 64884 | HP0469 | 1 | -15,879 | 20050127 | AZBR53 |
| 65123 | HP0469 | 1 | -200 | 20050119 | AZBR53 |
| 63495 | HP0469 | 1 | -7,127 | 20050128 | AZBR53 |
| 48711 | HP0470 | 1 | -8,676 | 20050119 | AZBR53 |
| 65137 | HP0471 | 1 | -1,777 | 20041118 | AZBR6 |
| 64943 | HP0471 | 1 | -16,808 | 20050209 | AZBR6 |
| 63795 | HP0472 | 1 | -16,100 | 20050617 | AZBR53 |
| 56537 | HP0472 | 1 | -36,376 | 20050224 | AZBR53 |
| 56569 | HP0472 | 1 | -45,326 | 20050422 | AZBR60 |
| 55759 | HP0473 | 1 | -10,376 | 20041105 | AZBR53 |
| 63724 | HP0473 | 1 | -4,110 | 20041102 | AZBR53 |
| 65939 | HP0474 0 | 1 | -3,076.76 | 20041110 | AZBR53 |
| 37163 | HP0474 | 1 | -26,326 | 20041103 | AZBR53 |
| 64618 | HP0476 | 1 | -3,777 | 20041220 | AZBR53 |
| 56512 | HP0479 | 1 | -6,216 | 20050706 | AZBR53 |
| 56616 | HP0480 | 1 | -39,000 | 20050304 | AZBR53 |
| 63397 | HP0480 | 1 | -2,155 | 20050309 | AZBR53 |
| 21550 | HP0480 | 1 | -10,326 | 20050512 | AZBR6 |
| 49726 | HP0481 | 1 | -30,010 | 20041025 | AZBR53 |
| 63657 | HP0482 | 1 | -10,377 | 20050304 | AZBR53 |
| 65277 | HP0482 | 1 | -629 | 20050531 | AZBR60 |
| 63807 | HP0483 | 1 | -5,118 | 20050103 | AZBR53 |
| 65679 | HP0483 | 1 | -777 | 20050118 | AZBR53 |
| 56224 | HP0485 | 1 | -8,000.5 | 20050203 | AZBR53 |
| 64906 | HP0486 | 1 | -10,198 | 20041201 | AZBR6 |
| 63379 | HP0486 | 1 | -18,676 | 20050105 | AZBR53 |
| 64896 | HP0486 | 1 | -5,376 | 20041220 | AZBR53 |
| 63773 | HP0487 | 1 | -10,376 | 20041222 | AZBR53 |
| 60951 | HP0487 | 1 | 11,300 | 20051110 | TXBR4 |
| 60951 | HP0487 | 1 | -11,300 | 20051110 | TXBR4 |
| 64613 | HP0487 | 1 | 13,676 | 20050405 | AZBR53 |
| 64613 | HP0487 | 1 | -13,676 | 20050406 | AZBR53 |
| 54620 | HP0487 | 1 | -5,626 | 20050513 | CABR12 |
| 64550 | HP0488 | 1 | -8,777 | 20050125 | AZBR53 |
| 63900 | HP0489 | 1 | -7,676 | 20041222 | AZBR53 |
| 56184 | HP0491 | 1 | -53,111 | 20050124 | AZBR2 |
| 64655 | HP0492 | 1 | -8,470 | 20041116 | AZBR53 |

```
        0·00 *
    6,325·00 *+
   61,651·00 +
   30,376·00 +
    7,376·00 +
   27,766·00 +
    9,333·00 +
   21,600·00 +
    4,817·00 +
    6,676·00 +
    6,676·00 -
   30,895·00 +
    9,173·00 +
   21,333·00 +
   18,750·00 +
    6,678·00 +
    2,879·00 +
    2,676·00 +
   15,879·00 +
      200·00 +
    7,127·00 +
    8,676·00 +
    1,777·00 +
   16,808·00 +
   16,100·00 +
   36,376·00 +
   45,326·00 +
   10,376·00 +
    4,110·00 +
    3,076·76 +
   26,326·00 +
    3,777·00 +
    6,216·00 +
   39,000·00 +
    2,155·00 +
   10,326·00 +
   30,010·00 +
   10,377·00 +
      629·00 +
    5,118·00 +
      777·00 +
    8,000·50 +
   10,198·00 +
   18,676·00 +
    5,376·00 +
   10,376·00 +
   11,300·00 +
   11,300·00 -
   13,676·00 +
   13,676·00 -
    5,626·00 +
    8,777·00 +
    7,676·00 +
   53,111·00 +
    8,470·00 +
048
  693,463·26 *
```

CONFIDENTIAL

AIG000194

| | | | | | |
|---|---|---|---|---|---|
| 65752 | HP0492 4 | 1 | 17,177.77 | 20050329 | AZBR53 |
| 64658 | HP0493 | 1 | -19,500 | 20050114 | AZBR53 |
| 64658 | HP0493 | 1 | 15,685 | 20050405 | AZBR53 |
| 64658 | HP0493 | 1 | -15,685 | 20050406 | AZBR53 |
| 65781 | HP0493 | 1 | -750 | 20041222 | AZBR53 |
| 64736 | HP0493 | 1 | -15,000 | 20050127 | AZBR53 |
| 64909 | HP0493 5 | 1 | -10,588.88 | 20050224 | AZBR53 |
| 37165 | HP0493 | 1 | -3,779 | 20050127 | AZBR53 |
| 63548 | HP0494 | 1 | -60,000 | 20050328 | AZBR53 |
| 64844 | HP0494 | 1 | -31,626 | 20050222 | AZBR53 |
| 43812 | HP0495 | 1 | -14,001 | 20041217 | AZBR6 |
| 49289 | HP0496 | 1 | -4,501.5 | 20050308 | AZBR53 |
| 49682 | HP0497 | 1 | 10,001 | 20050504 | AZBR6 |
| 49682 | HP0497 | 1 | -100,001 | 20050610 | AZBR6 |
| 49682 | HP0497 | 1 | -10,001 | 20050610 | CLAIM2 |
| 37045 | HP0497 | 1 | -36,920 | 20050610 | AZBR53 |
| 56106 | HP0498 | 1 | -3,756 | 20041209 | AZBR53 |
| 54658 | HP0498 | 1 | -42,626 | 20051213 | AZBR53 |
| 65821 | HP0498 | 1 | -4,007 | 20050525 | AZBR60 |
| 54687 | HP0500 2 | 1 | -52,656.03 | 20050714 | AZBR53 |
| 64968 | HP05011 | 1 | -15,886 | 20050315 | AZBR2 |
| 64836 | HP0503 | 1 | -39,900 | 20050425 | AZBR60 |
| 56662 | HP0503 | 1 | -3,126 | 20050714 | AZBR53 |
| 37015 | HP0503 | 1 | -6,575 | 20051208 | CABR12 |
| 64838 | HP0505 | 1 | -4,600 | 20051202 | AZBR64 |
| 56643 | HP0506 | 1 | -43,788 | 20050610 | AZBR53 |
| 64973 | HP0508 | 1 | -11,852 | 20050525 | AZBR60 |
| 37164 | HP0508 | 1 | -16,500 | 20050825 | AZBR53 |
| 56707 | HP0509 | 1 | -36,552 | 20050512 | AZBR6 |
| 64897 | HP0510 | 1 | -33,342 | 20050722 | AZBR53 |
| 55729 | HP0512 7 | 1 | -23,666.24 | 20050811 | AZBR53 |
| 63945 | HP0512 | 1 | -41,550 | 20050922 | AZBR53 |
| 64849 | HP0513 | 1 | -10,501 | 20050517 | AZBR6 |
| 55081 | HP0513 | 1 | -9,750 | 20050624 | AZBR53 |
| 64949 | HP0513 | 1 | -8,111 | 20050623 | AZBR53 |
| 64621 | HP0514 0 | 1 | -14,987.97 | 20050706 | AZBR53 |
| 37166 | HP0514 | 1 | -5,100 | 20050512 | AZBR53 |
| 56577 | HP0514 | 1 | -2,500 | 20050525 | AZBR53 |
| 42013 | HP0515 | 1 | -7,513 | 20050518 | AZBR53 |
| 62565 | HP05157 | 1 | 59,601.9 | 20050610 | AZBR6 |
| 62565 | HP05157 | 1 | -59,601.9 | 20050610 | AZBR6 |
| 43808 | HP0516 | 1 | -41,600 | 20051130 | AZBR64 |
| 60979 | HP0516 | 1 | -15,782.5 | 20050517 | AZBR6 |
| 64977 | HP05171 | 1 | -10,378 | 20050614 | AZBR6 |

CONFIDENTIAL

17,177.77*+
19,500.00 +
15,685.00 +
15,685.00 −
750.00 +
15,000.00 +
10,588.83 +
3,779.00 +
60,000.00 +
31,626.00 +
14,001.00 +
4,501.50 +
10,001.00 −
100,001.00 +
10,001.00 +
36,920.00 +
3,756.00 +
42,626.00 +
4,007.00 +
52,656.03 +
15,886.00 +
39,900.00 +
3,126.00 +
6,575.00 +
4,600.00 +
43,788.00 +
11,852.00 +
16,500.00 +
36,552.00 +
33,342.00 +
23,666.24 +
41,550.00 +
10,501.00 +
9,750.00 +
8,111.00 +
14,987.97 +
5,100.00 +
2,500.00 +
7,513.00 +
59,601.90 +
59,601.90 −
41,600.00 +
15,732.50 +
10,378.00 +

040

820,450.89 *

AIG000195

| | | | | | |
|---|---|---|---|---|---|
| 64471 | HP0517 2 | 1 | -13,100.05 | 20050527 | AZBR60 |
| 65508 | HP9820 | 1 | -730 | 20030729 | AZBR2 |
| 65607 | HP9938 | 1 | -100 | 20030114 | AZBR39 |
| 59056 | HT0002 | 1 | -8,000 | 20030826 | TXBR4 |
| 42088 | H00100 | 1 | -18,500 | 20031208 | CLAIM18 |
| 42095 | H00100 2 | 1 | -17,845.75 | 20030205 | CLAIM2 |
| 41699 | H001174 | 1 | -2,500 | 20041117 | AZBR2 |
| 42160 | H00205 | 1 | -58,500 | 20040407 | NJBR15 |
| 44916 | H00301 | 1 | -40,711 | 20040204 | CABR12 |
| 44933 | H00302 | 1 | -3,500 | 20030707 | CABR12 |
| 39879 | H00307 5 | 1 | -77,210.03 | 20031121 | CABR12 |
| 40778 | H00309 | 1 | -15,000 | 20040609 | CLAIM2 |
| 39890 | H003114 | 1 | -41,777.99 | 20030709 | CABR12 |
| 51664 | H01300 | 1 | -18,000 | 20040204 | CLAIM2 |
| 52639 | H01300 | 1 | -58,500 | 20031107 | CLAIM2 |
| 40082 | H013015 | 1 | -87,500 | 20030620 | CABR12 |
| 42227 | H01503 | 1 | -21,250 | 20030311 | NJBR15 |
| 52034 | H01702 2 | 1 | -13,860.87 | 20030428 | ILBR7 |
| 1567 | H019013 | 1 | -37,910 | 20030205 | CLAIM2 |
| 1567 | H019013 | 1 | -1,241 | 20030812 | CLAIM2 |
| 1567 | H019013 | 1 | -178.5 | 20040630 | CLAIM2 |
| 1567 | H019013 | 1 | -9,661.31 | 20050225 | CLAIM2 |
| 1567 | H019013 | 1 | -127.5 | 20050812 | CLAIM2 |
| 7657 | H01907 3 | 1 | -161,669.26 | 20031029 | CLAIM2 |
| 51413 | H02100 8 | 1 | -36,787.87 | 20030127 | TXBR4 |
| 51423 | H021021 | 1 | 16,521.7 | 20050120 | CLAIM2 |
| 51425 | H02102 | 1 | - | 20030205 | TXBR4 |
| 51425 | H02102 | 1 | -19,333 | 20040114 | TXBR4 |
| 51427 | H02102 5 | 1 | 25,904.97 | 20050324 | TXBR4 |
| 51526 | H021031 | 1 | - | 20051025 | CLAIM18 |
| 39451 | H02301 | 1 | -77,777 | 20030624 | CABR12 |
| 39895 | H02302 2 | 1 | 21,463.1 | 20040601 | CABR12 |
| 51711 | H02302 6 | 1 | 105,688.87 | 20030519 | CABR12 |
| 51711 | H02302 | 1 | -84,551.1 | 20030814 | CLAIM15 |
| 43394 | H024011 | 1 | -5,000 | 20030130 | NJBR15 |
| 43414 | H02402 | 1 | -306.31 | 20040212 | CLAIM15 |

Right-hand adding-machine column:

```
13,100.05*
   730.00 +
   100.00 +
 8,000.00 +
18,500.00 +
17,845.75 +
 2,500.00 +
58,500.00 +
40,711.00 +
 3,500.00 +
77,210.03 +
15,000.00 +
41,777.99 +
18,000.00 +
58,500.00 +
87,500.00 +
21,250.00 +
13,860.87 +
37,910.00 +
 1,241.00 +
   178.50 +
 9,661.31 +
   127.50 +
161,669.26 +
36,767.87 +
16,521.70 +
19,333.00 +
25,904.97 +
77,777.00 +
21,463.10 +
105,688.87 +
84,551.10 +
 5,000.00 +
   306.31 +
034
1,100,707.18 *
```

**CONFIDENTIAL**

AIG000196

| | | | | | |
|---|---|---|---|---|---|
| 52194 | H02501 | 1 | -9,775 | 20050119 | ILBR7 |
| 7707 | H02903 | 1 | -87,650 | 20030218 | CLAIM20 |
| 51539 | H03100 2 | 1 | -110,755. 2 | 20050314 | CLAIM18 |
| 51452 | H03100 3 | 1 | -49,806.9 7 | 20050324 | TXBR4 |
| 51452 | H03100 3 | 1 | 49,806.9 7 | 20050517 | DP1 |
| 51452 | H03100 3 | 1 | -49,806.9 7 | 20050517 | DP1 |
| 51647 | H031017 | 1 | -173.53 | 20040714 | CLAIM20 |
| 51647 | H031017 | 1 | 7,500 | 20050622 | CLAIM20 |
| 51647 | H031017 | 1 | -7,500 | 20050622 | CLAIM20 |
| 51647 | H031017 | 1 | -7,500 | 20050622 | CLAIM20 |
| 51765 | H03102 | 1 | -63,177.5 | 20041108 | CLAIM2 |
| 41452 | H03200 | 1 | -5,821 | 20030530 | ILBR7 |
| 41452 | H03200 | 1 | -100 | 20030603 | ILBR7 |
| 51716 | H03300 | 1 | -72,000 | 20031014 | CABR12 |
| 51716 | H03300 | 1 | -50,400 | 20031028 | CLAIM15 |
| 51717 | H03301 | 1 | -56,766 | 20040209 | CABR12 |
| 51717 | H03301 | 1 | - | 20040330 | CLAIM15 |
| 51575 | H03302 | 1 | -4,375 | 20040701 | CLAIM15 |
| 51752 | H03304 | 1 | -2,502.5 | 20040827 | CLAIM2 |
| 37084 | H03401 | 1 | -12,676 | 20040409 | TXBR4 |
| 51550 | H03402 | 1 | -6,933.6 | 20050922 | CLAIM18 |
| 51472 | H03402 | 1 | -103,869 | 20041018 | CLAIM2 |
| 37085 | H03403 | 1 | -3,112 | 20040824 | CLAIM18 |
| 51646 | H03900 | 1 | -311,113 | 20030717 | NJBR15 |
| 7739 | H03901 5 | 1 | -147,092. 6 | 20031027 | CLAIM2 |
| 7726 | H03902 | 1 | -20,000 | 20040909 | CLAIM15 |
| 509 | H03902 | 1 | -3,000 | 20030812 | CLAIM2 |
| 13768 | H03904 | 1 | -300 | 20040324 | CLAIM18 |
| 51591 | H04100 | 1 | -13,020 | 20050202 | CLAIM15 |
| 51592 | H041016 | 1 | -46,184 | 20050923 | CLAIM20 |
| 51592 | H04101 | 1 | -125,000 | 20050121 | CLAIM15 |
| 51592 | H04102 3 | 1 | -38,555.5 5 | 20051019 | CLAIM20 |
| 51566 | H04203 1 | 1 | -38,111.11 | 20050425 | CLAIM18 |
| 51566 | H04203 1 | 1 | -16,333.3 | 20050429 | DP1 |
| 51578 | H04300 | 1 | -10,160.1 | 20041008 | TXBR4 |
| 51718 | H04300 | 1 | -165,000 | 20040512 | CLAIM2 |
| 51782 | H04301 | 1 | -15,750 | 20050714 | CLAIM2 |
| 51810 | H04302 3 | 1 | -61,176.15 | 20050601 | CABR12 |
| 51589 | H04302 | 1 | -27,666 | 20050315 | TXBR4 |
| 51589 | H04302 | 1 | -15,216.3 | 20050315 | TXBR4 |

```
          0·00  *
      9,775·00 *+
     87,650·00  +
    110,755·20  +
     49,806·97  +
     49,806·97  -
     49,806·97  +
        173·53  +
      7,500·00  +
      7,500·00  -
      7,500·00  +
     63,177·50  +
      5,821·00  +
        100·00  +
     72,000·00  +
     50,400·00  +
     56,766·00  +
      4,375·00  +
      2,502·50  +
     12,676·00  +
      6,933·60  +
    103,869·00  +
      3,112·00  +
    311,113·00  +
    147,092·60  +
     20,000·00  +
      3,000·00  +
        300·00  +
     13,020·00  +
     46,184·00  +
    125,000·00  +
     38,555·55  +
     38,111·11  +
     16,333·30  +
     10,160·10  +
    165,000·00  +
     15,750·00  +
     61,176·15  +
     27,666·00  +
     15,216·30  +
035
  1,701,071·41  *
```

CONFIDENTIAL

AIG000197

| | | | | | |
|---|---|---|---|---|---|
| 51743 | H043054 | 1 | 117,772.25 | 20050329 | CABR12 |
| 51875 | H04404 | 1 | -277 | 20050406 | CLAIM18 |
| 51495 | H047005 | 1 | 151,323.36 | 20040722 | CLAIM2 |
| 37078 | H047014 | 1 | 136,639.03 | 20040929 | CABR12 |
| 52317 | H05300 | 1 | -471,626 | 20050906 | CABR12 |
| 6015 | H19000 | 1 | -100 | 20030224 | CLAIM15 |
| 39870 | H973113 | 1 | -47,502.75 | 20040519 | CLAIM15 |
| 45073 | H977012 | 1 | - | 20030205 | CLAIM2 |
| 45073 | H977012 | 1 | -3,823.3 | 20031107 | CLAIM2 |
| 45073 | H977012 | 1 | - | 20040630 | CLAIM2 |
| 40678 | H98814 | 1 | 31,333.11 | 20050418 | TXBR4 |
| 40678 | H988144 | 1 | -31,333.11 | 20050418 | TXBR4 |
| 40678 | H988144 | 1 | -31,333.11 | 20050418 | TXBR4 |
| 42058 | H99108 | 1 | -10,000 | 20030121 | CLAIM18 |
| 56362 | LG04071 | 1 | -10,626 | 20040907 | AZBR53 |
| 63320 | LG04107 | 1 | 14,260.85 | 20050125 | AZBR53 |
| 41397 | LG0443 | 1 | -200 | 20050624 | AZBR53 |
| 21628 | LP0230 | 1 | -33,676 | 20030702 | ILBR7 |
| 63863 | LP02505 | 1 | -10,552 | 20030821 | AZBR2 |
| 54993 | LP0305 | 1 | -571.16 | 20041110 | CLAIM20 |
| 56264 | LP0348 | 1 | -43,876 | 20040302 | AZBR53 |
| 63277 | LP03566 | 1 | -9,676 | 20040205 | AZBR53 |
| 63324 | LP04259 | 1 | -7,169 | 20051004 | CLAIM20 |
| 48715 | LP0429 | 1 | -70 | 20041005 | AZBR2 |
| 56707 | LP0504 | 1 | -36,552 | 20050610 | AZBR53 |
| 52656 | L003155 | 1 | -500 | 20041022 | CLAIM4 |
| 41024 | L014172 | 1 | -5,100 | 20030812 | CLAIM2 |
| 29968 | L021028 | 1 | -7,115.16 | 20030530 | CLAIM18 |
| 51325 | L023057 | 1 | -10,000 | 20051019 | CLAIM13 |
| 1778 | L039281 | 1 | -321.9 | 20031028 | CLAIM18 |
| 52396 | L041007 | 1 | -2,500 | 20050121 | CLAIM20 |
| 23767 | L04402 | 1 | - | 20050329 | CLAIM18 |
| 23768 | L04403 | 1 | 24,463.8 | 20050330 | CLAIM18 |
| 51614 | L05300 | 1 | -2,485 | 20050414 | CLAIM2 |
| 6110 | L20004 | 1 | -690.6 | 20030612 | CLAIM15 |
| 6110 | L20004 | 1 | -905 | 20030612 | CLAIM15 |
| 48888 | SH9800 | 1 | -71,600 | 20041111 | CLAIM20 |
| 66024 | 000001 | 1 | -7,488 | 20050517 | AZBR6 |
| 66031 | 0000017 | 1 | -307 | 20050517 | AZBR6 |
| 66054 | 000004 | 1 | -11,750 | 20050728 | AZBR53 |
| 66054 | 000004 | 1 | -24,281 | 20051104 | AZBR53 |
| 66060 | 000005 | 1 | - | 20050610 | AZBR60 |
| 66061 | 000005 | 1 | -16,100 | 20050623 | AZBR53 |
| 66077 | 000007 | 1 | -18,260 | 20051130 | AZBR64 |

O·*C

117,772.25*+
277.00 +
151,323.36 +
136,639.03 +
471,626.00 +
100.00 +
47,502.75 +
3,823.30 +
31,333.11 -
31,333.11 +
31,333.11 +
10,000.00 +
10,626.00 +
14,260.85 +
200.00 +
33,676.00 +
10,552.00 +
571.16 +
43,876.00 +
9,676.00 +
7,169.00 +
70.00 +
36,552.00 +
500.00 +
5,100.00 +
7,115.16 +
10,000.00 +
321.90 +
2,500.00 +
24,463.80 +
2,485.00 +
690.60 +
905.00 +
71,600.00 +
11,750.00 +
24,281.00 +
16,100.00 +
18,260.00 +

038

1,341,493.27 *

CONFIDENTIAL

AIG000198

| | | | | | |
|---|---|---|---|---|---|
| 66080 | 000007 | 1 | -10,326 | 20051020 | AZBR53 |
| 66086 | 000008 | 1 | -28,500 | 20050831 | AZBR6 |
| 66093 | 000009 | 1 | -28,666 | 20051010 | AZBR53 |
| 66138 | 0000144 | 1 | 12,377.77 | 20050629 | AZBR6 |
| 66138 | 0000144 | 1 | -12,377.77 | 20050705 | AZBR53 |
| 66141 | 0000150 | 1 | -6,676 | 20050915 | AZBR6 |
| 66143 | 0000152 | 1 | -10,601 | 20050623 | AZBR6 |
| 66174 | 0000177 | 1 | -6,810 | 20050706 | AZBR53 |
| 66054 | 0000193 | 1 | -25,560 | 20050815 | AZBR53 |
| 66200 | 000020 | 1 | -18,676 | 20050818 | AZBR53 |
| 66202 | 0000210 | 1 | -46,666 | 20050728 | AZBR53 |
| 66235 | 000025 | 1 | -11,150 | 20050630 | AZBR6 |
| 66238 | 000025 | 1 | -500 | 20050908 | AZBR53 |
| 66243 | 000026 | 1 | -2,770 | 20050527 | AZBR60 |
| 66256 | 000027 | 1 | 18,326 | 20051010 | TXBR4 |
| 66256 | 000027 | 1 | -18,326 | 20051010 | TXBR4 |
| 66256 | 000027 | 1 | -18,326 | 20051010 | TXBR4 |
| 66261 | 000028 | 1 | -42,500 | 20050719 | AZBR53 |
| 66284 | 000030 | 1 | -47,511 | 20050825 | AZBR53 |
| 66314 | 000033 | 1 | -8,999 | 20050617 | AZBR53 |
| 66315 | 000033 | 1 | -9,676 | 20050804 | AZBR53 |
| 66324 | 000034 | 1 | -8,256 | 20050922 | AZBR53 |
| 66325 | 000034 | 1 | -6,781 | 20051130 | AZBR53 |
| 66335 | 000035 | 1 | -17,376 | 20050922 | AZBR53 |
| 66362 | 000038 | 1 | -68,475 | 20050922 | AZBR53 |
| 66383 | 000041 | 1 | -12,651 | 20050623 | AZBR6 |
| 66404 | 000043 | 1 | -2,001 | 20051216 | AZBR64 |
| 66456 | 000049 | 1 | -7,376 | 20050816 | AZBR53 |
| 66458 | 0000501 | 1 | -12,757.5 | 20050922 | AZBR53 |
| 66508 | 000056 | 1 | -18,255 | 20050831 | AZBR6 |
| 66520 | 0000575 | 1 | -27,256 | 20051019 | AZBR53 |
| 66527 | 000058 | 1 | -7,226 | 20050720 | AZBR53 |
| 66531 | 000058 | 1 | -26,742 | 20050830 | AZBR53 |
| 66545 | 000060 | 1 | -12,210 | 20050630 | AZBR6 |
| 66545 | 000060 | 1 | -12,210 | 20050630 | AZBR6 |
| 66550 | 000060 | 1 | -24,900 | 20051028 | AZBR53 |
| 66555 | 000061 | 1 | -3,756 | 20051004 | AZBR53 |
| 66556 | 0000613 | 1 | -6,560 | 20050720 | AZBR53 |
| 66561 | 0000618 | 1 | -25,501.1 | 20050922 | AZBR53 |
| 66575 | 000063 | 1 | -7,856 | 20051019 | AZBR53 |
| 66578 | 000063 | 1 | -7,256 | 20051021 | AZBR53 |
| 66595 | 0000657 | 1 | -26,300 | 20051110 | AZBR53 |
| 66610 | 000067 | 1 | -20,179 | 20050819 | AZBR53 |
| 66646 | 0000710 | 1 | -12,256 | 20051209 | AZBR64 |
| 66652 | 0000716 | 1 | -13,660 | 20050829 | AZBR53 |
| 66656 | 000072 | 1 | -3,119 | 20050916 | AZBR53 |
| 66665 | 000073 | 1 | -15,000 | 20050722 | AZBR53 |
| 66688 | 000076 | 1 | -15,601 | 20050816 | AZBR53 |
| 66705 | 0000781 | 1 | -6,620 | 20051004 | ILBR7 |
| 66707 | 000078 | 1 | -6,801 | 20050816 | AZBR53 |
| 66718 | 0000797 | 1 | -4,176 | 20051206 | AZBR64 |
| 66719 | 000079 | 1 | -2,675 | 20050816 | AZBR53 |
| 66722 | 000080 | 1 | -47,700 | 20050825 | AZBR53 |

```
10,326.00 *+
28,500.00  +
28,666.00  +
12,377.77  +
12,377.77  -
 6,676.00  +
10,601.00  +
 6,810.00  +
25,560.00  +
18,676.00  +
46,666.00  +
11,150.00  +
   500.00  +
 2,770.00  +
18,326.00  -
18,326.00  +
18,326.00  +
42,500.00  +
47,511.00  +
 8,999.00  +
 9,676.00  +
 8,256.00  +
 6,781.00  +
17,376.00  +
68,475.00  +
12,651.00  +
 2,001.00  +
 7,376.00  +
12,757.50  +
18,255.00  +
27,256.00  +
 7,226.00  +
26,742.00  +
12,210.00  +
12,210.00  +
24,900.00  +
 3,756.00  +
 6,560.00  +
25,501.10  +
 7,856.00  +
 7,256.00  +
26,300.00  +
20,179.00  +
12,256.00  +
13,660.00  +
 3,119.00  +
15,000.00  +
15,601.00  +
 6,620.00  +
 6,801.00  +
 4,176.00  +
 2,675.00  +
47,700.00  +

049

813,401.60  *
```

CONFIDENTIAL

AIG000199

| | | | | | |
|---|---|---|---|---|---|
| 66723 | 000080 | 1 | -7,225 | 20051011 | AZBR53 |
| 66744 | 0000831 | 1 | -13,400 | 20050811 | AZBR53 |
| 66749 | 000083 | 1 | -31,467.5 | 20050816 | AZBR53 |
| 66759 | 000084 | 1 | -8,378 | 20051005 | AZBR53 |
| 66761 | 0000851 | 1 | -8,250 | 20050802 | AZBR53 |
| 66780 | 000087 | 1 | -4,888 | 20050801 | AZBR53 |
| 66819 | 0000918 | 1 | - | 20051121 | AZBR53 |
| 66837 | 000093 | 1 | -2,400 | 20050829 | AZBR53 |
| 66801 | 000094 | 1 | -2,900 | 20051121 | AZBR53 |
| 66867 | 000097 | 1 | -5,256 | 20050816 | AZBR53 |
| 66872 | 0000977 | 1 | -5,100 | 20051121 | AZBR53 |
| 66931 | 0001041 | 1 | -7,676 | 20051103 | AZBR53 |
| 66964 | 0001083 | 1 | -14,726 | 20050908 | AZBR53 |
| 66966 | 0001085 | 1 | -10,596 | 20050916 | AZBR6 |
| 66968 | 0001087 | 1 | -25,250 | 20050819 | AZBR53 |
| 66975 | 0001095 | 1 | -46,001 | 20050803 | AZBR53 |
| 66978 | 0001098 | 1 | -22,150 | 20051028 | AZBR53 |
| 66982 | 0001102 | 1 | -850 | 20051010 | AZBR53 |
| 66993 | 0001115 | 1 | -18,510 | 20050922 | AZBR53 |
| 66996 | 0001118 | 1 | -14,000 | 20050927 | AZBR53 |
| 67002 | 0001124 | 1 | -9,225 | 20051209 | TXBR4 |
| 67014 | 0001137 | 1 | -11,770 | 20050915 | AZBR6 |
| 67018 | 0001141 | 1 | -6,775 | 20050916 | AZBR6 |
| 67034 | 0001157 | 1 | -25,550 | 20051123 | AZBR64 |
| 67035 | 0001158 | 1 | -24,256 | 20051028 | AZBR53 |
| 67036 | 0001159 | 1 | -200 | 20050928 | AZBR53 |
| 67063 | 0001192 | 1 | -23,212 | 20051117 | AZBR64 |
| 67079 | 0001211 | 1 | -10,100 | 20050922 | AZBR53 |
| 67096 | 0001230 | 1 | -6,875 | 20051108 | AZBR53 |
| 67153 | 0001288 | 1 | -7,777 | 20051121 | AZBR53 |
| 67156 | 0001291 | 1 | -124,275.88 | 20050825 | CLAIM18 |
| 67159 | 0001295 | 1 | -14,251.5 | 20050922 | AZBR53 |
| 67160 | 0001296 | 1 | -22,575 | 20051104 | AZBR53 |
| 67167 | 0001304 | 1 | -25,888.88 | 20051013 | AZBR53 |
| 67189 | 0001328 | 1 | -7,256 | 20051019 | AZBR53 |
| 67218 | 0001360 | 1 | 1,680 | 20050922 | AZBR53 |
| 67218 | 0001360 | 1 | -1,680 | 20050922 | AZBR53 |
| 67804 | 0001397 | 1 | -10,700 | 20050922 | AZBR53 |
| 67841 | 0001441 | 1 | -10,112 | 20050922 | AZBR53 |
| 67857 | 0001460 | 1 | 14,500 | 20051121 | CABR12 |
| 67857 | 0001460 | 1 | -14,500 | 20051206 | CABR12 |
| 67885 | 0001493 | 1 | -13,300 | 20051202 | AZBR64 |
| 67929 | 0001549 | 1 | -7,510.5 | 20051021 | AZBR53 |
| 67933 | 0001553 | 1 | -27,200 | 20051116 | AZBR64 |
| 67945 | 0001567 | 1 | -7,310 | 20051108 | AZBR53 |
| 67985 | 0001610 | 1 | -3,999 | 20051121 | AZBR53 |
| 67994 | 0001619 | 1 | -11,200 | 20051005 | AZBR53 |
| 68013 | 0001641 | 1 | -26,676 | 20051206 | AZBR64 |
| 68036 | 0001666 | 1 | -3,927 | 20051005 | AZBR53 |
| 68055 | 0001693 | 1 | -1,500 | 20051216 | AZBR64 |
| 68058 | 0001697 | 1 | -8,001 | 20051118 | AZBR64 |
| 68059 | 0001698 | 1 | -11,376 | 20051021 | AZBR53 |

7,225·00 *+
13,400·00 +
31,467·50 +
8,378·00 +
8,250·00 +
4,888·00 +
2,400·00 +
2,900·00 +
5,256·00 +
5,100·00 +
7,676·00 +
14,726·00 +
10,596·00 +
25,250·00 +
46,001·00 +
22,150·00 +
850·00 +
18,510·00 +
14,000·00 +
9,225·00 +
11,770·00 +
6,775·00 +
25,550·00 +
24,256·00 +
200·00 +
23,212·00 +
10,100·00 +
6,375·00 +
7,777·00 +
124,275·88 +
14,251·50 +
22,575·00 +
25,888·88 +
7,256·00 +
1,680·00 −
1,680·00 +
10,700·00 +
10,112·00 +
14,500·00 −
14,500·00 +
13,300·00 +
7,510·50 +
27,200·00 +
7,310·00 +
3,999·00 +
11,200·00 +
26,676·00 +
3,927·00 +
1,500·00 +
8,001·00 +
11,376·00 +

047

711,822·26 *

CONFIDENTIAL

AIG000200

| | | | | | |
|---|---|---|---|---|---|
| 68062 | 0001701 | 1 | -2,789 | 20050923 | AZBR53 |
| 68065 | 0001705 | 1 | -22,825 | 20051121 | AZBR53 |
| 68086 | 0001728 | 1 | -37,550 | 20051118 | AZBR64 |
| 68094 | 0001737 | 1 | -30,100 | 20051116 | AZBR64 |
| 68116 | 0001760 | 1 | -12,345.67 | 20051020 | AZBR53 |
| 68123 | 0001767 | 1 | -23,671.87 | 20051216 | AZBR64 |
| 68127 | 0001772 | 1 | - | 20050922 | AZBR53 |
| 68141 | 0001789 | 1 | -16,251 | 20051123 | AZBR64 |
| 68195 | 0001847 | 1 | -13,777 | 20051109 | AZBR53 |
| 68223 | 0001879 | 1 | -5,210 | 20051214 | AZBR64 |
| 68242 | 0001905 | 1 | -8,888 | 20050916 | AZBR6 |
| 68525 | 0001968 | 1 | -4,300 | 20051202 | AZBR64 |
| 68558 | 0002001 | 1 | -11,787 | 20051205 | AZBR64 |
| 68569 | 0002014 | 1 | -6,700 | 20051121 | AZBR53 |
| 68574 | 0002019 | 1 | -18,900 | 20051205 | AZBR64 |
| 68580 | 000202 | 1 | -14,200 | 20051115 | AZBR64 |
| 68587 | 000203 | 1 | -2,389 | 20051201 | AZBR64 |
| 68601 | 000205 | 1 | -36,878 | 20051216 | AZBR64 |
| 68610 | 000206 | 1 | -5,252 | 20051028 | AZBR53 |
| 68656 | 0002121 | 1 | -5,334 | 20051020 | AZBR53 |
| 68667 | 0002132 | 1 | -31,630 | 20051207 | AZBR53 |
| 68694 | 0002164 | 1 | -28,500 | 20051121 | AZBR53 |
| 68742 | 0002223 | 1 | -9,389 | 20051104 | AZBR53 |
| 68748 | 000222 | 1 | -12,500 | 20051118 | AZBR64 |
| 68781 | 000228 | 1 | -6,825 | 20051205 | AZBR64 |
| 68811 | 0002322 | 1 | -6,362.5 | 20051115 | AZBR64 |
| 68820 | 0002331 | 1 | -58,500 | 20051111 | AZBR53 |
| 68915 | 000245 | 1 | -1,295.15 | 20051121 | AZBR53 |
| 69109 | 0002507 | 1 | -6,787 | 20051205 | AZBR64 |
| 69114 | 0002512 | 1 | -9,150 | 20051219 | AZBR64 |
| 69126 | 000252 | 1 | -37,676 | 20051114 | AZBR53 |
| 69166 | 0002571 | 1 | -22,780 | 20051206 | AZBR64 |
| 69169 | 0002574 | 1 | -31,676 | 20051110 | AZBR53 |
| 69190 | 0002599 | 1 | -10,100 | 20051206 | AZBR53 |
| 69208 | 0002618 | 1 | -3,825 | 20051214 | CLAIM18 |
| 69209 | 0002619 | 1 | -28,280 | 20051108 | AZBR53 |
| 69214 | 000262 | 1 | -6,376 | 20051206 | AZBR64 |
| 69215 | 0002625 | 1 | -14,200 | 20051115 | AZBR53 |
| 69216 | 000262 | 1 | -5,500 | 20051205 | AZBR64 |
| 69228 | 000264 | 1 | -5,100 | 20051212 | AZBR53 |
| 69231 | 000264 | 1 | -7,850 | 20051123 | AZBR64 |
| 69232 | 000264 | 1 | -32,900 | 20051202 | AZBR64 |
| 69236 | 000264 | 1 | -13,200 | 20051206 | AZBR53 |
| 69240 | 0002652 | 1 | -14,981 | 20051206 | AZBR53 |
| 69242 | 0002654 | 1 | -5,050 | 20051215 | AZBR64 |
| 69244 | 0002656 | 1 | -8,600 | 20051110 | AZBR53 |
| 69257 | 000267 | 1 | -17,001 | 20051129 | ILBR7 |
| 69266 | 000268 | 1 | -86,200 | 20051215 | CABR12 |
| 69273 | 0002687 | 2 | 100 | 20051117 | ILBR7 |
| 69273 | 0002687 | 1 | -3,177.77 | 20051129 | ILBR7 |
| 69273 | 0002687 | 2 | -100 | 20051207 | ILBR7 |

2,739·00*+
22,825·00 +
37,550·00 +
30,100·00 +
12,345·67 +
23,671·87 +
16,251·00 +
13,777·00 +
5,210·00 +
8,888·00 +
4,300·00 +
11,787·00 +
6,700·00 +
18,900·00 +
14,200·00 +
2,389·00 +
36,878·00 +
5,252·00 +
5,334·00 +
31,630·00 +
28,500·00 +
9,389·00 +
12,500·00 +
6,825·00 +
6,362·50 +
58,500·00 +
1,295·15 +
6,787·00 +
9,150·00 +
37,676·00 +
22,780·00 +
31,676·00 +
10,100·00 +
3,825·00 +
28,280·00 +
5,500·00 +
5,100·00 +
7,850·00 +
32,900·00 +
13,200·00 +
14,981·00 +
5,050·00 +
8,600·00 +
17,001·00 +
86,200·00 +
100·00 -
3,177·77 +
100·00 +

050

804,553·96 *

CONFIDENTIAL

AIG000201

| | | | | | |
|---|---|---|---|---|---|
| 69280 | 000269 | 1 | -5,000 | 20051208 | AZBR64 |
| 69280 | 000269 | 1 | -0,02 | 20051228 | AZBR53 |
| 69284 | 000269 | 1 | -11,009 | 20051227 | AZBR64 |
| 69285 | 000269 | 1 | -4,000 | 20051208 | AZBR64 |
| 69286 | 000270 | 1 | -5,216 | 20051108 | AZBR53 |
| 69287 | 0002701 | 1 | -52,000 | 20051202 | AZBR64 |
| 69295 | 000270 | 1 | -26,700 | 20051103 | AZBR53 |
| 69298 | 0002712 | 1 | -8,800 | 20051123 | AZBR64 |
| 69306 | 000272 | 1 | -14,300 | 20051202 | AZBR64 |
| 69308 | 0002722 | 1 | -32,900 | 20051110 | AZBR53 |
| 69308 | 0002722 | 1 | -32,900 | 20051110 | AZBR53 |
| 69311 | 0002725 | 1 | -4,369 | 20051121 | AZBR53 |
| 69314 | 0002728 | 1 | -18,777 | 20051110 | AZBR53 |
| 69326 | 0002741 | 1 | -9,684 | 20051109 | AZBR53 |
| 69356 | 0002774 | 1 | -17,601 | 20051212 | AZBR53 |
| 69371 | 000279 | 1 | -23,885 | 20051108 | AZBR53 |
| 69401 | 000282 | 1 | -1,026 | 20051205 | AZBR64 |
| 69427 | 000285 | 1 | -12,100 | 20051206 | AZBR53 |
| 69435 | 0002861 | 1 | -4,529 | 20051219 | AZBR64 |
| 69442 | 000286 | 1 | -10,289 | 20051101 | AZBR53 |
| 69442 | 000286 | 1 | -10,289 | 20051109 | AZBR53 |
| 69500 | 0002931 | 1 | -776 | 20051221 | AZBR64 |
| 69709 | 0002951 | 1 | -8,211 | 20051207 | AZBR53 |
| 69712 | 0002954 | 1 | -10,001.05 | 20051212 | AZBR53 |
| 69716 | 000295 | 1 | -22,001 | 20051212 | AZBR53 |
| 69746 | 000298 | 1 | -5,500 | 20051227 | AZBR64 |
| 69751 | 000299 | 1 | -50,500 | 20051103 | AZBR53 |
| 69756 | 0003001 | 1 | -11,105 | 20051207 | AZBR53 |
| 69812 | 000306 | 1 | -14,388 | 20051205 | AZBR64 |
| 69815 | 000306 | 1 | -10,750 | 20051212 | AZBR53 |
| 69848 | 0003101 | 1 | -12,240 | 20051213 | AZBR53 |
| 69894 | 0003150 | 1 | -6,112 | 20051219 | AZBR64 |
| 70210 | 0003517 | 1 | -63,755 | 20051227 | AZBR64 |
| 70212 | 0003519 | 1 | -6,896 | 20051215 | AZBR64 |
| 70434 | 0003557 | 1 | -14,200 | 20051221 | AZBR64 |
| 70438 | 0003561 | 1 | -66,555 | 20051227 | AZBR53 |
| 70551 | 0003675 | 1 | -28,400 | 20051215 | AZBR64 |
| 70554 | 0003678 | 1 | -6,700 | 20051219 | AZBR64 |
| 70570 | 000369 | 1 | -10,400 | 20051219 | AZBR64 |

**AIG**

Home| Adjustor Dairy|
Adjustor File Notes|
Loss Experience

5,000·00 *+
0·02 +
11,009·00 +
4,000·00 +
5,216·00 +
52,000·00 +
26,700·00 +
8,800·00 +
14,300·00 +
32,900·00 +
32,900·00 +
4,369·00 +
18,777·00 +
9,684·00 +
17,601·00 +
23,885·00 +
1,026·00 +
12,100·00 +
4,529·00 +
10,289·00 +
10,289·00 +
776·00 +
8,211·00 +
10,001·05 +
22,001·00 +
5,500·00 +
50,500·00 +
11,105·00 +
14,388·00 +
10,750·00 +
12,240·00 +
6,112·00 +
63,755·00 +
6,896·00 +
14,200·00 +
66,555·00 +
28,400·00 +
6,700·00 +
10,400·00 +

039

653,864·07 *

**CONFIDENTIAL**

AIG000202